Exhibit 4

## Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

LANDON PERRY,         |
                      |
          Plaintiff,  |
                      | Civil Action No.
v.                    | 4:23-CV-04441
                      |
HALLIBURTON ENERGY    |
SERVICES, INC.,       |
                      |
          Defendant.  |

----------------------------------------
VIDEOTAPED ORAL DEPOSITION OF
PATRICK HAYES, MD
JANUARY 9, 2025
----------------------------------------
(REPORTED REMOTELY)

## Page 2

1     VIDEOTAPED ORAL DEPOSITION OF PATRICK
2  HAYES, MD, produced as a witness at the instance
3  of the DEFENDANT, and duly sworn, was taken in the
4  above-styled and numbered cause on the 9th day of
5  January, 2025, from 9:04 a.m. Central Time to
6  1:02 p.m. Central Time, before Christopher D. Reho,
7  CSR, RPR, in and for the State of Texas, reported
8  by a Texas certified machine shorthand reporter,
9  via Zoom video conference, pursuant to the Federal
10 Rules of Civil Procedure and the provisions stated
11 on the record herein.

## Page 3

1                      APPEARANCES
2              (All Appearing Via Videoconference)
3  FOR THE PLAINTIFF:
4          JOHN GRINNAN, ESQUIRE
           ARNOLD & ITKIN, LLP
5          6009 Memorial Drive
           Houston, Texas 77007
6          888-493-1629
           jgrinnan@arnolditkin.com
7
8  FOR THE DEFENDANT:
9          REY FLORES, ESQUIRE
           KEVIN LEYENDECKER, ESQUIRE
10         AHMAD, ZAVITSANOS, & MENSING, PLLC
           1221 McKinney Street, Suite 2500
11         Houston, Texas 77010
           713-655-1101
12         rflores@azalaw.com
           kleyendecker@azalaw.com
13
14 ALSO PRESENT:
15         TREY SOLIS, VIDEOGRAPHER
16
17
18
19
20
21
22
23
24
25

## Page 4

1                      INDEX
2                                         Page
3  Appearances                              3
4  PATRICK HAYES, MD
5    BY MR. FLORES                          5
6  Reporter's Certification               159
7
8                  EXHIBIT INDEX
9  No.                               Page
10  Exhibit 1 Chain of Emails (NO BATES NUMBER)  31
11  Exhibit 2 Email (from Access Healthcare      36
              Management to Elite Medical Wellness
              Lake Charles) (NO BATES NUMBER)
12
13  Exhibit 3 Invoice (NO BATES NUMBERS)         38
14  Exhibit 4 Lien and Receivables Purchase and  125
              Assignment Agreement (NO BATES
              NUMBERS)
15
16  Exhibit 5 Spreadsheets (NO BATES NUMBERS)    143
17  Exhibit 6 Excel Spreadsheets (NO BATES       147
              NUMBERS)
18  Exhibit 7 Chain of Emails dated June 26, 2024 152
              (NO BATES NUMBERS)
19
20
21            PREVIOUSLY MARKED EXHIBITS
22                   (None.)
23
24
25

PATRICK HAYES, MD - 1/9/2025

Page 5

```
 1        P R O C E E D I N G S
 2        THE VIDEOGRAPHER:  Today's date is January
 3   9th, 2025.  The time is approximately 9:04 a.m.  We
 4   are on the record.
 5        PATRICK HAYES, MD,
 6   having been first duly sworn, testified as follows:
 7        EXAMINATION
 8   BY MR. FLORES:
 9   Q.   Good morning, Dr. Hayes.
10   A.   Good morning, Mr. Flores.
11   Q.   So as I mentioned a minute ago, my name is
12   Rey Flores, and I represent Halliburton in this
13   case.  Do you understand who I am and who I
14   represent?
15   A.   Yes, sir.
16   Q.   Would you please state your name for the
17   record?
18   A.   It's Patrick Charles Hayes.
19   Q.   You're a medical doctor?
20   A.   I am an allopathic physician, or an MD, a
21   medical doctor.
22   Q.   Okay.  A psychiatrist?
23   A.   I'm a board certified psychiatrist by the
24   American Board of Psychiatry and Neurology and a
25   subspecialty board certified addictions medicine by
```

Page 6

```
 1   the American Board of Preventive Medicine.
 2   Q.   Where are you currently located?
 3   A.   Physically today or where do I practice?
 4   Q.   Where are you physically today?
 5   A.   I'm physically located at Elite Medical
 6   Wellness, 2802 Hodges Street, Lake Charles,
 7   Louisiana.
 8   Q.   Is that also where you practice?
 9   A.   It's one of my practice locations.  Yes,
10   sir.
11   Q.   What are your other practice locations?
12   A.   Through Elite, I have a Elite Medical
13   Wellness West, which is in Houston, in the northwest
14   portion of Houston Heights on TC Jester.  I have an
15   affiliate off site in Leesville who provides therapy
16   services.
17        I also work for the state of Louisiana.
18   I'm the medical director for Imperial Calcasieu
19   Human Services Authority, essentially the public
20   district for mental health, substance abuse, illness
21   and -- and intellectual disability in the five
22   parishes that are the heel of the boot.  I cover the
23   Calcasieu Correctional Center, the Calcasieu
24   Sheriff's Prison, the juvenile detention center.
25        Through Imperial Calcasieu, a nurse
```

Page 7

```
 1   practitioner and I cover the Cameron Parish Jail
 2   through a professional services contract with, I
 3   believe, three sections of the agency.  Another
 4   psychiatrist and nurse practitioner and I cover most
 5   of the intellectual disability group homes for CALA
 6   Normal Life (ph), BrightSpring, ResCare in southern
 7   Louisiana from the Texas border over to Hammond at
 8   this point.  Recently expanded that contract.
 9        And then through contracts with -- with
10   the industry, I work for, I believe, five
11   pharmaceutical companies, and I travel all over the
12   country presenting on novel medications.
13   Q.   Okay.  You gave us the address for Elite
14   Medical Wellness in Lake Charles, correct?
15   A.   That's correct.  Yes, sir.
16   Q.   Okay.  What is the address for your -- you
17   called it Elite Medical Wellness West; is that
18   right?
19   A.   That's correct.  Yes, sir.
20   Q.   And that's in Houston?
21   A.   That's correct.
22   Q.   And what is the address?
23   A.   It's 2500 East TC Jester, Suite 165.  I
24   believe the ZIP is 77003.
25   Q.   Do you have any -- any staff members or
```

Page 8

```
 1   associates who work there?
 2   A.   I do.
 3   Q.   And who are they?
 4   A.   I have Claire Gilchrist; she's a social
 5   worker.  I have a Katie Cerar; she's a licensed
 6   professional counselor.  I have two technical
 7   writers who assist with generating reports.  I have
 8   a clerical staff member.  And then -- one, two --
 9   two of my therapists in the agency are also licensed
10   in Texas, so they provide services to Texas
11   patients, will occasionally rotate through Elite
12   Medical Wellness West.  And -- I'm sorry.  Three of
13   them.  And then all of my nurse practitioners are
14   licensed in multiple states and will also provide
15   services through patients in Texas.  Those guys have
16   not yet rotated through West physically, but we're
17   about to expand that operation.
18   Q.   Okay.  So Claire Gilchrist was the social
19   worker, correct?
20   A.   That's correct.  Yes, sir.
21   Q.   What was the name of the second person you
22   mentioned?  Cerar or Cerar, something like that?
23   A.   Katie Cerar, C-E-R-A-R.
24   Q.   And what does she do again?
25   A.   She's a licensed professional counselor.
```

HANNA & HANNA, INC.
713.840.8484

PATRICK HAYES, MD - 1/9/2025

---

Page 9

1    She's also certified in eye movement desensitization
2    reprocessing therapy.
3        Q.    Okay.  You mentioned a couple -- excuse
4    me.  You mentioned a couple of technical writers,
5    correct?
6        A.    Correct.
7        Q.    And what kind of reports do they assist
8    with generating?
9        A.    For example, I'm sure we'll talk about
10   Mr. Perry's initial master report today.  That is
11   going to come from my manually recorded handwritten
12   records from the -- the date of his assessment.
13   It's going to come from the testing.
14            So what happens after -- for example, I
15   did some initial assessments yesterday, I will sit
16   with the patient.  I will generate the handwritten
17   report.  And then that goes to one of the technical
18   writers to transcribe my writing.  At which time, it
19   comes back to me to proof that they transcribed my
20   terrible writing accurately, and then they will take
21   the -- the testing results.  They don't interpret
22   the tests.  I interpret the tests, but they will
23   take the results and transcribe them onto the
24   report.
25       Q.    And what are those technical writers'

---

Page 10

1    names?
2        A.    There's Kaelyn Roche, R-O-C-H-E, and Chase
3    Martin, M-A-R-T-I-N.
4        Q.    Okay.  You mentioned some therapists who
5    rotate through; is that right?
6        A.    That's correct.  Yes, sir.
7        Q.    What are their names?
8        A.    That's Dene' Culton, C-U-L-T-O-N.  She's
9    an LPC.  I also --
10       Q.    Any others?
11       A.    Davis Woodward, W-O-O-D-W-A-R-D.  Dene'
12   does marital therapy as well.  Mr. Woodward sees
13   children, does marital therapy.  He's certified in
14   cognitive assessment, cognitive remediation.  I
15   believe he's certified in EMDR as well.
16           And then I have James Johnson, spelled as
17   you'd expect.  He focuses -- he's LPC as well.  He
18   tends to focus more on adults but also on cognition,
19   so he does a lot of cognitive assessment, cognitive
20   remediation.  He's certified as a CRT through the
21   ACRM, and then he's pursuing his brain injury
22   specialist certification as well.
23       Q.    Okay.  Any other therapists who rotate
24   through?
25       A.    Not covering the Texas group, no, sir.

---

Page 11

1        Q.    Okay.  You mentioned clinical staff member
2    or members; is that right?
3        A.    That's correct.  Yes, sir.
4        Q.    And who are they?
5        A.    So I have Andrea Barrera, B-A-R-R-E-R-A.
6    She is the Elite Medical Wellness West clinic
7    manager.  She's currently pursuing certification in
8    professional medical translation.
9            And then I have Caitlin McGroarty,
10   M-C-G-R-O-A-R-T-Y.  She is an LPC.  She's also the
11   Elite Medical Wellness overarching practice manager.
12   She rotates through the Texas clinic as well,
13   largely administratively, but she is also an LPC.
14   She's also certified in cognitive assessments and
15   cognitive remediation therapy.
16       Q.    Okay.  Anyone else who either works at or
17   rotates through Elite Medical Wellness West?
18       A.    No.  The nurse practitioners ultimately
19   will.  One of my -- I think he's my first nurse
20   practitioner, my longest contracted one, Henry
21   Johnson.  He's expressed interest in rotating
22   through there.  So at some point, he will.  He just
23   has not yet.
24       Q.    Okay.  How often do you see patients at
25   Elite Medical Wellness West in Houston?

---

Page 12

1        A.    Schedules are malleable.  My schedule is
2    chaos.  In addition to the work we discussed, we
3    didn't talk about the criminal forensic work, which
4    has me in jails, courtrooms, prisons throughout the
5    state on a -- on a regular basis.  And then the --
6    the speaking presentations have me all over the
7    country on an intermittent and a regular basis.  But
8    in general, the current schedule is that 10 days out
9    of the middle of every month are at Elite Medical
10   Wellness West.  So it's set to be the second Monday
11   through the third Wednesday of every month.
12       Q.    So about 10 days a month you're at Elite
13   Medical Wellness West?
14       A.    Yes, sir.  That's current schedule.
15       Q.    And that was -- say that again -- the
16   second Wednesday through when?
17       A.    Second Monday through third Wednesday.
18       Q.    Second Monday through third Wednesday in
19   Houston, correct?
20       A.    That's correct.
21       Q.    Okay.  How often do you see patients at
22   Elite Medical Wellness in Lake Charles?
23       A.    Oh, essentially every day.
24       Q.    Whenever you're not in Houston or
25   traveling?

HANNA & HANNA, INC.
713.840.8484

PATRICK HAYES, MD - 1/9/2025

Page 13

1    A.   Correct.
2    Q.   When did you set up Elite Medical Wellness
3    in Lake Charles?
4    A.   I believe 2013.
5    Q.   Okay.  You mentioned an affiliate.  What
6    did you mean by your affiliate?
7    A.   I was in the Army for 12 years, and I was
8    stationed at Fort Polk, which is now Fort Johnson,
9    in the center of Louisiana.  It's about 75 miles
10   north of Lake Charles.  And one of the providers who
11   worked for me was Kimberly Simms.  She's a marital
12   family therapist and an LPC.
13        And after I got out of the Army in 2012, I
14   started working in the civilian sector, and I've
15   stayed in touch with Kim over the years.  And about
16   five, eight years ago, she -- she was looking for
17   some additional work, and I had the opportunity for
18   some coverage in that part of the country.  It's a
19   little bit more difficult to get in-person visits in
20   -- in 90 miles north of here.  It's not near any big
21   cities.  So she has her own clinic, but she sees
22   patients for Elite Medical Wellness through her
23   clinic, so she's an affiliate.
24   Q.   Do you know the name of her clinic?
25   A.   I would have to look.  It's something like

Page 14

1    West Central Louisiana Counseling Solutions.
2    Q.   Okay.  You mentioned work for
3    pharmaceutical companies; is that right?
4    A.   Yes, sir.
5    Q.   Can you describe that work please?
6    A.   Yes, sir.  So as recently -- the most
7    recent one I added was Bristol Myers Squibb.
8    There's the first novel schizophrenia-reducing
9    medication in nearly a century has just come out, so
10   I am on the speaker bureau.  I explain that
11   medication and indications to other providers.  I
12   speak for Neurocrine Pharmaceuticals on a movement
13   disorder medication, Ingrezza, which can antidote a
14   type of brain damage called tardive dyskinesia that
15   can come from long-term management with
16   antipsychotic medications.
17        I work for Alkermes.  That's the first one
18   and the one I've longest worked for.  I believe
19   that's been about 10 years.  Alkermes, while it was
20   still promoting Aristada.  It's a long-acting
21   injection antipsychotic.  I would do so clinically.
22   And then I was initially one of two, and then, I
23   believe, at the end, I was the only guy nationally
24   presenting on that compound in corrections.  So I
25   presented at the National Correctional Health Care

Page 15

1    Association, the National Sheriffs' Association,
2    just explaining to correctional leadership how basal
3    fire suppression with a long-acting antipsychotic
4    can help keep individuals from being reincarcerated
5    or being aggressive while they're incarcerated.
6        I speak for Teva Pharmaceuticals on a long
7    -- ultra long-acting antipsychotic injection Uzedy.
8        I speak for AXIM Pharmaceuticals on the
9    newest antidepressant that's come out, Auvelity.
10   Q.   Okay.  Any other pharmaceutical companies?
11   A.   I don't think so.  If you were to -- I
12   think we caused the CV to be sent to you earlier.
13   If you were to find another one on there, it
14   wouldn't surprise me.  But offhand, not that I can
15   think of right now.
16   Q.   All right.  Well, let's go through those
17   because I was trying to take notes as you were
18   describing them.
19        Bristol Myers was the first one?
20   A.   Bristol Myers Squibb, yes, sir.
21   Q.   And what medication do you speak on with
22   -- with regard to them?
23   A.   That's Cobenfy.
24   Q.   How do you spell that?
25   A.   C-O-B-E-N-F-Y.

Page 16

1    Q.   Cobenfy?
2    A.   Correct.
3    Q.   And --
4    A.   Xanomeline -- xanomeline/trospium, but I
5    figured that would be more of a mouthful.
6    Q.   Okay.  You said it's the first novel
7    schizophrenic medication in a while?
8    A.   Yeah.  In pretty close to 100 years.  So
9    the -- the first antipsychotic that came out was in
10   the early 1900s.  It was actually a neuroleptic for
11   anesthesia, and nobody has changed the dopamine
12   modulation until Cobenfy came out.  Actually sat
13   with the inventor of it at the -- the training a
14   couple of months ago.  It's a muscarinic receptor
15   modulator, so it avoids some of those other problems
16   like we discussed, the tardive dyskinesia.  It will
17   not cause tardive dyskinesia because it doesn't
18   operate through that mechanism.
19   Q.   Any other medications you discussed that
20   relate to Bristol Myers?
21   A.   No.  That's the only one for them.
22   Q.   Okay.  American Pharmaceuticals, was that
23   the second company you mentioned?
24   A.   Neurocrine, N-E -- N-E-U-R-O-C-R-I-N-E.
25   Q.   Sorry.  That's the name of the

HANNA & HANNA, INC.
713.840.8484

PATRICK HAYES, MD - 1/9/2025

Page 17

1  pharmaceutical company?
2      A.  That's the company, yes, sir.
3      Q.  Can you -- can you spell that again?
4      A.  Neuro, like neurology, crine like in
5  endocrine.  Neurocrine.
6      Q.  Okay.  That's the full name, Neurocrine?
7      A.  Neurocrine.  Neurocrine Biosciences.
8  They're out of San Diego.
9      Q.  Okay.  And what medication do you speak on
10  with regards to Neurocrine?
11      A.  Ingrezza.
12      Q.  How do you spell that?
13      A.  I-N-G-R-E-Z-Z-A.  And -- and if it helps,
14  these are listed on the CV.  I just pulled it up.
15  It's going to be on -- towards the bottom.  It's not
16  paginated, but it's going to be on page 11 and 12,
17  it looks like.
18      Q.  Okay.  Well, that -- that may make it
19  easier.
20      A.  Yeah.  That way, we don't have to spend 40
21  minutes spelling drug names.
22      Q.  Yeah.  So on the last two pages of your
23  CV, you've got an industry affiliation section,
24  correct?
25      A.  That's correct.  Yes, sir.

Page 18

1      Q.  Does that list all of the pharmaceutical
2  companies you have -- you are or have been
3  affiliated with?
4      A.  Correct.  And the reason I characterized
5  it thus is I've done not only speaker promotions,
6  but I've also done the correctional product theaters
7  and advisory boards.  When new medications come out,
8  sometimes I'll be asked to come in and opine on the
9  mechanism.  For Intra-Cellular was interesting.  I
10  got to be part of the -- the nomenclature.  So that
11  -- that encapsulates all of that.
12      Q.  Okay.  So Teva Pharmaceuticals, you're on
13  the Uzedy speaker bureau?
14      A.  Correct.  Yes, sir.
15      Q.  Okay.  And what does it mean to be on the
16  speaker bureau?
17      A.  So, for example, I just had a text this
18  morning pop up.  There's -- that particular
19  medication, it's not been out very long.  It's --
20  it's an ultra long-acting version of injection
21  risperidone, which is an anti-aggression,
22  anti-sexual, antipsychotic mood-stabilizing agent.
23  This is a unique preparation and a unique delivery
24  system.  So when individuals either asked to be
25  detailed on it or somebody identifies that there is

Page 19

1  an unmet need or utilization, I'll be tasked to come
2  in and speak to their providers and explain the
3  medication.  And there are good speaker decks by the
4  FDA.  We present those, and then, afterward, we're
5  allowed to narrowly answer questions by the
6  audience.
7      Q.  Okay.  So it looks like you're on the
8  speaker bureaus of all of these pharmaceutical
9  companies.  Would that include Neurocrine
10  Biosciences as well?
11      A.  Yes, sir.
12      Q.  Okay.
13      A.  They -- they use different terms for their
14  speaker bureaus, so I try to encapsulate that there.
15  But what -- what that means, ultimately, is I'm
16  considered a national expert on movement disorder
17  medications, antipsychotic medications,
18  mood-stabilizing medications, sleep medications,
19  antidepressant medications.
20      Q.  Okay.  And how often do you give
21  presentations or do you speak with respect to any of
22  these medications?
23      A.  It -- it varies wildly.  I probably across
24  the board spoke 200 times last year.
25      Q.  Okay.  Who are the staff members at Elite

Page 20

1  Medical Wellness in Lake Charles?
2      A.  The professional contractors or the
3  employed staff?
4      Q.  Well, let me just ask it a different way.
5  Who all works or rotates through Elite Medical
6  Wellness in Lake Charles?
7      A.  You're asking about medical service
8  providers, like licensed individuals?  Or you're
9  asking about support staff?
10      Q.  Both, please.
11      A.  Okay.  So we have Davis Woodward.  We've
12  already discussed him.  We have Caitlin McGroarty.
13  Davis is an LPC.  Caitlin McGroarty is an LPC.  We
14  have Mr. Henry Johnson.  He's a board certified,
15  full age range psychiatric nurse practitioner.  We
16  have Iva Conde, C-O-N-D-E.  She is both a licensed
17  marital family therapist and a -- a board certified
18  psychiatric nurse practitioner.  We have Dene'
19  Culton, C-U-L-T-O-N.  She's an LPC.  We have James
20  Johnson.  We've already discussed him.  Then we have
21  Laken Patin, P-A-T-I-N.  She's another board
22  certified, full age range nurse practitioner.
23      Q.  Is that it?
24      A.  That's it for professional providers
25  currently.

5 (Pages 17 to 20)

PATRICK HAYES, MD - 1/9/2025

Page 21

1    Q.   Okay.  Do you have any location outside of
2  Louisiana or Texas with Elite Medical Wellness?
3    A.   No.  I'm licensed in (inaudible), Texas
4  and Louisiana, and I have several providers that are
5  licensed in different states.  I've got one with a
6  license in Florida.  I've got one that's licensed, I
7  believe, in Florida, Mississippi.  I believe Alabama
8  is on a permit.  We've got somebody that may have
9  Georgia.  So I have providers that are licensed in
10  multiple locations where we're allowed to see
11  individuals, but physical locations are in Louisiana
12  and Texas.
13    Q.   Okay.  Are there any other medical doctors
14  in Elite Medical Wellness besides yourself?
15    A.   No.  Across the operations, I have other
16  physicians employed or contracted.  But at -- at
17  Elite at the present time, I had an addictions doc,
18  but she set out on a private practice, so she still
19  works for me for the state of Louisiana, but she's
20  not at Elite anymore.
21    Q.   You said, through the operations, you have
22  medical doctors contracted; is that right?
23    A.   That's correct.  Yes, sir.
24    Q.   And which operations are you referring to?
25    A.   Hayes Consultation & Therapeutics is a --

Page 22

1  another company of mine that I have a staffing
2  agency through, and also if that -- if the action
3  that's requested from somebody involves going to
4  their location and using their material, their
5  services, their charts, their nursing, that's
6  usually an HC&T operation versus if it comes to my
7  clinic and uses my staff, my material, my -- my
8  operation.  That's usually Elite.
9        So through Hayes Consultation &
10  Therapeutics, I have (inaudible) O'Leary contracted.
11  She's a triple board, which means she's board
12  certified in pediatrics, in child psychiatry and
13  adult psychiatry.  She provides coverage to
14  intellectually disabled individuals in the Eastern
15  part of Louisiana.
16        And then I have Christina Jones
17  contracted.  She's a internal medicine by training
18  but addictions by practice and certification.  She
19  and I are among the select group of Opioid Response
20  Network technical advisors for the state of
21  Louisiana.
22    Q.   What was the name of the first doctor you
23  mentioned, the triple board certified person?
24    A.   Andrea O'Leary?
25    Q.   Andrea O'Leary and Christine Jones are

Page 23

1  contracted doctors through Hayes Consultation &
2  Therapeutics?
3    A.   Correct.  Yes, sir.
4    Q.   And that's essentially a staffing company?
5    A.   It -- it has a staffing component to it as
6  well.  In the case of Dr. Jones, she is contracted
7  through the staffing company and assigned to
8  patients for the state.  And then in the context of
9  Dr. O'Leary, HC&T has a contract with -- for hers.
10  It is, I believe, Normal Life and BrightSpring.  And
11  I have her assigned duty station at the Normal Life
12  and BrightSpring group homes.
13    Q.   Okay.  All right.  So turning to this
14  case, Mr. Perry, Landon Perry, is one of your
15  patients; is that right?
16    A.   Yes, sir.
17    Q.   How did Mr. Perry come to be one of your
18  patients?
19        MR. GRINNAN:  Form.
20    A.   Sometimes I know that; sometimes I don't.
21  Sometimes it's knowable; sometimes it's not.  So
22  what I'm looking at now is my hard chart.  The very
23  first page after the left side of the -- the hard
24  chart exterior, it's a consult form from Access
25  Healthcare Management.

Page 24

1    Q.   (BY MR. FLORES) Okay.  Before we get into
2  that, what -- what documents do you have there with
3  you?
4    A.   In general?
5    Q.   I mean, in total, what -- what documents
6  do you have there in front of you?
7    A.   Okay.  So I have Mr. Perry's hard chart.
8  I have three articles on the effect of genital
9  injury in males.  I have -- on my computer, as we
10  just discussed, I have my CV pulled up.  And then I
11  have a file with -- I didn't tally it, but it's
12  about 35 different files of medical records of
13  Mr. Perry.
14    Q.   And what does a hard chart consist of?
15    A.   Hard chart is Mr. Perry's physical
16  document that encapsulates his care.  So there will
17  be an administrative section.  There will be a
18  medication and prior authorization administration
19  section.  There will be a records section, records
20  either we produced, such as psychological testing,
21  or that are received from other individuals via fax
22  in hard copy.  Although we have changed that; now
23  we're holding those electronically so that these
24  don't get -- because, for example, in Mr. Perry's
25  case, I think it's about 700 pages of records, 800

6 (Pages 21 to 24)

PATRICK HAYES, MD - 1/9/2025

Page 25

1   pages of records I went through.  His chart would
2   become unwieldy and unusable.  And then it
3   encapsulates or includes his clinical medical notes,
4   the psychiatric notes and his clinical therapy
5   notes.
6       Q.   Okay.  What is in the admin section?
7       A.   I'm not quite sure what you want me to
8   answer on that one.
9       Q.   Well, how many pages are there in the
10  admin section of the hard chart?
11      A.   No -- no idea.  You want me to count it?
12      Q.   Sure.
13      A.   It appears to be 39.
14      Q.   And just generally speaking, what sort of
15  documents are in the admin section?
16      A.   So on the top on the left, there's
17  informed consent for assessment and treatment.  The
18  second page is a notice of privacy, which is
19  is a two-page document.  Behind that, there's a copy
20  of Mr. Perry's driver's license.  Behind that,
21  there's the triggering referral from Access
22  Healthcare Management.  On the right side, there's a
23  series of administrative visit updates.  Behind
24  those or in the middle of those, there is my initial
25  master report of 16 pages, which is dated November

Page 26

1   28th of 2023.  And in Mr. Perry's case, that's the
2   extent of it.
3       Q.   Okay.  You mentioned a -- I'm trying to
4   read my notes here.  You mentioned a prior admin
5   section or something like that?
6       A.   I think what you're asking me about is the
7   medication administration section.  So that's going
8   to be like prior authorizations, prescription refill
9   requests.  That's just from the patient.  Here's
10  another prescription refill request.  Here's a --
11  this is a PA, an insurance issue.  They don't want
12  to cover his medications, even though that's
13  inexpensive.  So they force us to justify why we
14  wanted him on an inexpensive medication which is
15  ideally tailored to what he has.
16          And then there's what we call ROI
17  requests, releases of information, which is where
18  we've sent off medi-- or requests for clinical
19  notes, medication lists, problem lists, those sorts
20  of things to the providers that we knew about.  And
21  then I'm seeing also an Express Scripts, another
22  insurance book on an inexpensive med.  I'm seeing
23  another PA through CoverMyMeds.  I'm seeing another
24  PA through CoverMyMeds and some messages from the
25  patient about medication side effects.

Page 27

1       Q.   Okay.  And how many pages is that section?
2       A.   I shall count it.  So it's 14 pages of
3   that support behind medications, and then it is --
4   and then it's 10 pages of what's called a MAR.  It's
5   a medication list.  And then the copies of
6   prescriptions as well as looks like pharmacy
7   printouts.  Yeah.
8       Q.   The total of 24 pages?
9       A.   Correct.
10      Q.   Okay.  What are the names of the three
11  articles you mentioned and the authors please?
12      A.   Yes, sir.  So interestingly, 2013, there's
13  two British articles on male genital injury, both of
14  them published by the Royal Defence Force.  They're
15  both British.  The first one is -- is sort of a
16  scout.  And if you think about what's going on in
17  2013, I mean, we were a couple years into their
18  involvement in Afghanistan, so that is The
19  Psychological Challenge of Genital Injury by
20  W. Frappell-Cooke.
21      Q.   Could you spell the author's name please,
22  at least the -- the first name?
23      A.   It has his first initial.  It's just W.
24  But the last name is Frappell-hyphen-Cooke,
25  F-R-A-P-P-E-L-L-hyphen-C-O-O-K-E.  It's published in

Page 28

1   the Journal of the Royal Army Medical Corps.
2       Q.   And it's titled Psychological Challenge of
3   Genital Injury?
4       A.   Correct.
5       Q.   Okay.  What -- what's the next article?
6       A.   The second one is published by P.A. Lucas,
7   and there's all secondary and, you know, et al.
8   authors on these, but I'm just going to give you the
9   lead author.  Lucas spelled as you would expect,
10  L-U-C-A-S.  This is The Impact of Genital Trauma on
11  Wounded Serviceman, colon, Qualitative Study.  It's
12  published in the journal Injury.
13      Q.   Journal of Injury?
14      A.   The journal is just titled Injury.
15      Q.   Is that a British publication?
16      A.   Injury, I think, is an American journal.
17  I would have to go in and -- and look.  It's
18  Elsevier Press.  I think it's an American journal.
19  It's a British group that did the -- the analysis,
20  but I believe it's published in an American journal.
21          And then there's a large meta-analysis
22  published last year on several thousand Americans
23  with genital burns in particular, so it's Genital
24  Burns are Associated with Worse Psychosocial and
25  Physical Outcomes.  The lead author is Suhaib Shah.

7 (Pages 25 to 28)

PATRICK HAYES, MD - 1/9/2025

1    First name is S-U-H-A-I-B.  Last name is Shah,
2    S-H-A-H.
3        Q.    Suhaib with B as in boy at the end?
4        A.    B as in bravo, yes.
5        Q.    And what's the name of the article again?
6        A.    Genital Burns are Associated with Worse
7    Psychosocial and Physical Outcomes.  And that's in
8    Oxford University Press.  It's an American Burn
9    Association annual meeting article.
10        Q.    And when did you locate these articles?
11        A.    Oh, I've had these for a while.  I don't
12    know that I can tell you that.
13        Q.    Were they part of Mr. Perry's case file in
14    the ordinary course of business?
15        A.    In his case, I believe I had pulled them
16    in the context of writing his report.  Or I had done
17    a life care plan meeting with Dr. Savant.  It may
18    have been around that time.  Just sort of assembling
19    prognostic factors and shaping the -- the discussion
20    around that.  I will typically place literature in
21    the file.  I don't see it in his.  That may have
22    been an oversight.  Or it may be -- again, as we
23    migrated the -- the handling of the files to include
24    more electronic stuff, it might be in his electronic
25    file.

1        Q.    For purposes of this deposition, when did
2    you print those out?
3        A.    For this deposition, I printed them last
4    night.
5        Q.    Okay.  And they weren't in the hard copy
6    file prior to that?
7        A.    No, I don't see them there.
8        Q.    Okay.  And as far as you know, were they
9    or were they not in the electronic or digital file?
10        A.    I just glanced at it.  I don't see them
11    there.  And then the -- the 2024 article, I don't
12    see a date on that one, but when in 2024 -- I don't
13    see a (inaudible) on it.  Let me see if I can give
14    you that one.
15        Q.    Okay.  You said the first article was from
16    2013, correct?
17        A.    Correct.  The first two are both from
18    2013.
19        Q.    Okay.  And the last one by Shah is from
20    2024?
21        A.    That's from last year.  Yes, sir.  And I
22    may have pulled that one later.
23        Q.    Okay.
24        A.    Landon had a -- had an exacerbation of
25    symptoms about six months ago, so we did some casual

1    multi-D work on him.  Ms. Conde, Ms. Culton and I,
2    that's sort of the -- the primary clinical team
3    working with him.  It may have been around
4    (inaudible) time that I pulled it as well.
5        Q.    Sorry.  I was getting a little feedback
6    there.  Could you -- you mentioned some names, I
7    think?
8        A.    Yeah.  Landon sees Ms. Conde and me for
9    medication.  He sees Ms. Culton for psychotherapy.
10    And there was a -- an exacerbation of his symptoms
11    some months ago, six, four months ago.  And you can
12    see in his visit frequency goes up at that time.  So
13    it may have been around them -- then that I pulled
14    the article, that -- that 2024 article.  I'm not
15    quite sure.
16        Q.    Okay.  All right.  So Mr. Perry was
17    referred to you looks like in August of 2023; is
18    that right?
19        A.    Go back there and look.  Yes, sir.  It
20    looks like August 28th, 2023.
21        Q.    Okay.  And you mentioned referral
22    document.  Let me make sure I'm looking at the same
23    thing here.  So this will be Exhibit 1 to your
24    deposition.
25            (Exhibit 1 was marked for identification.)

1        Q.    All right.  So I've got an email here.  Do
2    you see that on your screen?
3        A.    It's wee.  I can't make --
4        Q.    Sorry?
5        A.    I said it's wee.  It's teeny-tiny.  I
6    can't make it out.
7        Q.    Really?  Okay.  It's pretty huge on my
8    screen, so let me see.  Is that any better?
9        A.    Can you maximize your screen?  It looks
10    like you're on partial minimization.
11        Q.    I am maxed out on my end.
12            MR. GRINNAN:  Rey, I think it might be
13    because of, like, the way you have the settings on
14    Zoom.
15            MR. FLORES:  Uh-huh.  Okay.
16            MR. GRINNAN:  But I'm not sure.
17            MR. FLORES:  Well, let me see here.
18            THE REPORTER:  Do we want to briefly go
19    off the record?
20            MR. FLORES:  No.  Let me give this a shot.
21    Hold on.  Is that any better?
22            THE WITNESS:  No.  It's the same.
23            MR. FLORES:  Okay.
24            THE REPORTER:  For me, it's full screen.
25    Do you need to change your view, Doctor, in the top

8 (Pages 29 to 32)

PATRICK HAYES, MD - 1/9/2025

Page 33

1 right?
2     MR. FLORES: Hold on. Yeah. Let's just
3 go off the record.
4     THE REPORTER: Okay.
5     THE VIDEOGRAPHER: We're off the record.
6 The time is 9:44 a.m.
7     (Short recess.)
8     THE VIDEOGRAPHER: We're back on record.
9 Time is 9:52 a.m.
10     Q. (BY MR. FLORES) All right, Dr. Hayes. We
11 were talking about Mr. Perry's referral to you in
12 August of 2013, correct?
13     A. Correct. Yes, sir.
14     Q. All right. And this will be Exhibit 1 to
15 your deposition. Can you see this document on the
16 screen now?
17     A. Yeah. As we discussed on the break, it is
18 more legible. It's larger. I can see what appears
19 to be about two-thirds of the page, now about half
20 of the page. If you scroll up and down, I can see
21 the whole thing.
22     Q. Okay. So you see an email here, correct?
23     A. That's correct.
24     Q. And the originating email at the bottom of
25 the page came from Morgan Gill. Do you see that?

Page 34

1     A. I do.
2     Q. On August 28th, 2023, at 10:22 a.m.,
3 correct?
4     A. That's correct.
5     Q. And is that the referral document you were
6 referring to in your -- in your hard chart?
7     A. No, sir.
8     Q. I'm sorry?
9     A. No, sir.
10     Q. Okay. So we'll get to what that might --
11 that other document might -- might be.
12     A. That's probably the email that the
13 referral document was attached to.
14     Q. Right, right. Okay.
15     And so it says here, Hayes in person.
16 Henry via telepsych and Davis via telepsych. Do you
17 see that?
18     A. I do.
19     Q. Okay. I guess Henry and Davis are some of
20 your staff members?
21     MR. GRINNAN: Form.
22     A. That's correct.
23     Q. (BY MR. FLORES) Okay. Do you know who
24 Morgan Gill is?
25     A. I know her name. I don't believe I've

Page 35

1 ever met her.
2     Q. Okay. And she -- her title here is
3 Behavioral Health Scheduling Coordinator, Access
4 Healthcare Management, LLC; is that right?
5     MR. GRINNAN: Form.
6     A. Yes, sir. That's what I can see on the
7 email.
8     Q. (BY MR. FLORES) Okay. And this was sent
9 to Kourtney Sittig at your clinic, it appears; is
10 that right?
11     A. Kourtney Tommasi was her -- or is her
12 married name. Kourtney Sittig was her maiden name.
13 Yeah, that's the -- who it was sent to.
14     Q. Okay. And she responded to Ms. Gill with,
15 11-27-2023 at 1:30 Hayes, right?
16     A. That's what I see on there. Yes, sir.
17     Q. Okay. So was that going to be Mr. Perry's
18 first appointment with you?
19     MR. GRINNAN: Form.
20     A. I mean, I don't know. That's what I can
21 intuit from that, but, again, as I mentioned
22 earlier, I don't do scheduling. I have staff
23 trained to do so. They tell me where to be and what
24 to bring.
25     Q. (BY MR. FLORES) Okay. I don't think you

Page 36

1 mentioned Kourtney Tommasi earlier as a staff
2 member. Is she still with Elite Medical Wellness?
3     A. No, no. She actually is an administrative
4 assistant at a car dealership now.
5     Q. Okay. All right. So there was an
6 attachment to this email. Let's go to that next.
7     Okay. Can you see this new document on
8 your screen?
9     A. Yes, sir.
10     Q. This will be Exhibit 2 to your deposition.
11     (Exhibit 2 was marked for identification.)
12     Q. Is this the referral document you were
13 referring to in your hard chart?
14     A. That's correct.
15     Q. Okay. It says, from Access Healthcare
16 Management; Elite Medical Wellness, Lake Charles,
17 right?
18     A. Correct.
19     Q. Okay. It says, provider, Access
20 Healthcare Management, down at the bottom; is that
21 right?
22     A. That's what it says. Yes, sir.
23     Q. Okay. What is Access Healthcare
24 Management?
25     A. They're a case management service that we

HANNA & HANNA, INC.
713.840.8484

PATRICK HAYES, MD - 1/9/2025

Page 37

1  work with who refers us patients that need
2  behavioral health treatment.
3      Q.  Okay.  And when you say case management
4  company, what do you mean by that?
5      A.  Probably the easiest way to encapsulate
6  it, I used to work for comp or work with comp.  And
7  then, over the years, I had accepted single case
8  agreements with workers' comp.  It very much --
9  Access very much behaves like a private workers'
10  comp where, if an individual has behavioral health
11  condition, they will find behavioral health
12  provider.  We are one of those that Access works
13  with.  And then, when I need to place medication
14  orders, when I need to place consult orders, when I
15  need to schedule visits, those go through Access
16  Healthcare Management for the scheduling.  They will
17  do all of that.
18      Q.  Okay.  And so you said they -- they
19  basically act like an insurer, a workers' comp
20  insurer or carrier?
21          MR. GRINNAN:  Object to the form,
22  foundation.
23      A.  Yeah, more like the -- the comp clinical
24  case managers.  Very much like that.
25      Q.  (BY MR. FLORES) Okay.  And how long have

Page 38

1  you worked with Access Healthcare Management?
2      A.  Probably about 10 years at this point.
3      Q.  Okay.  So they sent Mr. Perry to you in
4  August of 2023, correct?
5      A.  That's correct.
6      Q.  All right.  Now, I'm going to pull up a
7  bill because I want to see if this is a
8  comprehensive summary or listing of -- of every
9  visit with Mr. Perry.  So this will be Exhibit 3 to
10  your deposition.
11          (Exhibit 3 was marked for identification.)
12      Q.  All right.  Do you see this document on
13  your screen now?
14      A.  Yeah.  I can see probably half of it in
15  that current zoom, and I can read most of what's on
16  there.
17      Q.  Yeah.  It appears to be a five-page PDF
18  file or five-page document.  Do you see that?
19      A.  I'm just going to have to trust that
20  you're representing it's five pages accurately.
21      Q.  Okay.  Do you recognize this document?
22      A.  Yeah.  It appears to be one of our billing
23  documents.
24      Q.  Okay.  And there's an entry on September
25  8th, 2023, by somebody named Caitlin Witherwax or

Page 39

1  associated with Caitlin Witherwax.  Do you see that?
2      A.  I do.
3      Q.  Who is Caitlin Witherwax?
4      A.  She was a clerk who was working with us at
5  the time.
6      Q.  Okay.  No longer with Elite Medical
7  Wellness?
8      A.  No, sir.  Clerical staff is very difficult
9  to -- to maintain and hold in 2023 and 2024.
10      Q.  Who is Madison Ellzey?
11      A.  She's another clerical staff who was
12  working at the time who's no longer with us.
13      Q.  What about Kaileigh Lantz?
14      A.  Ditto.
15      Q.  Okay.  What about Stacey Rougeau or
16  Rougeau?
17      A.  Rougeau, correct.  She's a clerical staff.
18  She's actually the custodian of medical records in
19  the criminal forensic court administrator.  She has
20  been with me now for seven years, I believe.  She's
21  still here.
22      Q.  Okay.  And you mentioned Iva Conde and
23  Dene' Culton previously, correct?
24      A.  Correct.  Yes, sir.
25      Q.  Okay.  I see your name is listed here on

Page 40

1  the bottom of page two, Patrick Hayes, MD.  Do you
2  see that?
3      A.  I do.
4      Q.  And the entry associated with your name is
5  April 5th, 2024.  Do you see that?
6      A.  Yes, at the top.  Uh-huh.
7      Q.  It says, non-deposition meeting, one hour.
8  Do you see that?
9      A.  Correct.
10      Q.  And there's a -- there's a code there,
11  EH034.  Do you see that?
12      A.  Correct.
13      Q.  What does EH034 represent?
14      A.  That's going to be the -- the line item to
15  encapsulate how we bill a non-deposition one-hour
16  meeting.
17      Q.  Okay.  That's internal to -- to your
18  clinic?
19      A.  Correct.  This clinic does not accept any
20  manner of health insurance.  We do not use CPT
21  codes.  We do not use E&M codes.  So for billing
22  purposes, our module is built around proprietary
23  codes which describe what the services are in the
24  single fee schedule.
25      Q.  Okay.  And this non-deposition meeting for

HANNA & HANNA, INC.
713.840.8484

PATRICK HAYES, MD - 1/9/2025

Page 41

```
1    one hour, was that with Mr. Perry?
2       A.   No.  That was a life care plan meeting
3    with Dr. Savant.
4       Q.   Okay.  Was that in person or over the
5    phone or teleconference?  How did that take place?
6       A.   I have met with Shelly in person before.
7    I've known Shelly for a long time.  But I believe
8    that one most likely -- based on the time of year
9    that was, I was probably on the road.  That was
10   probably (inaudible).  Excuse me.
11      Q.   I'm sorry.  You broke up there.  Could you
12   repeat what you said?
13      A.   Yeah.  No worries.  I just said that was
14   probably telephonic.
15      Q.   Okay.  All right.  I'm continuing to go
16   through this -- is this an invoice?  Is that what
17   you would call this or a billing summary?
18      A.   Yeah.  I think you could use either of
19   those terms for it.
20      Q.   Okay.  And then there's, you know,
21   deposition, video deposition.  That's the fee for
22   today's deposition, correct?
23      A.   Yes, sir.
24      Q.   All right.  What is I-V-A?
25      A.   That's my provider, the nurse
```

Page 42

```
1    practitioner, Iva Conde.
2       Q.   Okay.  So the -- the -- initials there
3    or Dene' here would -- would show who met with or
4    who spoke with Mr. Perry on that day?
5       MR. GRINNAN:  Form.
6       A.   You'll probably notice that there's a
7    change in convention across that period of time.  So
8    when -- about a year ago, January of 2024, when
9    Caitlin McGroarty took over as practice manager,
10   just going through and doing process improvement,
11   practice development, what she found is that the --
12   the prior style of billing was assigning that line
13   to the person that submitted the billing, the
14   clerical asset.  That's why you see Kaileigh Lantz,
15   Madison Ellzey versus assigning the -- the line
16   billing to the provider that delivered the service,
17   which makes more sense, and it's easier to follow.
18   So that's what you're seeing on there.  The -- the
19   ones with a provider's name, that's the provider who
20   did it.
21      Q.   (BY MR. FLORES) Okay.  And prior to that,
22   I guess, practice change there, the provider who --
23   who saw or spoke with Mr. Perry is listed, I
24   suppose, to the right of the date of each
25   interaction; is that correct?
```

Page 43

```
1       A.   That's correct.  So the -- the electronic
2    portion of the system was charging it or assigning
3    it to the person entering it, and then that person
4    was having to go back and manually point it to the
5    provider versus the improved way of doing it.
6       Q.   Okay.  So, for example, on September 8th,
7    2023, Iva Conde met or spoke with Mr. Perry,
8    correct?
9       A.   Can you zoom in on that?  I can't really
10   read the dates.
11      Yeah.  So you're saying September -- or
12   September 8th?  Yeah.  So Caitlin Witherwax would
13   have been the clerical asset who entered that
14   charge, but the visit was with Iva Conde.
15      Q.   Okay.  And then, just to compare, on
16   October 23rd of 2023, the visit or the interaction
17   was with Dene' Culton, correct?
18      A.   Correct.
19      MR. GRINNAN:  Form.
20      Q.   (BY MR. FLORES) Okay.  And so when was the
21   first time you personally met or spoke with
22   Mr. Perry?
23      A.   On November 27 of 2023.
24      Q.   And why is there no charge on this billing
25   summary for that -- that interaction?
```

Page 44

```
1       MR. GRINNAN:  Form.
2       A.   I think you're above November 27.  I think
3    you'd have to scroll down.
4       Q.   (BY MR. FLORES) You mean 2020 -- well,
5    this is November -- okay.  I see.  So this date down
6    here, is that the date of payment?
7       A.   That's how I appreciate that.  Again, I
8    don't do billing, but that looks like -- the -- the
9    line you just highlighted, that looks like a
10   September 8, 2023, visit with Iva entered by
11   Ms. Witherwax with payment fulfilled on November 17
12   of 2023.  So the bottom of the sheet you're showing
13   me is 11-1-2023.  So to capture my 11-27 visit,
14   you're going to have to scroll down.  There it is.
15      Q.   Okay.  So 11-27, entered by Madison
16   Ellzey.  The work is titled, Hayes full report,
17   correct?
18      A.   Correct.  Yes, sir.
19      Q.   And you met with Mr. Perry on November
20   27th?
21      A.   Yes, sir.
22      Q.   Was that in person or through some other
23   means?
24      A.   That was in person.
25      Q.   Okay.  Was that the first time you'd met
```

11  (Pages 41 to 44)

PATRICK HAYES, MD - 1/9/2025

---

Page 45

1  with Mr. Perry?
2     A.   Correct.
3     Q.   Okay.  And how long was that meeting?
4     A.   Let me look.  So his assessment was 102
5  minutes that day.
6     Q.   And there's a 5,000 dollar charge for a
7  report, correct?
8     A.   Correct.  Yes, sir.
9     Q.   Okay.  And what was the purpose to that
10 report?  Somebody -- who asked you to produce a
11 report, first of all?
12    A.   My staff asked me to produce the report to
13 do -- what you see there is a full report.  There
14 are different administrative actions that I do.
15 There's different paperwork that I can do.
16 Somewhere upstream of me, my administrative staff
17 was made aware or understood that this would be a
18 treating case and then that somebody wanted a civil
19 forensic full report, which is a differential
20 diagnosis.  The foundation for that differential
21 diagnosis, prognosis, commentary on causation and
22 commentary on treatment moving forward.
23    Q.   Okay.  So if I'm understanding correctly,
24 essentially, your staff, I suppose, understood or
25 received a request that Mr. Perry's lawyers would

---

Page 46

1  want and need a report from you, and that's --
2        MR. GRINNAN:  Object to the form.
3     Q.   (BY MR. FLORES) And that's what's
4  reflected here?  Is that --
5        MR. GRINNAN:  Form and --
6     Q.   (BY MR. FLORES) Is that fair?
7        MR. GRINNAN:  Form and foundation.
8     A.   Yeah.  It -- it is really a logical
9  extension in that that I can't completely affirm.
10 In this case, Access Healthcare Management requested
11 that, so we often don't know what is the
12 administrative action outside of Access Healthcare
13 Management.  We don't know if it's a lawsuit.  We
14 don't know if it's a mediation.  We don't know
15 what's going on with that.  So somebody at Access is
16 working with somebody.  And Access told us that they
17 wanted a full report with treatment on this guy, so
18 that's what we provided.
19    Q.   (BY MR. FLORES) Do you know Access
20 Healthcare Management told you or your staff that
21 they wanted a full report?
22       MR. GRINNAN:  Object to the form,
23 foundation.
24    A.   Did you ask me how I know that?
25    Q.   (BY MR. FLORES) Yes.  Yes, sir.

---

Page 47

1     A.   I don't, really.  I mean, I can see it
2  there on the invoice.  So somebody who's involved in
3  inputting charges knew it.  I can see the -- the
4  referral form in my chart, and that's how it was
5  presented to me that day.  But, Mr. Flores, I'm very
6  busy, so I don't tap dance around in taking phone
7  calls, setting up schedules, doing the billing.  My
8  staff gives me the appropriate work at the
9  appropriate time, and they tell me what to do.  I
10 mean, I'm the medical director.  I'm the owner.  I'm
11 in charge of it.  But I have trained them to handle
12 that.
13       So in terms of, like, when somebody calls
14 for a refill, for example, I don't take the call for
15 a refill.  I don't do the initial check to see if
16 they should have refills.  I don't do the initial
17 two, three salvos with the pharmacy.  I don't check
18 with the patient to make sure the -- the refill
19 numbers.  My staff does all of that.  Still my
20 medication refill, but this is similar.  My staff
21 told me to do an intake on Mr. Perry with a full
22 report, so that's what I did.
23    Q.   Okay.  And, I mean, somebody would have
24 had to request a report for you to do it; is that
25 correct?

---

Page 48

1        MR. GRINNAN:  Object to the form and
2  foundation.  It's been asked and answered.
3     A.   Yeah.  That's what -- that's what I
4  understand from these forms that we're looking at
5  now.  But that's the nature of the practice.  If
6  somebody requests something, it's within the
7  skill set, it's within the field of what we do, yes,
8  sir, my staff can hand me that.
9     Q.   (BY MR. FLORES) Okay.  All right.  So
10 continuing to move through this billing summary, it
11 looks like Iva Conde and Dene' Culton would meet
12 with Mr. Perry, it looks like, about once a month.
13 Is that about right?
14    A.   Yeah.  He's actually kept essentially 94
15 percent of his booked visits.  He's got a fantastic
16 compliance rate.  He's been our patient for 16
17 months at this point.  He's kept 30 visits in 16
18 months.  So he's averaged almost two visits a month.
19 It's 1.9 visits per month.
20    Q.   Okay.  And looks like your next meeting
21 with Mr. Perry was on April -- well, no.  That was
22 the -- the meeting with Dr. Savant, you said, right,
23 April 5th, 2024?
24    A.   Correct.
25    Q.   Okay.  So according to this billing

12  (Pages 45 to 48)

PATRICK HAYES, MD - 1/9/2025

Page 49

```
 1    summary, you met with Mr. Perry once; is that right?
 2       A.   That's correct.  Yes, sir.
 3       Q.   For, I think you said, 102 minutes?
 4       A.   Correct.  That's the duration of his
 5    assessment.
 6       Q.   Okay.  Have you spoken over the phone or
 7    over Team -- Teams or Zoom with Mr. Perry at any
 8    time other than in November of 2023?
 9       A.   No.  I've engaged in disciplinary meetings
10    with the team about him.  I've helped coordinate the
11    care of Mr. Perry, but he is improving.  The -- the
12    regimen is tailored to what he has.  So in general,
13    I would expect to see him again this coming year
14    within the next couple of months, but I have not
15    yet.
16       Q.   Okay.  And so just to be clear, you've
17    only met or spoken with Mr. Perry once, and that was
18    in November of 2023, correct?
19       A.   Yeah.  To date, that's -- that's the
20    number of times I've seen him, but I anticipate
21    seeing him again.
22       Q.   And you mentioned -- well, let's -- let's
23    hold off on that for now.  Let's talk about the --
24    the payments here.  Do you know who's making these
25    payments that are reflected on this billing summary?
```

Page 50

```
 1       A.   Inasmuch as has been asked about before in
 2    other depositions and in other trial moments, that
 3    -- that characterization of patient check payment
 4    and a number, it's my understanding that that is
 5    actually -- that's one of the lines that was
 6    selected in the billing module to characterize it.
 7    I don't know that there's a more appropriate line.
 8    But given that Mr. Perry is case managed by Access
 9    Healthcare, they are paying his -- his invoices.
10       Q.   Okay.  So just to make sure I understand
11    then, although this says patient check, it's not
12    your understanding that Mr. Perry is cutting a check
13    or making a payment personally, correct?
14       A.   No.  As I understand the universe, he's
15    ultimately responsible for all charges, but those
16    check numbers, I believe, are the monthly payments
17    from Access.
18       Q.   Okay.  So Mr. Perry hasn't, you know,
19    pulled out his checkbook and written out a check to
20    Elite Medical Wellness, correct?
21           MR. GRINNAN:  Object to the form,
22    foundation.
23       A.   I don't do billing.  I'm not aware of
24    that.  But as you're showing me, 10-6-2023,
25    10-23-2023, both showing posted on 12-27-2023 with
```

Page 51

```
 1    the same check number, it's my understanding that
 2    that 11182 would have been the 12-27-2023 payment
 3    from Access Healthcare Management.
 4       Q.   (BY MR. FLORES) Okay.  And do you believe
 5    that Access Healthcare Management has made all these
 6    payments reflected on these -- this billing invoice
 7    or billing summary?
 8           MR. GRINNAN:  Form.
 9       A.   Again, I -- I don't do billing.  I don't
10    have any reason to dispute that.  But, yeah, I don't
11    really know.
12       Q.   (BY MR. FLORES) And the one caveat I would
13    -- I would insert there would be that, you know, our
14    firm made the payment for your video deposition,
15    correct?
16       A.   If you (inaudible) that's accurate, yeah,
17    sure.  Again, I -- really, Mr. Flores, I don't do
18    billing.
19       Q.   Yeah.  Who does your billing for you?
20       A.   That would be Caitlin McGroarty, and I'm
21    not sure who she delegates out additional billing
22    actions.  You -- you'd have to ask her.
23       Q.   And she's primarily in Lake Charles?
24       A.   She's the overarching practice manager, so
25    most of her physical time is in Lake Charles, but
```

Page 52

```
 1    she does go to the Houston office as well.
 2       Q.   Okay.  And Elite Medical Wellness would
 3    have the copies of the checks themselves, right, in
 4    its -- in its billing file?
 5       A.   I have no idea.
 6       Q.   Okay.  Would Caitlin be the person to ask
 7    that question to?
 8       A.   Correct.  Yes, sir.
 9       Q.   Okay.  All right.  Since we're on this
10    document, let's talk about charges.  It looks like
11    Iva Conde on September 8th, 2023, was billing at 400
12    dollars per visit; is that right?
13       A.   Yes, sir.
14       Q.   Okay.  And Dene' Culton at 300 dollars per
15    visit, correct?
16       A.   That's correct.
17       Q.   Okay.  Let's see.  It looks like their
18    rate has remained the same into 2024; is that right?
19       A.   Yes, sir.
20       Q.   Okay.  So Iva Conde, can you remind me of
21    her credentials please?
22       A.   She's a board certified psychiatric mental
23    health nurse practitioner.
24       Q.   And can you remind me of --
25       A.   I'm sorry.  My apologies.  She's also a
```

13 (Pages 49 to 52)

PATRICK HAYES, MD - 1/9/2025

Page 53

1  licensed marital family therapist, but for -- for
2  purposes of this case, she is serving as a nurse
3  practitioner.
4      Q.   And would you remind me of Dene' Culton's
5  credentials?
6      A.   She's a licensed professional counselor.
7      Q.   And so just based on their billing rate,
8  it seems that a nurse practitioner is considered a
9  -- a step up, if you will, from a licensed
10  professional counselor; is that correct?
11     A.   Well, nurse practitioners and physician's
12  assistants are what are considered mid-level medical
13  providers, so a medication visit involves more risk.
14  It involves more risk in the conditions treated.
15  The conditions treated are -- are more broad.
16  There's more complicated medical decision-making.
17  The intervention requires additional support.  We
18  discussed earlier medication prescriptions, refills.
19  So, yes, across the board, medication and medical
20  visits are going to be more complicated and thus
21  more expensive than psychoeducational visits, health
22  visits, therapy, those sorts of things.
23     Q.   Okay.  Do you have an hour -- a fee that
24  you would charge for an office visit with a patient
25  like Mr. Perry?

Page 54

1      A.   Yes, sir.
2      Q.   And what is that?
3      A.   So the single fee schedule, if you haven't
4  requested that, that can certainly be provided to
5  you.  But the -- the follow-up visit so that -- what
6  you have on there as EA023, an adult psychiatric
7  visit plus administrative update, that will be the
8  same for a follow-up.
9      Q.   So would you bill 400 dollars for -- for
10  an EA23 visit with Mr. Perry?
11     A.   Correct, for a follow-up.  Yes, sir.
12     Q.   And what about for an initial visit?
13     A.   The fee schedule guides what the cost is.
14  In the case of Mr. Perry, there was a request for a
15  full report and the additional charge that you
16  discussed earlier on -- or from November 27th is for
17  that 15-, 16-page report and the extended time with
18  him and the additional testing with him.  If
19  somebody had requested a different style of report
20  or a different action, that's going to be on the fee
21  schedule, and the charge might be different.
22     Q.   Okay.  And I think you mentioned earlier
23  that Elite Medical Wellness in Lake Charles does not
24  accept insurance; is that correct?
25     A.   That's correct.  I don't accept any manner

Page 55

1  of insurance.
2      Q.   Okay.  And I assume you also don't accept
3  Medicare?
4      A.   It's federal, but it's still insurance.
5  So the -- the answer holds.
6      Q.   Okay.  And same for workers' comp
7  insurance, correct?
8      A.   Correct.
9      Q.   So in other words, both private and
10  governmental type of insurance patients are not seen
11  in Lake Charles, correct?
12     A.   They may be, but we are fee for service,
13  cash only or cash equivalent.  So if an individual
14  wants to come here and they have insurance, we can
15  provide them our -- our superbill or their superbill
16  for the visit.  And they're welcome to go back and
17  request reimbursement, but we do not directly work
18  with any insurers.  We are not contracted, Elite
19  Medical Wellness, with any insurers, public or
20  private.
21     Q.   Does that also apply to Elite Medical
22  Wellness West in Houston?
23     A.   It does.  Yes, sir.
24     Q.   Has Elite Medical Wellness ever accepted
25  insurance?

Page 56

1      A.   We did.  Yes, sir.
2      Q.   And when did you stop?
3      A.   I believe it was August 4, 2019.
4      Q.   Since then, it's been full, you know, bill
5  them out, cash payment or cash equivalent?
6      A.   Correct.  Yes, sir.
7      Q.   Are you the sole member of Elite Medical
8  Wellness?
9      A.   Talking about the corporate structure of
10  Elite Medical Wellness, LLC?
11     Q.   Correct.
12     A.   Yes.  I'm -- I'm the owner.  I'm the
13  single managing member.
14     Q.   Do you know if 400 dollars per visit with
15  a nurse practitioner like Iva Conde -- how does that
16  compare to sort of the -- the average charge for
17  that sort of visit with that sort of provider in --
18  in and around Lake Charles?
19         MR. GRINNAN:  Object to the form.
20     A.   Yeah.  It's a usual, customary rate
21  because that is not simply a psychiatric visit.
22  There is an administrative update, so you have the
23  technical writers trained to extract data from the
24  note to make it more legible.  Then that particular
25  administrative extraction goes back to the provider.

14  (Pages 53 to 56)

PATRICK HAYES, MD - 1/9/2025

Page 57

```
 1   So it's basically a visit, all of the actions that
 2   go into supporting the visit, plus a one-page report
 3   every time he's seen.  So those charges are
 4   appropriate.
 5       Q.   (BY MR. FLORES) Okay.  So for September
 6   13th, 2024, for example, Iva Conde, adult
 7   psychiatric visit plus admin update.  Do you see
 8   that?
 9       A.   Yes, sir.
10       Q.   The total fee was 400 dollars, right?
11       A.   That's correct.
12       Q.   What percentage of that 400 dollars is
13   attributable to the psychiatric visit, and what
14   percent is attributable to the admin update?
15       A.   Oh, I would have to go back and look at
16   the fee schedule and compare what a straight
17   treatment as usual psych follow-up visit is compared
18   to with the admin update.  I don't know it offhand.
19       Q.   Okay.  And same question for September
20   16th, 2024, the visit and update involving Dene'
21   Culton at 300 dollars.
22       A.   Same deal.  I'd have to go back and look
23   at it.  I don't think I did the last two or three
24   updates to the fee schedule.  I trust my practice
25   manager understands what the -- the costs are in
```

Page 58

```
 1   executing these business actions, so I delegate her
 2   the authority to do so.
 3       Q.   Okay.  So there -- there seems to be an
 4   admin update associated with every visit; is that
 5   correct?
 6       A.   That's correct.  Yes, sir.
 7       Q.   Okay.
 8       A.   Excluding the -- the initial comprehensive
 9   visit because that gets the 16-page report in
10   Landon's case.  So there doesn't need to
11   additionally be a summary of that.  That report
12   summarizes it.
13       Q.   And what are the administrative tasks that
14   go into an admin update?
15       A.   Across the board?
16       Q.   Yeah, everything that is -- is encompassed
17   by admin update in these -- these charges.
18       A.   So the -- the chart itself goes to the
19   front office staff immediately conclusion of the
20   the visit for outprocessing, and then the front
21   office staff will generate some manner of scan or
22   photocopy of the -- the visit itself because those
23   are just convenience copies of the -- the durable
24   document.  Those are not preserved.
25            Then that goes to one of the available
```

Page 59

```
 1   technical writers, who have been trained on how to
 2   extract -- it's essentially a SOAP note for a
 3   follow-up, so we want to extract the most salient
 4   one, two, three pieces of the subjective section;
 5   one, two, three pieces of the objective section and
 6   then encapsulate any changes in the assessment and
 7   plan.  Those are then typeset in digital fashion.
 8   They are printed and provided to the provider for
 9   proofreading.
10            The provider, in most cases, will kick it
11   back to the technical writer because they -- they
12   are the providers.  They're the ones who understand
13   what's going on.  It's really capturing a snapshot
14   of what happened in that moment.  It goes back to
15   the technical writer for additional revision, and
16   then it comes back to the provider to sign off on
17   and then prepare to the front staff.
18       Q.   Okay.  And that's the full spectrum of
19   administrative tasks that go into this admin update?
20       A.   Yes, sir.
21       Q.   Okay.  All right.  You mentioned a little
22   while ago when we were talking about the -- the
23   visits with Mr. Perry throughout the latter part of
24   '23 and '24 that he has improved.  Can you elaborate
25   on that?
```

Page 60

```
 1       A.   Yes, sir.  There's about four hours of
 2   stuff I could say.  Can you narrow your question a
 3   little bit for me?
 4       Q.   Well, I would like to get your thoughts on
 5   what you meant by he has improved.
 6       A.   Yeah.  So --
 7       Q.   Well, let -- maybe I can narrow it for you
 8   a bit.
 9            What is your current diagnosis of
10   Mr. Perry?
11       A.   So he had four diagnoses.  Those have not
12   changed.  Post-traumatic stress disorder, F43.10.
13   He has clinical insomnia; there's a whole bunch of
14   codes that follow that.  He has male erectile
15   dysfunction, unspecified, N52.9.  And he has
16   post-burn pain and itch related to unspecified burns
17   of the male genital region sequelae; the codes to
18   encapsulate that are R52 plus L29.9, slash,
19   T21.06XS.
20       Q.   Okay.  And those diagnoses are in effect
21   as of this date; is that correct?
22       A.   That's correct.  Yes, sir.  His most
23   recent visit with Iva was on November 15, and his
24   most recent visit with Dene' was on December 18.  So
25   we've seen him recently.  He's got another visit
```

15  (Pages 57 to 60)

PATRICK HAYES, MD - 1/9/2025

Page 61

1    booked with Iva on January 15 and one booked with
2    Dene' on January 10. So he's got a couple of visits
3    right around the corner.
4        Q.   Okay. On the erectile dysfunction, do you
5    have an opinion as to whether that is physical or
6    psychological in nature?
7        A.   It's a good question. I initially used
8    the N52.9 code, which is the urological code. Now,
9    psychiatrists often work in sexual dysfunction. So
10   there's a -- a chapter -- excuse me -- in the DSM on
11   psychoneurotic sexual dysfunction. And then it is
12   among the most common complaint about concerns in
13   soldiers, veterans, first responders. It's just a
14   very common thing to roll in through a psych clinic.
15       But based on my appreciation of the images
16   of his genital injury, based on the location of
17   those injuries, based on his description of the
18   pain, I initially used the urological code and not
19   the psychological code. The rationale of that --
20   for that being, in the DSM, criterion D for male
21   erectile dysfunction is that it's not definable to
22   something medical or surgical or medication induced.
23       So at the time I initially sat with him
24   and through his course of care to date, it has
25   looked like it has -- it's related to the injury

Page 62

1    itself, but there's significant overlap in that. I
2    mean, if you take away a young man's sense of
3    masculinity, if you add discomfort to the mix, if
4    you add penile anesthesia to the mix and then he
5    begins thinking that it's -- it's a problem or he
6    begins to have these expectations that he cannot be
7    successfully sexually potent, then it can become
8    psychological, or there can be an overlap of both.
9    So having worked with Landon, having looked at his
10   records, having talked to the team, at this point,
11   it -- it appears to me to be a blend of both.
12       MR. FLORES: And, John, I think we're
13   getting some feedback or some noise from you.
14       MR. GRINNAN: I -- really?
15       MR. FLORES: Yeah. You keep -- you're
16   popping up as a speaker occasionally.
17       MR. GRINNAN: There's no -- I'm not saying
18   that that's not, but I think it's silent in here.
19   So I apologize. I'm not sure what -- what it's
20   coming from. What does it sound like, Rey?
21       THE REPORTER: Just feedback.
22       MR. FLORES: Like somebody talking. Like
23   a radio interference or something.
24       MR. GRINNAN: It might be my next door
25   neighbor.

Page 63

1        MR. FLORES: Okay.
2        MR. GRINNAN: Talking loud on the phone.
3    I'm sorry. I --
4        MR. FLORES: Okay. Well, I mean --
5        MR. GRINNAN: You don't hear it now, do
6    you?
7        MR. FLORES: No. I mean, we hear you
8    talking as a speaker. But if -- I don't know if
9    you're able to go on mute and -- you know, I don't
10   know. Just you're kind of cutting in when -- with
11   the testimony.
12       MR. GRINNAN: I apologize. Not -- I'm not
13   trying to be disruptive.
14       MR. FLORES: Okay.
15       Q.   (BY MR. FLORES) All right. So, Dr. Hayes,
16   your -- your current opinion -- well, let me -- let
17   me back up. Your initial opinion was that
18   Mr. Perry's erectile dysfunction diagnoses was
19   attributable to the physical injury, correct?
20       A.   Correct. The initial opinion was that it
21   appeared to be urological in nature so related to
22   the -- the caustic burns of his genitals.
23       Q.   Your current opinion is that it's both
24   urological and psychological in nature; is that
25   right?

Page 64

1        A.   Correct. And that's really an unescapable
2    reality with Landon. I mean, this is not a
3    gentleman that, because he's stressed, not sleeping,
4    just suddenly can't have sex with his wife. This is
5    an individual whose genitals were burned with some
6    manner of caustic corrosive and then has developed
7    significant sexual problems with his wife -- his now
8    wife. So, yeah, it is a blend of both.
9        Q.   Are you offering any urological opinions?
10       A.   No. I'm not a urologist. I am aware that
11   Mr. Perry was burned with second-degree burns on
12   his -- the glands of his penis, the corona and on
13   the anterior-inferior aspect of his scrotum. I have
14   reviewed the reports of Dr. Liu, Dr. Henderson,
15   Dr. Frey, the UMC Medical Center, Our Lady of
16   Lourdes. I'm aware he has injuries there, but I am
17   not a urologist.
18       Q.   Have you ever physically examined
19   Mr. Perry's genital area?
20       A.   Again, I'm a psychiatrist. He has showed
21   me images of it on his phone, and I have seen
22   somewhere around 40 images in the medical records of
23   his injuries. So I have visualized them. But I am
24   not managing the skin breakdown. I am not managing
25   the penis itself. So, no, there would be no reason

HANNA & HANNA, INC.
713.840.8484

PATRICK HAYES, MD - 1/9/2025

Page 65

```
 1    for his psychiatrist to have him take out his
 2    genitals in the office.
 3         Q.   All right.  And so just to be clear, you
 4    have not physically examined Mr. Perry's genital
 5    area, correct?
 6         A.   Again, that's what we discussed.  It would
 7    not be necessary, given the information that I have
 8    in the medical records, given the images, given what
 9    I understand and our role in his management, to
10    examine his genitals in a psychiatric office.
11         Q.   Okay.  And so fair to say you have not
12    done so?
13         A.   Rey, I'm going to keep saying the same
14    thing.  It would not be a necessary or indicated or
15    appropriate, given the available information, to
16    take Mr. Perry's genital out in a psychiatric
17    office, given the nature of our management of his
18    condition.
19         Q.   And you're not going to offer any -- any
20    urology-based opinions at trial, correct?
21         A.   No, sir.
22         MR. GRINNAN:  Form.
23         A.   He has a -- he has a urologist, and he has
24    individuals in the plastic and burn surgery realm
25    managing that level of his health condition.
```

Page 66

```
 1         Q.   (BY MR. FLORES) Have you spoken with his
 2    urologist?
 3         A.   In Mr. Perry's case, no, although the team
 4    and I discussed it because it -- Landon is a symptom
 5    minimizer, and one of the things we've noticed in
 6    review of the records is that it's not entirely
 7    clear that Landon has fully revealed the -- the
 8    extent of his headaches from the -- the -- the
 9    erectile medications.  So I think the urologist may
10    be operating with the idea that they're -- they're
11    more tolerated than they are.  So the team and I
12    have discussed reaching out to that -- that group.
13    We have not done so yet though.
14         MR. FLORES:  All right.  I'll object as
15    nonresponsive.
16         Q.   (BY MR. FLORES) My question was simply
17    whether or not you've spoken with the urologist.
18         A.   No.  I have not done so yet.
19         Q.   For the psychological component for your
20    opinion of Mr. Perry's erectile dysfunction, what is
21    the -- the treatment for that?
22         A.   He has done well finally opening up to the
23    team and I about those problems, and then that in
24    and of itself is -- can be immensely therapeutic.
25    So to -- to sit on a difficulty, to stew on it and
```

Page 67

```
 1    to feel isolated in that without any -- any ability
 2    to normalize it, any ability to work on it, that can
 3    be perpetuating.  So we've gotten past that point.
 4         And then, in terms of his medications,
 5    we're being mindful to use agents that are not
 6    typically associated with significant erectile
 7    dysfunction.  So several of the -- the indicated
 8    agents for PTSD, the strict SSRIs, number one side
 9    effect, number two side effect is erectile
10    dysfunction.  We are not using those.  We're using
11    duloxetine, which has a balancing adrenergic
12    component.  And in most patients, we can get away
13    with use of that if it's pretty neutral.  And then
14    his medications at night, we've been trying to use
15    the TCAs that are not typically associated with
16    significant erectile dysfunction and recently
17    initiated, although we've been fighting with his --
18    his coverage on it, one of the dual orexin receptor
19    antagonists, and those are very clean in terms of
20    sex life.
21         So we're talking about it.  We're working
22    on it.  He -- in his most recent visit just a couple
23    weeks ago, discussion was about alternative
24    activities with his -- his wife, things that they
25    could do to be sexually fulfilling that would --
```

Page 68

```
 1    would take that role that doesn't necessarily
 2    involve full erectile consummation.  He's a bit
 3    averse to that.  He doesn't like it.  He's
 4    embarrassed.  So those -- those are the kind of
 5    things that we're working on with him.
 6         Q.   Okay.  So I think I heard you mention that
 7    he opened up to discuss the erectile dysfunction
 8    with you, which can be therapeutic, correct?
 9         A.   Yes, sir.
10         Q.   There are medications you are
11    administering to help with the erectile dysfunction
12    or to treat his psychological symptoms while not
13    impairing his sexual function?
14         A.   More the latter.  Now, in cases where an
15    individual does not have access or has not
16    established care with a urological team, we will
17    often through Elite manage the erectile medications
18    or cause referrals for that.  He's got a urologist
19    that's working with him on one of the PDE5s, so our
20    job then is to do the psychological side, work on
21    expectations, work on shame, work on partner
22    relational stuff, work on approaching his fiancee,
23    work on sense of self.  And then, on the medication
24    side, not to ruin what's going on, not to spoil
25    something or add additional problems to it.
```

17 (Pages 65 to 68)

HANNA & HANNA, INC.
713.840.8484

PATRICK HAYES, MD - 1/9/2025

Page 69

1  Q.  Okay.  And you mentioned -- you mentioned
2  a discussion with him of alternatives to, I guess,
3  traditional sexual activity?
4  A.  Yeah, full coitus.  Uh-huh.
5  Q.  Okay.  So alternatives to full coitus have
6  been discussed with Mr. Perry?
7  A.  That's correct.  Yes, sir.
8  Q.  As part of his ongoing counseling or
9  therapy?
10  A.  Correct, and -- and he doesn't like it.
11  He's embarrassed by that, and his response -- he has
12  opened up well to it.  He does well when we see him
13  a little bit more frequently.  That's why we've been
14  keeping his -- his cadence a little bit higher.  He
15  will deteriorate into avoidance.  But as we will
16  talk with him a little bit more, one of his main
17  concerns is his new wife would like to have a baby,
18  and there's no amount of masturbation, foreplay,
19  oral sex, those sorts of things that's going to
20  cause a pregnancy.  So that's still -- that's been a
21  sticking point that we're still working on, you
22  know, actively.
23  Q.  So what are the alternatives to full
24  coitus that have been discussed with Mr. Perry?
25  A.  That was in the most recent visit with

Page 70

1  Ms. Culton, and she and I were discussing that
2  yesterday.  I didn't ask her specifically if she
3  talked about, you know, manual stimulation or oral
4  sex.  I didn't dive into that.  We just discussed
5  that, in general, she was offering him, from a -- a
6  neutral, sterile, clinical third-person point of
7  view, hey, these are things that you could do.  It
8  doesn't have to be full coital sex.  It doesn't have
9  to be this.  And then you see how the -- the -- the
10  patient responds to that, and then you respond to
11  their response.
12      So our -- our design in psychotherapy is
13  to be persuasive in that person's best interest.  So
14  they're -- they're fluid, malleable conversations.
15  It's not -- there's not advice giving.  There's not
16  a right way or a wrong way.  It's more seeing where
17  he's at, figuring out what the problem is, offering
18  some solutions or coaching him into coming up with
19  some solutions and then seeing how those fit, and we
20  do it again.
21  Q.  All right.  Now, you -- you were not
22  involved with that session with Mr. Perry and -- and
23  Mrs. Conde, right?
24  A.  Those with Ms. Culton, and, no, I was not
25  sitting in on that session.  We discussed it

Page 71

1  yesterday.
2  Q.  Okay.  And so what -- what is the typical
3  course of treatment for erectile dysfunction, the
4  psychological or psychiatric component of that?
5  A.  Again, it's very, very common, and we are
6  reluctant to use terms such as normal or typical
7  when we're working with patients.  That can be
8  stigmatizing in and of itself.  But in general, we
9  want to have the somatic approach, which is medical,
10  surgical, medications, and we want to have the
11  psychological approach, which is psychotherapy,
12  expectation management, psychoeducation.  And then
13  moving forward, as I discussed in -- in your last
14  question, you want to see what fits, what works,
15  what doesn't work, why it doesn't work and then do
16  it again, readjust.
17  Q.  Okay.  So psychologically, we're talking
18  about psychotherapy and expectation management?
19  A.  Yes, sir.
20  Q.  Okay.  Now, at some point, you kind of
21  alluded to earlier your opinion changed and went
22  from the erectile dysfunction being physical in
23  nature to being both physical and psychological in
24  nature, correct?
25  A.  Yes, sir.

Page 72

1  Q.  When did that change in opinion occur?
2  A.  It was during his -- his symptom flare --
3  excuse me -- some four to six months ago where we
4  started seeing him a little bit more.  He, like many
5  individuals that do not have a -- a mental health
6  history, do not have a lot of medical history
7  generally, he operated in a lot of denial and a lot
8  of avoidance.  And what we found during that
9  season was just how preoccupied he was with the --
10  the erectile dysfunction, how insulting it was to
11  him.
12      For example, he -- he will do the things
13  we suggest.  He's unhappy.  He's dysphoric.  He
14  doesn't have a lot of energy.  But we've offered,
15  you know, what are some things that you could do.
16  He talked about fishing.  But then, when he goes
17  fishing, he can't tolerate it.  He can only do about
18  two hours because of the heat and the -- the
19  friction.  Then he's down for about two days with
20  discomfort.
21      But what we've learned through the -- the
22  context of him being a very, very compliant, very
23  participative patient, just how bothered he is by
24  the sexual stuff.  And the level of botherment is
25  such that it would be very unlikely that it is

18  (Pages 69 to 72)

PATRICK HAYES, MD - 1/9/2025

Page 73

1    strictly surgical at this point, that there's not
2    some expectational component, that there's not some
3    psychological component.
4        Q.   So about four to six months ago is when
5    your -- your opinion sort of began to evolve?
6            MR. GRINNAN:  Form.
7        A.   I mean, we're -- we're continuously
8    reassessing.  We're gathering data.  We are working
9    with individuals.  The -- the differential
10   diagnoses, the therapeutic approach, those should
11   mature over time in the way that the patient should
12   improve.  And they should also mature over time.
13   So, yeah, somewhere midstream in his treatment --
14   he's been with us for 16 months -- somewhere about
15   half a year ago, it -- it became apparent that this
16   is probably not simply a -- a surgical corrosive
17   problem.  This is probably a psychological problem
18   as well.
19       Q.   (BY MR. FLORES) Would you expect the
20   psychological issue to resolve?
21       A.   We're going to treat optimistically, and
22   we're going to try to help get him there.  It
23   remains to be seen.
24       Q.   Is there literature or have there been
25   studies on the resolution of erectile dysfunction

Page 74

1    when it's psychologically based?
2        A.   Oh, I'm sure there is.  I have not pulled
3    that in his case.  I did not go back and look at it.
4            Sexual dysfunction is very, very common.
5    I mean, there's a reason there's whole industries on
6    the internet for buying a little blue pill from
7    Mexico.  And then the little blue pill often works
8    in patients that don't have vascular erectile
9    difficulties or don't have surgical or mechanical
10   erectile difficulties.  That is expectational from
11   taking the powerful little blue pill.
12           So I have seen patients that we can get
13   past it.  They do well.  I have seen patients that
14   somehow it creates a stiction point either in their
15   psyche or in their relationship, and it's
16   irrecoverable.  I've seen both.
17           MR. FLORES:  I'm going to object as
18   nonresponsive.
19       Q.   (BY MR. FLORES) I think my question there
20   was is there literature -- is there literature
21   related to the resolution of erectile dysfunction
22   when it's psychologically based?
23       A.   Yeah, and I led off with a direct response
24   to that, that I -- I did not go to the literature on
25   his erectile dysfunction, either in the context of

Page 75

1    his care or in preparation for the deposition.
2        Q.   Is it your current understanding that
3    Mr. Perry is unable to achieve an erection?
4            MR. GRINNAN:  Form.
5        A.   It's my understanding that he is
6    mechanically able to attain an erection through
7    either the cavernosal injection or through some of
8    the medications.  But he has been limited by
9    discomfort, and there's an aversion now to the
10   erection itself because of the discomfort.
11       Q.   (BY MR. FLORES) Is it your understanding
12   that he's able to obtain an erection during foreplay
13   or sexual activity with his wife?
14       A.   Same thing.  If he uses a cavernosal
15   injection or takes one of the medications, yes, he
16   would be capable of mechanically doing that, from my
17   understanding.  But it hurts, and then, if he uses
18   it, it hurts more.
19       Q.   Okay.  And so your understanding -- just I
20   want to make sure I understand.  Now, your
21   understanding is that Mr. Perry, in order to obtain
22   an erection, requires either medication or an
23   injection, correct?
24           MR. GRINNAN:  Object to the -- object to
25   the form.

Page 76

1        A.   That's my current understanding of it.
2    Yes, sir.
3        Q.   (BY MR. FLORES) And that, without those,
4    he is unable physically to obtain an erection?
5        A.   That's my understanding.  Now, whether
6    it's a low-quality erection, whether that's
7    intermittency to it -- then, in addition to the
8    mechanical act, there's the expectation of it.
9    There's the head space that an individual needs to
10   fall into.  There are both activation of
11   parasympathetic and sympathetic nervous system to
12   the -- the sexual act, and what that, in shorthand,
13   means, one needs to be able to both be fully relaxed
14   to be fully excited, physically.  And then,
15   psychologically, the -- it maps in a similar
16   fashion.  There are challenges to that.
17           So, again, recall who you're talking to.
18   This is the psychiatric manager.  We are not
19   involved -- in his case, we're not prescribing the
20   PDE5s.  We're not prescribing the cavernosal
21   injections.  We're not prescribing the intraurethral
22   pellets.  We are not managing the caliber of the
23   actual penile erection.  We are managing his sexual
24   dysfunction with him psychotherapeutically and
25   through medications that do not worsen that.  So I

19  (Pages 73 to 76)

PATRICK HAYES, MD - 1/9/2025

Page 77

1  have not and my team has not been spending a ton of
2  time talking specifically about the quality of that
3  physical erection.
4      Q.    So fundamentally, is your opinion that,
5  because of the physical discomfort that Mr. Perry
6  says he experiences with an erection, he is unable
7  psychologically to enjoy and, therefore, engage in
8  sexual activity?
9      A.    That's how he's related to -- related it
10 to us.  And that makes a lot of sense
11 psychologically.  If -- if your genitals hurt and
12 then continue to hurt after you use them when you're
13 prepared for sex, it's going to not only enhance
14 those feelings of inadequacy, emasculation,
15 incompetence.  It's going to create an aversive
16 dosage to the act as well.  It -- it's a difficult
17 recipe.
18     Q.    And you said earlier that erectile
19 dysfunction is quite common in your line of work?
20     A.    Oh, yes, sir.
21     Q.    Have you treated erectile dysfunction
22 patients in the past?
23     A.    Oh, thousands.
24     Q.    In your experience, what percentage of
25 those patients have overcome their erectile

Page 78

1  dysfunction and been able to engage in satisfying
2  sexual activity?
3      A.    As we just discussed earlier, I've seen
4  both spectrums of that happen.  I have seen patients
5  that one or two small interventions get them back in
6  their groove.  They're good to go.  I've seen
7  individuals that will persist with sexual
8  dysfunction with their partner for the rest of their
9  marriage.  I've seen one of each of those examples
10 this month.  So I've never sat down and quantified
11 how many of the sexual dysfunction male patients
12 I've had have improved, how many have not improved,
13 how many are somewhere in between.
14     Q.    What percentage would you say have the
15 issue resolved within, let's say, 12 months?
16     A.    Again, I haven't quantified that.  There's
17 -- there's really no reason to sit around and count
18 that kind of stuff.
19     Q.    And same question if I were to ask you how
20 many resolve in 24 or -- or 36 months?
21     A.    I mean, I'm -- I'm busy working with folks
22 and trying to help patients do better.  I'm not
23 sitting around quantifying that sort of stuff.
24     Q.    Okay.  So same question if I were to ask
25 you how many have resolved in five years?

Page 79

1      A.    And, sir, I'm not trying to be obstinate,
2  but it's kind of like depression.  Depression is the
3  bread and butter of psychiatric care.  I've probably
4  seen 23-, 24,000 individual patients by this point
5  in my career.  Many of my depression patients get
6  better.  There are some that don't get better.  I've
7  worked in refractory depression before.  But I have
8  no ability to quantify, like, give you even a -- a
9  rough estimate of how many of my depression patients
10 got better in 12 months, how many got better in two
11 years.  Same deal with sexual dysfunction, insomnia.
12 I don't know.
13     Q.    All right.  So as you sit here today, you
14 can't tell us what percentage of your patients with
15 erectile dysfunction have improved in 12, 24, 36, 48
16 or 60 months, fair?
17         MR. GRINNAN:  Form, asked and answered.
18     A.    Yeah.  Again, these are such common
19 conditions.  No, I don't think I could hazard even a
20 -- a rough estimate.
21     Q.    (BY MR. FLORES) You mentioned PTSD -- a
22 PTSD diagnosis, correct?
23     A.    Yes, sir.
24     Q.    What is the course of treatment for
25 post-traumatic stress disorder?

Page 80

1      A.    So in general, psychotherapy is considered
2  the primary change agent in PTSD.  You want to move
3  patients to a remission status by generating post-
4  traumatic wisdom or growth as opposed to symptoms of
5  stress disorder, and medications can be assistive in
6  that process where we can suppress limbic outflow.
7  We can enhance energy.  We can suppress sleep.  We
8  can enhance mood, suppress anxiety.  So the -- the
9  gold standard or the best practice is a combination
10 of medications and psychotherapy.
11     Q.    How many sessions of psychotherapy are
12 typically needed to resolve PTSD?
13     A.    Yeah.  You'll see some stuff in the
14 literature on that.  I still do assessments for the
15 VA.  I was in the Army for 12 years.  Individuals
16 with PTSD often require long-standing treatment.
17 The DSM itself includes a commentary that many
18 patients have symptoms for 50 years or longer.  It
19 depends on inherent characteristics of the
20 individual.  It depends on the insult that was
21 suffered.  It depends on comorbidities that happen
22 with it, psychological or medical.  So it runs the
23 spectrum.
24         I'm aware that certain publications say,
25 with EMDR, one should be able to obviate PTSD

20  (Pages 77 to 80)

PATRICK HAYES, MD - 1/9/2025

---

Page 81

1  symptoms in 24 sessions.  With cognitive processing
2  therapy, one should be able to obviate those
3  symptoms or mitigate them in 12 to -- to 30
4  sessions.  There are a couple psychologists who
5  publish disputes that PTSD doesn't even exist.
6      What I can tell you, in reality, from
7  having been a very busy Department of Defense
8  provider, from having done many different clinical
9  assessments and treatments and administrative
10  evaluations for the VA, the reality is that people
11  are going to the VA for a long time.  People that
12  are being treated by the DOD with PTSD receive
13  treatment for a long time.  People that are in
14  corrections with PTSD receive treatment for a long
15  time.
16      Q.   Which articles are you aware of that say
17  that, with EMDR therapy, PTSD is typically resolved
18  in about 24 sessions?
19      A.   I'd have to pull them.  I didn't prepare
20  those for today.
21      Q.   Which articles are you aware of that say
22  that, with cognitive behavioral therapy, PTSD is
23  typically resolved in about 12 sessions?
24      MR. GRINNAN:  Form.
25      A.   And it's one of the cognitive behavioral

---

Page 82

1  therapies.  I mentioned cognitive processing
2  therapy, CPT.  But, again, I -- I did not pull that.
3  I have pulled them before.  I have some literature,
4  but I don't have that available today.
5      Q.   (BY MR. FLORES) Have you treated patients
6  with PTSD previously?
7      A.   Oh, sure.  I mean, I'm a combat-deployed
8  Army psychiatrist.  I was the busiest Army
9  psychiatrist in Centcom at the time of my
10  deployment.  I ran all of mental health for southern
11  Iraq.  I did all line-of-duty behavioral health
12  investigations.  During my time in Iraq, I ran an
13  inpatient ward, an outpatient service.  I ran an
14  aerovac mission through Iraq to Landstuhl Regional
15  Medical Center.  I have worked a lot with PTSD.
16      Q.   In Elite Medical Wellness, do you -- have
17  you treated patients with PTSD?
18      A.   Oh, sure.
19      Q.   And of those you've treated through Elite
20  Medical Wellness, what percentage would you say have
21  had their PTSD resolve?
22      A.   Again, PTSD's fairly common, so it's not
23  quite as common as insomnia, as major depression.
24  But the general estimate from the National Institute
25  of Health wave two epidemiologic study is about six

---

Page 83

1  to seven percent of Americans at any given time meet
2  criteria for PTSD.  About six to seven percent meet
3  criteria for subsyndromic PTSD.  There's some
4  additional data out there that suggests that, across
5  the life span, it's quite similar to that.  11 to 14
6  percent will have had PTSD at some point.  So it's
7  not an uncommon experience.
8      We've got about 6,000 patients underneath
9  all the operations.  So if you multiply 6,000 by 10,
10  15 percent, I mean, we've got 6-, 900 patients at
11  any given time with PTSD.  So I've not quantified
12  how many of them have remitted.  What I can tell you
13  is that, with treatment, most of our patients have
14  gotten better.  The -- the -- the great majority,
15  probably 95-plus percent, have improved some.  The
16  number that have improved to remission, I don't have
17  a number for you.
18      Q.   Okay.  You said 90 to 95 percent have
19  improved some?
20      A.   Yes, sir.
21      Q.   And when you say some, what do you mean by
22  that?
23      A.   I suppose a synonym for some would be any.
24      Q.   Now, does PTSD preclude productive
25  employment?

---

Page 84

1      MR. GRINNAN:  Object to form.
2      A.   It can.  It doesn't necessarily have to.
3  So the -- the condition itself does not necessarily
4  imply level of disability.  One can have severe
5  acute stress disorder, which is the antecedent to
6  PTSD, where I can't do anything.  One can have
7  remitted PTSD or nearly remitted PTSD years later
8  where they can be quite functional.  So the
9  condition itself does not -- it's not confirmatory
10  of a level of disability.
11      Q.   (BY MR. FLORES) In Mr. Perry's case, do
12  you have an opinion as to whether or not his
13  diagnosis of PTSD precludes employment?
14      A.   I've not done a specific occupational
15  analysis of him.  If I were asked to do so, I would
16  use one of the -- the heuristics that go through
17  sustained concentration, reliability, attention to
18  detail, ability to interact with co-workers, ability
19  to tolerate criticism from supervisors.  Again, I've
20  not done that.  We often do the World Health
21  Organization Disability Assessment Scale 2.0 12
22  version.  That gets to some of those items.  We just
23  haven't done that yet.  I mean, we've been working
24  with Landon for 16 months.  That will happen in the
25  next season.

---

21  (Pages 81 to 84)

PATRICK HAYES, MD - 1/9/2025

Page 85

1    But I can tell you, from his real world
2    steps to do what we've encouraged him to do -- so
3    what that looks like is, hey, what do you think you
4    could do?  And one of the -- the things, as I
5    mentioned, was fishing.  But another one was getting
6    a dog.  So he's tired.  He doesn't want to go out,
7    so he got a puppy, which forces him to get up and go
8    out.  But what ends up happening is he's -- he
9    develops mechanical irritation of the -- the
10   scrotum, and then that makes him uncomfortable, and
11   he'll start to limp.  When he limps, if anybody
12   comments on it, it puts him into a dysphoric spin
13   for a couple of days where he doesn't want to go
14   out.  So that's the kind of stuff we're working on
15   at this point.
16        So do I have him restricted from work?
17   No.  I don't think his PTSD, his insomnia -- I don't
18   think those would be harmed by work.  I don't think
19   he's -- would be harmful to other workers.  Do I
20   think he's capable of that?  Now, I'm answering you
21   casually.  I didn't do a -- the occupational
22   heuristic.  I didn't do a WHODAS yet.  But do I
23   think he's capable of work at this point?  Would he
24   be reliable?  Would he show up for work?  Be capable
25   of doing an eight-, 10-, 12-work hour day -- hour

Page 86

1    workday?  I do not believe he would.
2        MR. FLORES:  Object as nonresponsive.
3    Q.   (BY MR. FLORES) Let's back up here a
4    second.  So you don't have Mr. Perry restricted from
5    work, correct?
6        MR. GRINNAN:  Object to the form.
7    A.   I don't have any restrictions on him at
8    work.
9    Q.   (BY MR. FLORES) And so as you sit here
10   today, is it fair to say that you don't believe his
11   PTSD diagnosis precludes his productive employment?
12       MR. GRINNAN:  Object to the form.  It's
13   been asked and answered.
14   A.   That's inaccurate.  So restrictions and
15   limitations are different things.  Restrictions are
16   me affirmatively reaching out and saying, this would
17   harm the individual because, or, this individual
18   would be harmful, risky to others because.  Do not
19   have him restricted for psychological conditions.
20   Limitations are -- are entirely another thing.  I do
21   believe he has several and significant limitations
22   at the present time.
23       THE WITNESS:  And, Rey, we're at two
24   hours.  Can we take five?
25       MR. FLORES:  Sure.  We can take a

Page 87

1    five-minute break.
2        THE WITNESS:  Cool.
3        THE VIDEOGRAPHER:  We're off the record.
4    The time is 11:02 a.m.
5        (Short recess.)
6        THE VIDEOGRAPHER:  We're back on record.
7    Time is 11:13 a.m.
8    Q.   (BY MR. FLORES) All right.  Dr. Hayes, are
9    you ready to proceed?
10   A.   Yes, sir.
11   Q.   Did your staff have a chance to scan the
12   articles we talked about earlier?
13   A.   No, sir.
14   Q.   Are they able -- do you have somebody able
15   to do that?
16   A.   I'll probably get that at the end.
17   Q.   Well, I'd like to be able to, since you
18   have them in front of you, potentially ask you about
19   them.  Can you do that now, if we take a quick
20   three-minute break?
21   A.   Yeah.  Yeah, if you want to do three
22   minutes of that.
23       MR. FLORES:  Okay.  Let's go off the
24   record.
25       THE VIDEOGRAPHER:  We're off the record.

Page 88

1    Time is 11:14 a.m.
2        (Short recess.)
3        THE VIDEOGRAPHER:  Back on the record.
4    Time is 11:24 a.m.
5    Q.   (BY MR. FLORES) All right.  Dr. Hayes, is
6    there literature that you're aware of regarding the
7    typical time frame for resolution of PTSD symptoms?
8    A.   As we discussed earlier, I think you asked
9    me the same question, but there is volumes of
10   literature out there on different treatment
11   modalities, the expected treatment response, the --
12   the time to resolution.  There are literature
13   including within the DSM discussing that, in many
14   patients, symptoms last 50 years or longer.
15   Q.   Do you know what percentage of patients
16   exhibiting PTSD complaints resolve in, let's say, 12
17   months?
18   A.   What percentage of my patients or patients
19   generally?
20   Q.   Well, let's -- let's start with patients
21   generally.
22   A.   It depends on -- on who you're citing and
23   what their opinion is.  As I mentioned before, there
24   are two psychologists who are fairly well-considered
25   providers in the field that don't even believe in

HANNA & HANNA, INC.
713.840.8484

PATRICK HAYES, MD - 1/9/2025

Page 89

1    PTSD. But in general, most patients will improve,
2    and -- and my patient population is similar to that.
3    They will improve. The number that get to full
4    remission in 12 months I don't have a number on.
5        Q.   Do you have any numbers on full remission
6    in, let's say, 24 months or 36 or 48 or -- or 60
7    months?
8        A.   As you get further out, the -- the
9    populations tend to bifurcate, so the treatment
10   responders will -- will improve more. Those with
11   refractory conditions will -- will stay sicker. So
12   individuals that have longer standing PTSD will
13   often be sicker with it long term. Those that got
14   better quicker, and the more they improved.
15       But again, we're not looking for cure of
16   this. We're not going to obviate the things that
17   happened to Mr. Perry. We're looking for
18   improvement. We're looking for remission. So that
19   the -- the strict, raw percentage number, I can't
20   provide you.
21       Q.   All right. Can you discuss the basis for
22   your diagnosis of insomnia with Mr. Perry?
23       A.   Sure. So clinical insomnia is when an
24   individual has difficulty either falling asleep,
25   maintaining sleep through fracturing or maintaining

Page 90

1    enough duration of sleep through the morning to feel
2    sufficiently rested the -- the next day. And then
3    it's incumbent upon treatment providers because of
4    the disability associated with insomnia to call that
5    as an isolated condition, even if it is a component
6    of another condition.
7        Q.   Is it a component of another condition in
8    this case?
9        A.   Yes, sir. So there are criteria of PTSD,
10   and hyperarousal, lack of sleep is one of the
11   aspects of PTSD that allows us to establish that
12   diagnosis. But because insomnia is of such
13   relevance, even though it is the -- I believe it is
14   D -- D3, D4, even though it's in that zone, that the
15   insomnia diagnosis should be utilized.
16       Q.   If I'm understanding correctly, the
17   insomnia diagnosis here is essentially derivative of
18   the PTSD diagnosis; is that correct?
19       A.   No, sir. It's independent of it. I mean,
20   it -- his sleep problems are a facet of -- of PTSD.
21   But, again, the expert work groups on these of the
22   American Psychiatric Association, American Sleep
23   Association -- the recommendation is, if an
24   individual is having clinically relevant insomnia,
25   you call that, and you make it part of the

Page 91

1    differential diagnosis because it is worth making
2    sure that the entire team is aware of it, is
3    treating it, and it has independent prognostic
4    factors.
5        Q.   Okay. I think you said the insomnia here
6    is a facet of the PTSD?
7        A.   Yes, sir. Insomnia is one of the -- I
8    said D. It's one of the E criteria for PTSD, the
9    hyperarousal. But it is not appropriate in such a
10   situation simply to call the condition PTSD.
11   Mr. Perry is also sleeping poorly.
12       Q.   Sure. It sounds like though, if the PTSD
13   is resolved, the insomnia should be resolved with
14   it; is that fair?
15       A.   I -- I get what you're driving at, I mean,
16   where it's one of the E criteria of PTSD helping us
17   establish PTSD. But one can have PTSD without
18   insomnia. One can have insomnia without PTSD. So
19   it is an active diagnosis. It is something we are
20   treating in him. It is, in fact -- in his most
21   recent two medication visits, the sleep problems
22   have been the most refractory thing. So we're
23   struggling more with the insomnia than the PTSD at
24   this point in terms of finding an appropriate
25   regimen, helping him to improve through it.

Page 92

1        Q.   But it's fair to say that the insomnia is
2    related to the PTSD -- to the PTSD, correct?
3        MR. GRINNAN: Form.
4        A.   Again, the -- the full mouthful of the
5    insomnia diagnosis includes the presence of other
6    conditions that could be contributing to it. So I'm
7    going to flip over to my report.
8        Q.   (BY MR. FLORES) Okay. Because I thought I
9    heard you say earlier that the insomnia was a facet,
10   I think is what you said, of the PTSD, meaning it's
11   deriving from his PTSD condition.
12       A.   No. Let me clarify that then. So, I
13   mean, when you look at page nine of the report, the
14   diagnosis is insomnia disorder with mental disorder
15   with medical condition persistent. And then there
16   are coding nomenclatures to that. But you add in
17   the ICD codes of those mental disorders of the
18   medical conditions that can have a role in
19   contributing to sleep problems.
20       Nonetheless, this individual, Mr. Perry,
21   he meets criteria for PTSD. He has PTSD. And then
22   he meets criteria for clinical insomnia. And what
23   the guidance is don't -- as a provider, don't
24   obviate that second diagnosis simply as a piece of
25   the first one. So it is appropriate to use both of

23  (Pages 89 to 92)

HANNA & HANNA, INC.
713.840.8484

PATRICK HAYES, MD - 1/9/2025

Page 93

1    those.  He has both of those as standalone
2    conditions.  Had he not been splashed with a caustic
3    corrosive on his genitals and his lip and his right
4    arm and his axilla, he would not have either of
5    them.  But they -- they are intertwined, but they
6    are also both discrete.
7        Q.  Let me ask it this way.  In your opinion,
8    what is causing Mr. Perry's diagnosis of insomnia?
9        A.  It was caused by the corrosive exposure on
10   April 22nd of 2023.
11       Q.  Let me be more specific.  Are you -- is
12   the -- in your opinion, is Mr. Perry's diagnosis of
13   insomnia based on physical pain or discomfort or
14   some sort of other physical symptom or a
15   psychological issue?
16       A.  It has roles of both of those.
17       Q.  Can you elaborate on that?
18       A.  How so, sir?
19       Q.  What do you mean by it has roles of both?
20       A.  So if he is hot at night and his groin,
21   his scrotum begin to itch, that can wake him up.  If
22   he has a bad dream, that can wake him up.  If he
23   feels flat, pessimistic, apathetic, if he doesn't do
24   much that day, he doesn't burn off enough energy, he
25   doesn't sleep well that night.  If his wife wants to

Page 94

1    be intimate with him and he's unable to do so and he
2    falls into anxious, negativistic rumination, that
3    can keep him from falling asleep.  So it is all of
4    those things.
5        Q.  What is the course of treatment for
6    insomnia?
7        A.  So insomnia, in many cases, we can be
8    effective with medications.  And psychotherapy can
9    be assistive, but if mental exercises were
10   sufficient in and of themselves, Americans would
11   sleep very well.  You wouldn't see all the ads for
12   Unisom and NyQuil PM and all of that fun stuff.  And
13   melatonin wouldn't fly off the shelves.  So people
14   struggle to sleep.  Pharmacotherapy is more
15   important in that condition.  Where I discussed
16   earlier the change agent PTSD is talk therapy with
17   support from pharmacotherapy, for insomnia, it's
18   likely the obverse of that.  Pharmacotherapy takes
19   primacy and then psychotherapy, mindfulness, how to
20   relax, how to deal with those other things.  Then
21   second order issues, partner relational problems,
22   sexual problems, if we can reduce some of that
23   sting.  So medications first with mindfulness-based
24   psychotherapy second.
25       Q.  What medication are you prescribing or

Page 95

1    would you prescribe to Mr. Perry for insomnia?
2        A.  Yes, sir.  And those have changed.  So the
3    duloxetine during the day is an SNRI.  That's a
4    non-narcotic analgesic.  It is a mildly stimulating
5    medication, but it's a daytime med designed to give
6    him a little energy and reduce some of the scrotal
7    and glands pain.  So, again, second order, that
8    should help him sleep through some of the
9    discomfort.  And then, most recently, my team
10   prescribed him trimipramine, which is probably the
11   most sedative of the secondary amine tricyclic
12   antidepressants.  It's good for anxiety, good for
13   depression, good for PTSD, non-narcotic pain as
14   well.  And then it's a potent sedative.
15       So we prescribed him.  We started at
16   milder medicines at milder doses.  Now we've gotten
17   up to a 25 or 50 milligram range.  That is for sleep
18   maintenance predominantly and nighttime analgesia.
19   And then the most recent attempt was to add
20   suvorexant, or Belsomra, which is one of the three
21   dual -- dual orexin receptor antagonists, a DORA.
22   That's more the sleep switch.  So that's involved in
23   helping a person fall asleep.
24       So if you think of the rational design to
25   that, morning med, pain down, energy up, mood

Page 96

1    better, anxiety down.  Med at night to shut off the
2    mind, help him sleep.  It's non-narcotic,
3    nonaddictive.  It's a CDS IV, but it's not
4    functionally a narcotic.  And then the trimipramine
5    at night to maintain sleep and then to continue the
6    analgesic pathway.
7        Q.  How long do you expect Mr. Perry to remain
8    on these medications?
9        A.  I would anticipate a lifetime of treatment
10   for Landon.  Now, the medications, as you've seen
11   from the initiation of care as you follow the
12   records, as you look at the initial life care plan
13   meeting from almost a year ago compared to now, they
14   will change.  We will use the best medications at
15   any given time, but I would anticipate these
16   medications or similar.
17       Q.  For the rest of his life?
18       A.  Yes, sir.  That's correct.
19       Q.  What percentage of your patients take
20   insomnia medication for their entire life?
21       A.  Oh, my goodness.  That's the bread and
22   butter of psychiatry.  I mean, in -- in the state
23   mental health clinic where we have 3,750 patients or
24   so, I would say that 60 percent of them take
25   insomnia medications or medications that promote

                          24  (Pages 93 to 96)

PATRICK HAYES, MD - 1/9/2025

Page 97

1    sleep.  Fully half of them are -- are long-term
2    medication utilizers.  In this private clinic, I
3    would say probably a similar proportion of patients,
4    60 percent, 70 percent, are taking medication to
5    assist with sleep.  I'd say fully half of them will
6    -- will take those medications or equivalent long
7    term.
8         Q.    Long term, do you mean the rest of their
9    lives?  Or do you mean five years, 10 years,
10   eventually weaning off?  Or does it vary?
11        A.    Yeah.  It -- it depends.  It depends on
12   the conditions.  It depends on the duration.  It
13   depends on the comorbidities.  So the -- the more of
14   these things we can improve, the less the
15   medications we'll need.
16         You and I just discussed those three that
17   are prescription.  He's also been advised to use
18   docosahexaenoic acid, which is an omega-3 fatty acid
19   supplement.  That's for wound healing.  And then
20   melatonin more for its antioxidant effects, but that
21   also has sleep promotion.  So ultimately, I've got
22   four things going on in Landon that should help
23   promote sleep, and he hasn't been able to pick up
24   the -- the most recent one because of coverage
25   issues.  But we've got three, pending four, onboard.

Page 98

1    Ideally, we will get it down to where he's not
2    taking all of those forever, but we're going to have
3    to see.  We're still early in his treatment.
4         Q.    What coverage issues are you referring to?
5    Because you've mentioned that a few times throughout
6    our conversation today.
7         A.    Yeah.  I got message that whatever
8    mechanism he's using to receive his medications has
9    not approved the Belsomra.
10        Q.    How do you spell that medication?
11        A.    B-E-L-S-O-M-R-A.
12        Q.    And what message or what document are you
13   looking at there with that note?
14        A.    Yeah.  This one is actually saying that
15   the pharmacy has not received a script for his sleep
16   medication.  And then I'm looking at the clinical
17   document from Ms. Conde's November 15 note where, at
18   the bottom, she had initiated Belsomra on October
19   31st.  And really, the two-week follow-up on
20   November 15th was to see, did you get the
21   medication?  Did you take the medication?  Did it
22   cause any sour or off-target side effects?  Did it
23   help anything?
24         And then I can see her terminal note is,
25   start Belsomra with, in parentheses, pending PA

Page 99

1    process.  So what that means is he tried to fill the
2    Belsomra.  It looks like there was a callback to the
3    clinic.  Pharmacy said they didn't have it.  She
4    pushed it back through to the pharmacy.  Pharmacy
5    got it.  And then, when she went through those
6    questions with them in the med follow-up on November
7    15th, he told her he hadn't been able to get it yet
8    because of the PA process.
9         So somewhere in the mix, his health
10   insurance or -- or whatever -- whatever agency is
11   covering his medications has said, no.  They need
12   more information.  So with that note, I don't see
13   where the -- the documentation is.  She may have
14   done it telephonically.  But it looks like she had
15   to provide them more information to get it for him.
16        Q.    Are you saying pending PA process,
17   papa-alpha?
18        A.    Yes, sir.  It stands for prior
19   authorization.  It's -- it's insurance elegant speak
20   for post hoc denial.  They call it prior
21   authorization.  It's a sleight of hand euphemism,
22   but it means you have prescribed something, and then
23   they've decided that your patient can't have it.
24        Q.    Would you expect that Access Healthcare
25   Management is the entity making that determination

Page 100

1    here?
2         A.    No, sir.
3         Q.    And why do you say that?
4         A.    That's not the language that would be used
5    with -- with that case manager.  They would not
6    initiate a PA.  That's insurance language.
7         Q.    So does this indicate to you that there's
8    some sort of insurance paying for the medication?
9         A.    That's what that would suggest, but that's
10   all benefits and payment stuff.  That's well
11   downstream from us.  We're going to work with
12   whatever comes back and try to get Mr. Perry his --
13   his medication.  But that's not something I'm aware
14   of.  I don't -- I don't know what insurance it would
15   be.  I don't know.  I just don't know.
16        Q.    Does Access Healthcare Management cover
17   medication?  Do they pay for medications?
18        A.    I do not know.  Sometimes we ask for
19   medications through them.  We will place orders
20   through them.  And, again, back to the case
21   management concept, how they handle that, those
22   relationships they have, what they do, how they get
23   labs, how they get meds, I don't know.  You'll have
24   to ask those guys.
25        Q.    So aside from medication, what else is

25  (Pages 97 to 100)

PATRICK HAYES, MD - 1/9/2025

Page 101

1    involved in the course of treatment for insomnia?
2        A.    Like I said, medication takes primacy, and
3    then psychotherapy is secondary.
4        Q.    And is it fair to say that, at this point,
5    you don't know to a, I guess, reasonable degree of
6    medical certainty whether or not Mr. Perry will need
7    to remain on these medications for the rest of his
8    life?
9        MR. GRINNAN:  Form.
10       A.    Again, I can tell you, based on my
11   experience, based on the -- the thousands of
12   patients I've worked with with these conditions --
13   and I have quite a bit of experience with -- the
14   team and I with Mr. -- Mr. Perry over almost a year
15   and a half, roughly two visits per month.  We know
16   him quite well at this point.  We have a good
17   psychological understanding of him.  We know what
18   his response to medications has been.  He will be
19   treated for these conditions for the rest of his
20   life.
21       Q.    (BY MR. FLORES) And that's your opinion to
22   a reasonable degree of medical certainty?
23       A.    That's correct.  At the 51 percent
24   standard or the greater -- greater than 50 percent
25   standard, yes, sir.

Page 102

1        Q.    And when you say treated for these
2    conditions, do you mean he will remain on all three
3    or four of these medications that you referenced or
4    maybe fewer?
5        A.    Optimistically, we will attempt to
6    streamline his meds at any given time.  If we can
7    help somebody sleep with one or two things, that's
8    what we're going to do.  We discussed at present his
9    -- his insomnia has been refractory, so we just
10   added a fourth agent to attempt to assist with that.
11   If we can get some traction on those sleep problems,
12   if as we get some traction on the psychological
13   problems, we can see some improvement, then we will
14   attempt to alleviate those or streamline them.  And
15   the new meds come out.  So if a new medicine has
16   multiple mechanisms that can handle a few of those
17   things at the same time -- but at -- at present,
18   that is the best working metaphor.
19       Q.    Is it your opinion to a reasonable degree
20   of medical certainty that Mr. Perry will require all
21   of these, duloxetine, trimipramine and Belsomra and
22   suvorexant, for the rest of his life?
23       A.    And Belsomra is the suvorexant.  We also
24   have melatonin and docosahexaenoic acid on board,
25   both of those over the counter.

Page 103

1        Yes.  It's my opinion, based on my
2    experience with similar conditions, based on my
3    experience treating large populations, based on
4    analyzing staffing ratios, hiring, shifting, those
5    sorts of things, yes, Mr. Perry will require these
6    medications or similar for the long-term.
7        Q.    Is it your opinion to a reasonable degree
8    of medical certainty that Mr. Perry will have
9    erectile dysfunction for the remainder of his life?
10       A.    As we discussed on that one, there's been
11   some maturation of the differential diagnosis in
12   that, initially, it looked strictly
13   surgical-medical.  And then, as we've gotten to know
14   Landon more, as he's opened up more, as we worked
15   with him, as -- as we've seen how he has responded
16   to those issues, that diagnosis is maturing.
17       So it -- it is quite significant at this
18   point, and we are almost two years after the injury,
19   so this is not the acute phase.  We're not two weeks
20   after the injury, two months after the injury.  We
21   are 21 months after the injury.  So the more data --
22   and as I discussed earlier, if one is sick, we can
23   make some forecasts from that.  If one is sicker,
24   that will allow us to make more forecasts on that.
25   If one is sicker longer, we can make more certain

Page 104

1    forecasts on that.
2        So Landon has been sick with erectile
3    dysfunction.  He has been quite sick with erectile
4    dysfunction.  It has permeated his psyche, and he
5    has remained quite sick with erectile dysfunction
6    for longer.  So it is my clinical supposition that
7    erectile dysfunction will likely be a long-standing
8    component of his treatment.  If we can get some
9    traction on that, perhaps that will change in the
10   future, but I would anticipate that that will be a
11   long-term component of his care.
12       Q.    Is it your opinion to a reasonable degree
13   of medical certainty that he will have erectile
14   dysfunction for the remainder of his life?  Or can
15   you simply not tell us?
16       MR. GRINNAN:  Form.
17       A.    On that one, where there is such an
18   overlap with the -- the medical-surgical component,
19   I believe it will be long-standing, based on those
20   factors that I just discussed with you.  But whether
21   or not that will be lifelong, I cannot say.
22       Q.    (BY MR. FLORES) Now, when you say
23   long-standing, what -- what do you mean by that?
24       A.    I think I answered that in the first
25   question that you didn't like.  It will be -- it has

26  (Pages 101 to 104)

PATRICK HAYES, MD - 1/9/2025

Page 105

1   been almost two years at this point. So the -- the
2   likelihood that that will go away in the next year,
3   two years, five years is quite small. He has
4   married. It is creating supplemental marital
5   discord. His wife would like to have children.
6   It's creating supplemental discord in his own psyche
7   on his inability to do that.
8       Where I'm struggling to tell you at the --
9   at the lifetime duration is at the 51 percent
10  standard. There are medical and surgical conditions
11  com-- combining to contribute to that. There has
12  been some difference in opinion. Dr. Henderson
13  thought that Landon needed penile surgery. Dr. Liu
14  did not. The burn surgeons had a different opinion
15  on it. So as those guys, working with the
16  urologist, are coming up with a summary on what
17  should happen surgically, that's going to help guide
18  psychologically what's going on with him. So I
19  suspect it will be lifelong. Whether or not I can
20  tell you that at -- at the greater than 50 percent
21  standard today, I cannot.
22      Q.   All right. And the fourth diagnosis was
23  post-burn pain and itch, correct?
24      A.   Yeah. Post-burn pain and itch related to
25  unspecified burns of the male genital region

Page 106

1   sequelae.
2       Q.   Is that a psychiatric diagnosis, or is
3   that just a physical symptom or condition?
4       A.   No, sir. That -- that is a physical
5   condition of psychiatric relevance.
6       Q.   What is the psychiatric relevance of that
7   physical condition?
8       A.   So he has a highly dysphoria inducing to
9   him condition. He's got some anesthesia of his
10  penis. He's got some seemingly neuropathic pain of
11  his penis. He's got some discoloration and some
12  disfigurement that he does not like. And then he's
13  very sensitive to both environmental temperature and
14  friction. And then the combination of those can
15  lead to additional discomfort and also itch. These
16  are not omnipresent all the time, but there will be
17  times where Landon has advised us that he can't
18  sleep because he's itching, because his scrotum
19  itches. Or he can't go out and do stuff with his
20  friend because, when he's out in the heat, it makes
21  him hurt for a couple days. And then the hurt, as
22  that goes away, it turns into itching.
23      So it is hard to feel capable, masculine.
24  It's hard for Landon to feel appropriate as a
25  husband and to feel like things are going to get

Page 107

1   better. The therapeutic optimism that we're working
2   with him on, when his penis continues to hurt and/or
3   itch. He has supplemental negative impact when
4   he'll do stuff, like walk his puppy, but then he
5   becomes sore, and he starts to limp. And as I
6   mentioned earlier, if anybody comments on the limp,
7   then he becomes very dysphoric, very sad, very
8   acutely depressed. So those clearly have a linkage
9   to his psychological symptoms.
10      Q.   When was the first diagnosis of these --
11  these issues, PTSD, insomnia, erectile dysfunction
12  and post-burn pain and itch?
13      A.   So Ms. Conde had the first clinical visit
14  with Landon in my service. That was on September
15  8th of 2023, and she diagnosed PTSD, insomnia and
16  erectile dysfunction. And -- and I know Iva -- I've
17  known Iva for years. She started work with me at
18  Fort Polk with service members in, I believe, 2009,
19  maybe 2010. She's got a lot of experience working
20  with -- with trauma-exposed individuals, wounded
21  individuals, burns. I added the post-burn pain and
22  itch diagnosis in my visit on November 27th, 2023.
23      Without going too far off on a discourse,
24  I did quite a lot of work on burnt Iraqi civilian
25  children when I was overseas. And that sort of

Page 108

1   started my approach to using psychological and
2   psycho- -- psychiatric medications in thermal
3   injury. And the more of that you do, the more
4   people you get sent to you that have that kind of
5   stuff. So I've been working with ancillary
6   analgesia, ancillary antipruritic medications in
7   thermal, caustic, other corrosive injuries for
8   decades now.
9       MR. FLORES:  I'll object as nonresponsive.
10      Q.   (BY MR. FLORES) So Ms. Conde diagnosed
11  Mr. Perry with PTSD, insomnia and erectile
12  dysfunction on September 8th, 2023, correct?
13      A.   Correct.
14      Q.   And you diagnosed Mr. Perry with post-burn
15  pain and itch on November 27th, 2023, correct?
16      MR. GRINNAN:  Form.
17      A.   I -- I added that diagnosis as the fourth
18  to the differential diagnosis.
19      Q.   (BY MR. FLORES) On that day?
20      A.   Correct.
21      Q.   What is your anticipated future course of
22  treatment for Mr. Perry, including any sort of
23  therapy and medication for these four diagnoses?
24      A.   Yes, sir. So we're going to look at
25  medications, the supportive medications, and then

27  (Pages 105 to 108)

PATRICK HAYES, MD - 1/9/2025

Page 109

1    we're going to look at psychotherapy.  So the
2    medications at present are duloxetine, or Cymbalta.
3    It's a 60 milligram plus a 30 milligram dose,
4    totaling 90.  That's a three-quarter maximum dose.
5    We may increase that to 60-60, but we have not yet.
6    He's currently prescribed the strongly sedative
7    secondary amine trimipramine, 25 milligram dose, one
8    to two of those by mouth every night.  He's
9    currently prescribed the DORA, suvorexant, Belsomra,
10   at the 10 milligram dose.  And as I mentioned
11   before, we are currently in actions designed to get
12   him that medication.
13        He's currently advised to purchase and
14   take docosahexaenoic acid, or DHA, somewhere between
15   2- and 600 milligrams.  Most of my patients I advise
16   to buy the 600 milligram dose from Amazon.  It's low
17   cost.  It's readily available.  It is made out of
18   plant materials.  You don't have to worry about any
19   mercury bioaccumulation or allergy.  And then he's
20   also been advised to purchase and take melatonin at
21   the low dose of 0.5 milligrams by mouth at night.
22        Based on his current and most recent visit
23   and the visits that he has upcoming, he's actually
24   doing a little bit more medication management at
25   this time than psychotherapy -- psychotherapy, which

Page 110

1    matches that his insomnia is a little bit more of a
2    problem.  So in his first year, we anticipate about
3    17 visits.  Optimistically, we treat down by about
4    50 percent with recovery, so we'd anticipate 10
5    visits for year two.  And optimistically, down by
6    about 50 percent to every six to 10 weeks, or about
7    six visits, for year three.  Beginning year four
8    through life span, we'd anticipate quarterly
9    maintenance follow-up, just checking in, making sure
10   you're doing okay.
11        And then, over the years, I've found that
12   individuals -- PTSD, again, is a remitted condition,
13   sort of like oncology.  You don't -- once you've had
14   lymphoma, they don't just cut you loose once the
15   blood count looks okay.  You come back for
16   follow-up.  And often these conditions, once it's
17   been kindled, they can come back.  So with PTSD,
18   clinically relevant insomnia and those physical
19   conditions, a guy like Landon we'd anticipate every
20   four to five years, about six to 12 months of
21   additional one to two visits.  If you multiply and
22   cross-divide that out, it's about three additional
23   visits per maintenance year.  So 17, 10, six, four
24   plus three.
25        And then, for psychotherapy, as I

Page 111

1    mentioned, we've been seeing him slightly more
2    frequently to keep coming back.  But the most recent
3    regimen was every four to six weeks, so about 10
4    visits for year one.  Step down by about half for
5    year two, or six visits.  We'll catch maintenance
6    plateau at year three, so every 10 to 14 weeks, or
7    about four visits per, with the same allowance for
8    flares.  And what we like that to look like is
9    maintenance should be about every three months.  But
10   perfect world, we can alternate that where
11   maintenance therapy and maintenance meds are -- are
12   meshing.  So about every six weeks, someone is
13   touching base.
14        And that's one of the good things about
15   COVID, that the increased applicability, efficacy of
16   telemedicine, especially on low-intensity
17   maintenance follow-ups.  You can do a lot of those
18   telemed.  And it's just not so intrusive to
19   patient's life.
20   Q.   All right.  You kind of lost me there on
21   the psychotherapy visits.  I think I got 10 visits
22   the first year; is that right?
23   A.   Yes, sir.
24   Q.   All right.  Second year?
25   A.   Six.

Page 112

1    Q.   What about the third year?
2    A.   Third year begins maintenance, so that
3    will be four plus three.
4    Q.   For the rest of his life?
5    A.   Yes, sir.
6    Q.   Now, what percentage of your patients at
7    Elite Medical Wellness go through psychotherapy and
8    -- and -- and counseling and therapy for their
9    entire lives versus stopping at some point?
10   A.   Oh, like you asked me earlier, we've been
11   running this show for a little over 10 years now,
12   almost 12, and I still have a large deck of my
13   patients that started at the very beginning.
14   Mr. Woodward and I -- he's my first therapist.  I
15   actually worked for him at an opioid recovery
16   clinic.  He has several patients that he started
17   with with Dr. Garrett Ryder, who's now deceased.
18   They've been following up with him for 15, 17 years.
19        Especially on the maintenance phase, even
20   when folks are -- are remitted -- and when I went
21   from insurance to noninsurance, many of my patients
22   were fully remitted.  Like, they -- they really
23   didn't need to come back and see me.  There weren't
24   active management changes going on, but many dozens
25   of them have elected to continue just because they

28  (Pages 109 to 112)

PATRICK HAYES, MD - 1/9/2025

Page 113

1  like the -- the continuous contact.  They like
2  knowing that the person who knows their health
3  history, knows their family history.  So I haven't
4  broken that down by percentage, but there's a lot of
5  folks that have been with us for 10, 15 or more
6  years.
7       Q.   What percentage of your patients stop
8  seeing you within the first 12 months?
9       A.   And it's a different population.  We
10  actually had an interesting case that was referred,
11  high acuity, came over 10 days ago or so for the --
12  the first visit.  And second visit was yesterday.
13  Really, the interventions that were done in the
14  first visit were essentially curative.  She's now
15  moving to Dallas.  She's got her dream job up there,
16  and she's going to initially continue some telemed
17  follow-up.  But she'll probably be done within the
18  first year.
19       So, again, I have not analyzed retention
20  characteristics for this or any of the clinics.  But
21  it -- it does happen.  You typically see that signal
22  initially though in individuals that have a drastic
23  response early.  If you can find that sweet spot of
24  a medication, get them sleeping like a baby early,
25  they probably will not follow with you long term.

Page 114

1       Q.   Is it fair to say that, as you sit here
2  today, you can't tell us what percentage of your
3  patients stop visiting Elite Medical Wellness after
4  12, 24, 36, 48, 60 months or any other period of
5  time?
6            MR. GRINNAN:  Object to the form.
7       A.   No, sir.  Over the -- the 23-, 24,000
8  patients I've probably seen over -- this is now my
9  25th year in human medicine, counting medical
10  school.  I have not sat down and analyzed the
11  percentage of patients that -- that stayed for those
12  durations of time.
13       Q.   (BY MR. FLORES) Is there any other medical
14  treatment that you are recommending for Mr. Perry in
15  the future besides the medications, the office
16  visits and the psychotherapy we just discussed?
17            MR. GRINNAN:  Form.
18       A.   No.  At -- at this point, based on his
19  medications, he would benefit from, if he remains on
20  the trimipramine at higher dose -- now, he's kind of
21  at moderate dose.  He may benefit from an EKG
22  annually.  But he does not need laboratory studies
23  for these particular medications.
24       Q.   (BY MR. FLORES) Okay.  Have you reviewed
25  the report of Dr. Christopher Ticknor?

Page 115

1       A.   In this case, no, sir.
2       Q.   How many times have you spoken with
3  Dr. Shelly Savant in this case?
4       A.   In Mr. Perry's case?
5       Q.   Correct.
6       A.   I believe one.  But if you were to find a
7  document that said it was more than one, I wouldn't
8  challenge that.
9       Q.   And you spoke with her -- I think we
10  looked at that billing entry earlier, right?
11       A.   Correct.  I believe it was April 4 of 2024
12  or April 5.
13       Q.   April 5th, 2024, sounds right to you?
14       A.   Yes, sir.
15       Q.   All right.  Now, earlier you mentioned
16  the -- what did you call -- the administrative
17  section of your chart and the medical -- or
18  medication and prior authorization section, right?
19       A.   Yes, sir.
20       Q.   Would you mind putting the administrative
21  section up towards the screen so that we can -- so
22  that I can see what -- what you're looking at?
23       A.   Sure.  So this is his chart.  Got his name
24  on it.  It's a yellow chart, which means it's a -- a
25  clinical treatment chart.  As we open it, you're

Page 116

1  going to find this is consents and the referral
2  form.  This is the administrative updates and the
3  initial report.  Other similar data will go there.
4       Q.   Okay.  Can -- can I see the documents that
5  are in that administrative section?
6       A.   I mean, this is one of the challenges to
7  -- to Zoom depositions and why I don't prefer them.
8  I think I went through and counted 39 pages.  Do you
9  want me to show you all 39 of those?
10       Q.   Well, let's try kind of skipping -- or
11  flipping through them quickly.  I just want to make
12  sure they look familiar to me.
13       A.   So consent.
14       Q.   Okay.
15       A.   Consents, driver's license, the document
16  we discussed at length, the referral document.  Then
17  I'm sure you have these.  These are the
18  administrative updates for the visits.  I'm sure you
19  have the initial report.  And you'd asked me about
20  the medication section.  We're going to have a -- a
21  medication list, which looks like that.
22       Q.   Okay.
23       A.   You're going to have copies of
24  prescriptions.  And those can be electronic
25  prescription printouts, or they can be hard copy

29 (Pages 113 to 116)

HANNA & HANNA, INC.
713.840.8484

PATRICK HAYES, MD - 1/9/2025

Page 117

```
 1    prescriptions of handwritten stuff.  You're going to
 2    see some stuff that looks like pharmacy fills,
 3    pharmacy records that can look like the one I just
 4    showed you.  For -- that can look like this.  Should
 5    have all of those.  Then you're going to have the
 6    medication refill patient requests or concern
 7    patient requests.  Then you're going to have
 8    communications with pharmacies or benefits carriers
 9    that should look like this.  That one is a pharmacy
10    refill request.  This one is one of the PA request
11    for forms that we had discussed.  You should have
12    all of those.
13         The only thing we don't produce is other
14    people's records.  I consider HIPAA and 42 CFR a
15    one-stop shop.  The patient is granting records to
16    come to me, not for me to then distribute them.
17    Everything else in this hard chart should have been
18    produced for you.
19    Q.   And the -- the communi- -- the notes on
20    these medication records, for example, on -- I think
21    we do have these records.  I'm looking at a note for
22    duloxetine that's dated November 1st.  Says, had to
23    call a certain phone number.  She had to call
24    patient to get insurance info.  Stated she will call
25    back once she had insurance info from patient.  And
```

Page 118

```
 1    there's another note said, e- -- emailed MLS to get
 2    approved.  MLS approved.
 3    A.   Yeah.  I see that one.
 4    Q.   Okay.  Whose notes are those?
 5         MR. GRINNAN:  Form.
 6    A.   I really don't know.  That's one of my
 7    administrative staff.  They're supposed to sign off
 8    on it so we can later identify.  I don't actually
 9    recognize the handwriting, so I don't know who wrote
10    that.
11    Q.   (BY MR. FLORES) Who -- who would normally
12    handle this sort of task for you?
13         MR. GRINNAN:  Form.
14    A.   Oh, this is going to be front office
15    clerical staff.
16    Q.   (BY MR. FLORES) And which -- who in the
17    front office clerical staff would be assigned to
18    this particular work, if -- if you know?
19         MR. GRINNAN:  Form.
20    A.   Whoever -- whoever answered the phone.
21    Q.   (BY MR. FLORES) And who might answer the
22    phone?
23         MR. GRINNAN:  Form.
24    A.   This would have been -- I think this is
25    11-1-2023.  So at that time, that would have been
```

Page 119

```
 1    Madison Ellzey.  That would have been Kaileigh
 2    Lantz.  That would have been Caitlin Witherwax.
 3    That could have been Kourtney Tommasi.
 4    Q.   (BY MR. FLORES) And who would it be now?
 5    A.   At this point, that would be Brelin
 6    Wondergem.  It could be Sydney Westlake.  It could
 7    be Morgan Gould.  It could be Cadence Ackley.  It
 8    could be Mallory Fontenot or the practice manager,
 9    Caitlin McGroarty.
10    Q.   And these are all people that work at
11    Elite Medical Wellness in Lake Charles?
12    A.   Yes, sir.  Those are all employees.
13    Q.   Okay.  What is -- I'm sorry.  Go ahead.
14    A.   I'm sorry.  I was going to qualify
15    Caitlin, but, no, she's an employee now, too.
16    Q.   Okay.  What does MLS stand for?
17    A.   That -- Medical Legal Solutions, I
18    believe, is what it stood for.  I do not know how
19    MLS and Access Healthcare Management relate to one
20    another.  It -- I don't know if it's the same
21    company that reorganized or if MLS closed its
22    company and it became Access Healthcare Management.
23    But from -- from our standpoint, they're essentially
24    the same company.
25    Q.   I see.  Well, how long has Access
```

Page 120

```
 1    Healthcare Management had that name, as far as you
 2    know?
 3    A.   I really --
 4         MR. GRINNAN:  Object to the form.
 5    A.   Yeah.  I really don't know at this point.
 6    You'd have to ask those guys.
 7    Q.   (BY MR. FLORES) Well, because you said
 8    maybe MLS changed its name and became Access
 9    Healthcare Management, so I'm wondering whether
10    Access Healthcare Management is a recent name or if
11    you've been dealing with them under that name for
12    several years.
13         MR. GRINNAN:  Object to form.
14    A.   It's been -- yeah.  It's been several
15    years, but that's an irrelevance to me.  I mean,
16    what -- what they do internally, how they are
17    corporately, I really don't know.  I've got plenty
18    of my own stuff to pay attention to.  So, yeah,
19    you'd have to ask Access when they reincorporated or
20    incorporated or what their structure is.  From --
21    from our standpoint, they -- those agencies have
22    behaved the same.
23    Q.   (BY MR. FLORES) Okay.  But you said MLS
24    stands for Medical Legal Solutions, correct?
25         MR. GRINNAN:  Form.
```

30  (Pages 117 to 120)

PATRICK HAYES, MD - 1/9/2025

Page 121

1    A.  That's my understanding.  Yes, sir.
2    Q.  (BY MR. FLORES) Okay.
3        THE REPORTER:  Mr. Grinnan, just so you
4    know, I'm trying to hear your objections, but
5    sometimes they're a little bit difficult to hear.
6        MR. GRINNAN:  Okay.
7    Q.  (BY MR. FLORES) Dr. Hayes, do you
8    personally deal with Access Healthcare Management on
9    any issues?
10   A.  How do you mean personally?
11   Q.  You yourself.  Do you interact with
12   anybody at Access Healthcare Management?
13   A.  Sure.
14   Q.  Who do you interact with over there?
15   A.  I believe I have spoken to Morgan on the
16   phone.  I believe I have spoken to Melissa on the
17   phone.  I have spoken to the owner, John Condos.
18   I've spoken to him multiple times.
19   Q.  Okay.  And how often do you speak with
20   them?
21       MR. GRINNAN:  Form.
22   A.  On a regular basis.  I probably speak to
23   -- to John if not weekly a couple of times a month.
24   And it's usually stuff like, hey, I've got this --
25   this kid that this happened to.  Is that something

Page 122

1    you can treat?  So it's more administrative triage
2    and just making sure that either I can handle
3    something or it's within the skill set or it's
4    within the population that we work with or I have
5    somebody that can.
6        Or as is appropriate for a case manager,
7    if somebody's in higher acuity because I think, to
8    get on my schedule flat booking right now, I think
9    we're looking at June, July of 2025.  It's quite
10   full, and -- and I stay quite booked, despite
11   working seven days a week.  So if -- if John is
12   aware of somebody that's -- that's sick or suicidal
13   or psychotic or withdrawing from something, he's
14   going to give me a call and see if I can get him in,
15   like -- like all of these agencies do.  I mean, I
16   got a call about a similar inmate not too long ago.
17   I got a call about somebody at the Sulphur clinic
18   for the state clinic.  When something is high
19   acuity, I get a call, and then we put the right
20   people in place.
21       MR. FLORES:  All right.  I'll object as
22   nonresponsive.
23   Q.  (BY MR. FLORES) So I think my question was
24   how often do you speak with these people.
25   A.  And I answered that for you.

Page 123

1    Q.  Okay.  Are they located in Lake Charles?
2        MR. GRINNAN:  Form.
3    A.  Access Healthcare Management?
4    Q.  (BY MR. FLORES) Yes.
5    A.  Physically, I don't know.  I mean, I would
6    presume that they are.  I think that paperwork we
7    were discussing earlier, I believe it has a Lake
8    Charles address.  Let me see.  It only has their
9    name.  Yeah.  I believe they're in Lake Charles, but
10   post COVID and Hurricanes Laura and Delta, I'm not
11   quite sure where their office is.  And then, even
12   antedating those events, I've never been in their
13   office.
14   Q.  What is Melissa's last name?
15   A.  Let me look.  I'd have to look somewhere.
16   I don't remember offhand.
17   Q.  Okay.  And Morgan is Morgan Gill, who was
18   on that email we looked at earlier?
19   A.  Correct.  Yes, sir.
20   Q.  And does John Condos live in Lake Charles?
21       MR. GRINNAN:  Form, foundation.
22   A.  I believe so, but you'd have to ask him.
23   Q.  (BY MR. FLORES) Okay.  Does Elite Medical
24   Wellness have an agreement, a contract in writing,
25   with Access Healthcare Management?

Page 124

1    A.  Yes, sir.
2        MR. GRINNAN:  Form.
3    Q.  (BY MR. FLORES) How long has Elite Medical
4    Wellness had a written agreement with Access
5    Healthcare Management?
6        MR. GRINNAN:  Form.
7    A.  However long we've been working with those
8    guys.  Like I mentioned earlier in the deposition, I
9    think it's pretty close to 10 years or around that
10   timeline.  And the initial agreement, I believe, was
11   with -- was with MLS.  And then, at some point, MLS
12   became Access Healthcare Management, so at some
13   point, three, five, six, seven years ago, the -- the
14   -- the contract changed from with MLS to with AHM.
15   Q.  (BY MR. FLORES) Has Elite Medical Wellness
16   signed multiple contracts with Access Healthcare
17   Management, or has it been one the entire duration
18   after this name change?
19       MR. GRINNAN:  Form.
20   A.  I don't recall.  I think there's one --
21   somebody showed it to me in a -- a deposition not
22   too terribly long ago.  That's the first time I've
23   seen it in years.  I don't recall if we've signed
24   another one since then or if that's the most recent
25   one.

31  (Pages 121 to 124)

PATRICK HAYES, MD - 1/9/2025

Page 125

1    Q.   (BY MR. FLORES) Would you be the person to
2    sign the contracts on behalf of Elite Medical
3    Wellness?
4        A.   Yes, sir.
5        MR. GRINNAN:  Form.
6        Q.   (BY MR. FLORES) This will be Exhibit 4 to
7    your deposition.
8        (Exhibit 4 was marked for identification.)
9        Q.   All right.  Do you see this document on
10   your screen titled Lien and Receivables Purchase and
11   Assignment Agreement?
12       A.   Yes, sir.
13       Q.   Do you recognize this document?
14       A.   Yeah.  That looks like the -- the contract
15   somebody showed me not too long ago.
16       Q.   Okay.  Is this the operative agreement
17   between Elite Medical Wellness and Access Healthcare
18   Management?
19       MR. GRINNAN:  Object to the form.
20       A.   It -- it appears to be, but I don't know
21   if that is an amendment or an appendment to the
22   existing operating agreement or if that's a
23   standalone.
24       MR. GRINNAN:  And, Rey, do you have a copy
25   of this?

Page 126

1        MR. FLORES:  A copy of it?
2        MR. GRINNAN:  Yeah, this document.  I
3    don't have it.
4        MR. FLORES:  Oh.  Well, I have the copy
5    that I have on the screen right now.
6        MR. GRINNAN:  I understand that.  I wasn't
7    asking that.  I don't have a copy of it, so I don't
8    know what you're showing him.  Can you send me a
9    copy of this?
10       MR. FLORES:  Yeah.  I'll send it during
11   the -- the next break.
12       MR. GRINNAN:  Well, can you send it now so
13   I can review it?
14       MR. FLORES:  Well, let me finish my
15   questions to -- to Dr. Hayes on this.
16       MR. GRINNAN:  Well, can you -- well, Rey,
17   come on.
18       MR. FLORES:  John, I'm in the middle of my
19   questions here.
20       MR. GRINNAN:  All right.  Well, then let's
21   go off the record.  And, like, just send me a copy
22   of it.  That's all I'm asking is to have a copy of
23   the document you've handed the witness.
24       MR. FLORES:  All right.  We'll go off the
25   record.  Let's stay on the camera and --

Page 127

1        MR. GRINNAN:  That's fine.
2        MR. FLORES:  I'll email it to you.
3        THE VIDEOGRAPHER:  We're off the record.
4        MR. GRINNAN:  Thank you.
5        THE VIDEOGRAPHER:  Time is 12:18 p.m.
6        (Short recess.)
7        THE VIDEOGRAPHER:  We're back on record.
8    Time is 12:19 p.m.
9        Q.   (BY MR. FLORES) All right.  Dr. Hayes, can
10   you see the Lien and Receivables Purchase and
11   Assignment Agreement between Elite Medical Wellness
12   and Access Healthcare Management on your screen?
13       A.   Yeah.  At that scale, I can't read it, but
14   I can see it.
15       Q.   Okay.  Now, I'm going to scroll down to
16   the bottom here.  And look at the -- the -- the
17   signatures and the dates.  Is that your signature as
18   medical provider?
19       A.   Yep.
20       Q.   And John Condos signed off on the behalf
21   of Access Healthcare Management, correct?
22       MR. GRINNAN:  Form.
23       A.   Yeah.  Presumably so.  Yes, sir.
24       Q.   (BY MR. FLORES) Okay.  And this is
25   dated -- this agreement is dated September 27th,

Page 128

1    2018, correct?
2        A.   Yes, sir.
3        Q.   Is this the agreement that is currently in
4    effect between Elite Medical Wellness and Access
5    Healthcare Management?
6        A.   Presumably, it is.  You know how contracts
7    go.  You don't rely on them or really mess with them
8    until and unless something goes sour or needs some
9    leverage.  So Access sends us patients.  We provide
10   the services that we're requested to provide.
11   Access pays for those services in a timely fashion.
12   I just don't muck around with the contract a lot.  I
13   don't need to.
14       Q.   Have there been any amendments signed
15   since the date of this agreement that we're looking
16   at right now?
17       MR. GRINNAN:  Form.
18       A.   I don't recall, but if you have one, it
19   wouldn't surprise me.
20       Q.   (BY MR. FLORES) Well, I mean, I'm not
21   aware of any amendment, so I'm asking you, since you
22   said earlier you would be the person to sign on
23   behalf of Elite Medical Wellness.  Have you signed
24   any amendments or modifications or other novations
25   to this agreement that we're looking at now since

32  (Pages 125 to 128)

PATRICK HAYES, MD - 1/9/2025

1    September 27th, 2018?
2         MR. GRINNAN: Form.
3         A.   And, again, I'm not -- I'm not trying to
4    be obtuse. I'm not trying to, you know, hide the
5    weasel. I do not recall, but if there are some out
6    there, if I had signed an amendment in 2019 or 2020
7    in COVID, it is entirely possible. I'm not trying
8    to hide that or anything. But I don't recall that
9    there's anything after this one.
10        Q.   (BY MR. FLORES) Okay. As far as you know,
11   to the best of your knowledge and recollection, this
12   is the agreement that is currently in effect between
13   Elite Medical Wellness and Access Healthcare
14   Management, correct?
15        MR. GRINNAN: Object to the form, asked
16   and answered.
17        A.   Yeah. As far as I know, that's the last
18   formal document I have signed with Access Healthcare
19   Management ever.
20        Q.   (BY MR. FLORES) Okay. And what are the
21   compensation terms under this agreement between your
22   clinic and Access Healthcare Management?
23        MR. GRINNAN: Form.
24        A.   I mean, I'd have to -- read it again.
25        Q.   (BY MR. FLORES) Do you know how often

1    Access Healthcare Management pays Elite Medical
2    Wellness?
3         MR. GRINNAN: Form.
4         A.   I'm sorry. I was hacking. Can you ask me
5    again?
6         Q.   (BY MR. FLORES) Do you know how often
7    Access Healthcare Management pays Elite Medical
8    Wellness?
9         A.   I do roughly. It's approximately every
10   month, but some of that is based on our billing, so
11   if our billing at Elite is intact, all of the
12   requisite invoices, all of the supporting paperwork,
13   all of that is provided in a clean fashion, Access
14   pays us within, I believe, 30 days -- 20, 30, 45
15   days, something like that, after a clean submission.
16        When I had a significant transition in
17   management staff, we got a little bit behind. So
18   there was a -- and that was not an Access issue.
19   That was an Elite issue on billing. So there was a
20   -- probably a 45-day, 60-day period where it wasn't
21   paid. But roughly monthly they pay.
22        Q.   Okay. And looking at paragraph three or
23   section three of this agreement titled Reimbursement
24   of Medical Provider, do you see that?
25        A.   I do. Yes, sir.

1         Q.   And would you agree that Access Healthcare
2    Management's reimbursement to Elite Medical Wellness
3    is in line with the language of this section?
4         MR. GRINNAN: Object to the form and
5    foundation. He's not a lawyer.
6         MR. FLORES: No need for speaking
7    objections, Mr. Grinnan.
8         MR. GRINNAN: Well, I mean, you're asking
9    him about compliance with a contract. I think it's
10   only fair that he has a lawyer present.
11        Q.   (BY MR. FLORES) Dr. Hayes, is it your
12   understanding that Access Healthcare Management pays
13   your clinic in accordance with section three of this
14   agreement?
15        MR. GRINNAN: Object to the form. Same
16   objections.
17        A.   Yes, sir. And in the -- way that was
18   established was, in a busy operation with multiple
19   different service lines, multiple different service
20   types, multiple different potential options, how to
21   account for case management in a way that we didn't
22   have clerical staff simply moving the beans,
23   spending time doing nothing but -- but billing and
24   accounting, so approximately half of the billed
25   service seems to be appropriate. Because -- and it

1    has seemed to be appropriate over the years because,
2    if the service is small, it's less expensive. It
3    probably has less case management. Half of that
4    charge is a lesser charge.
5         And then, if something is larger, it
6    involves testing. It involves moving around testing
7    results. It involves large reports. It involves
8    medications, follow-ups, consults, referrals, labs.
9    Then that will involve more case management, so the
10   -- the more complicated things are the more
11   expensive things. The more expensive things will
12   tithe 50 percent to the case management
13   relationship, which makes sense because they have to
14   do more case management on those more complicated
15   things. So that seemed a decade-plus ago to be a --
16   a fair, above-board, appropriate way of accounting
17   for those charges. And then we've continued with
18   that since.
19        Q.   (BY MR. FLORES) There's an Exhibit A
20   that's referenced here in this section three. Do
21   you see that? Right here.
22        A.   I see the reference that you're
23   highlighting. Yes.
24        Q.   Does Elite Medical Wellness have a copy of
25   this Exhibit A?

33 (Pages 129 to 132)

PATRICK HAYES, MD - 1/9/2025

Page 133

1    MR. GRINNAN: Object to the form, but I
2    A.  Presumably we have it somewhere, but I
3    also believe that contract says that I won't release
4    it without the permission of Access Healthcare
5    Management.
6    Q.  (BY MR. FLORES) And who at Access
7    Healthcare Management would we need to -- would you
8    need to -- to discuss this with?
9    MR. GRINNAN: Object to the form,
10   foundation.
11   A.  Yeah.  Presumably that would be John
12   Condos.  And in Exhibit A, the way the language -- I
13   believe that is the fee schedule.
14   Q.  (BY MR. FLORES) Do you have John Condos'
15   contact information?
16   MR. GRINNAN: Form.
17   A.  Do I have his contact information?  Yeah,
18   I do.
19   Q.  (BY MR. FLORES) Could you provide us with
20   his email address and phone number?
21   A.  I'm not going to give you his cell phone
22   number.  I mean, I think you can probably use 411 or
23   a Google lookup for his -- his information on that.
24   And then is his email not on that contract you're
25   showing me?

Page 134

1    Q.  Doesn't appear to be.
2    A.  Yeah.  I'll -- I'll ask him if he's
3    comfortable with me forwarding that.
4    Q.  When do you think you can talk to him
5    about that?
6    MR. GRINNAN: Object to the form.
7    A.  I don't know.  When do you think we're
8    going to be done?
9    Q.  (BY MR. FLORES) You said you had to go at
10   1 o'clock, right?
11   A.  Yes, sir.  I'll be right in to patients.
12   So it will probably be -- if we run right to 1:00,
13   it will be later today or tomorrow morning.
14   Q.  Okay.  Now, when did you first sign the
15   contract with Medical Legal Solutions?
16   MR. GRINNAN: Form.
17   A.  Oh.  Somewhere around a decade ago.
18   Q.  (BY MR. FLORES) And as we saw from Exhibit
19   -- Exhibit 2 of your deposition, there are referral
20   documents created when Access Healthcare Management
21   refers a patient to Elite Medical Wellness, correct?
22   A.  Remind me what was Exhibit 2.  Yes, sir.
23   Q.  Okay.  You see Exhibit 2 here?
24   A.  I do.  Yes, sir.
25   Q.  Okay.  So there are referral documents

Page 135

1    created each time, correct?
2    MR. GRINNAN: Object to the form,
3    foundation.
4    A.  Correct.
5    Q.  (BY MR. FLORES) And so would Elite Medical
6    Wellness be able to tell us how many patients Access
7    Healthcare Management has referred to Elite Medical
8    Wellness since the signing of that agreement in 2018
9    we were just looking at?
10   MR. GRINNAN: Object to the form.
11   A.  We don't track that.
12   Q.  (BY MR. FLORES) I understand you don't
13   track it, but you would have the records from which
14   the answer could be derived, correct?
15   MR. GRINNAN: Object to the form.
16   A.  Not in a reasonable fashion.
17   Q.  (BY MR. FLORES) What do you mean by --
18   A.  Well, I mean, there will be information in
19   -- in charts.  That would be akin to asking me how
20   many patients across the spectrum of all the
21   operations have been prescribed duloxetine.  That
22   would be knowable.  It would probably take 1,000
23   years to know it.  You would have to go into every
24   chart and then manually search for duloxetine, and
25   you'd have to present that.

Page 136

1    So within the duration of records
2    retention, which is not as long as this operation or
3    these relationships have been in force, so we're
4    going to lose 40 percent of that time just on the --
5    the amount of time that we can destroy records -- or
6    after which we can destroy records.  And we don't --
7    we don't store that.  We -- we don't track that.
8    There's no repository of where the Access referrals
9    came from.  So in Mr. Perry's case, it's within his
10   chart.  So it's not practicably knowable.
11   And then we also had a couple of large
12   data corruptions over the years electronically.  And
13   then, with the storms in 2020, Hurricanes Laura and
14   Delta, this building was essentially ripped open.
15   And many of the files were destroyed, some of the
16   files held within the building, some held within a
17   protected archival storage.  So in addition to
18   records retention, there's an additional some
19   percentage of files which were destroyed.  So, no,
20   that's not a knowable number.
21   Q.  What is your record retention duration
22   policy?  How long do you maintain records?
23   A.  Oh, I let my practice manager and those
24   guys maintain that in the active file.  I believe
25   adults we have to maintain for seven years.  And I

34  (Pages 133 to 136)

PATRICK HAYES, MD - 1/9/2025

---

Page 137

1  believe children we have to maintain for seven years
2  or the age of majority.  But, again, I -- I didn't
3  go back and look at record stuff in preparation for
4  today.
5      Q.  Do you -- does your clinic have a written
6  document and record retention policy?
7      A.  I am not sure if that's part of the -- the
8  policy manual or not.
9      Q.  How long does your email system retain
10 emails?
11         MR. GRINNAN:  Form.
12     A.  The email system, I don't know.
13     Q.  (BY MR. FLORES) Is there any sort of
14 automatic deletion of emails after a certain period
15 of time or -- or not?
16         MR. GRINNAN:  Form.
17     A.  -- differently.  I still don't know.
18     Q.  (BY MR. FLORES) Who would I talk to if I
19 wanted to find the answer to that?
20         MR. GRINNAN:  Form.
21     A.  Ms. McGroarty may know that, but I'm not
22 certain.
23     Q.  (BY MR. FLORES) How long does your office
24 retain payment records and checks and so on from
25 individuals or entities paying for treatments?

---

Page 138

1         MR. GRINNAN:  Form.
2      A.  I don't know.  I would defer you to
3  Ms. Rougeau and Ms. McGroarty, and they will have
4  worked with our health care attorney.  That's
5  Mr. Mike Schulze out of Sullivan Stolier Schulze in
6  Lafayette, New Orleans.  And our defense litigator
7  is Mr. Bob Wynne out of Houston.  Whatever the
8  minimum amount of time that we have to maintain
9  those is how long they maintain them.
10     Q.  (BY MR. FLORES) Were you involved
11 personally in responding to our subpoena for
12 documents from Elite Medical Wellness?
13     A.  No, sir.
14     Q.  Who was involved in that process?
15         MR. GRINNAN:  Form and foundation.
16     A.  No idea.
17     Q.  (BY MR. FLORES) Who is typically involved
18 in your clinic in responding to document subpoenas
19 in litigation?
20         MR. GRINNAN:  Form.
21     A.  So the -- the custodian of medical
22 records, Ms. Stacey Rougeau, she's the first point
23 of response.  And then, if she has questions, she
24 will typically involve Ms. Mallory Fontenot.  And if
25 they together cannot solve the request, then they

---

Page 139

1  will discuss with Caitlin McGroarty.  And then, if
2  there are issues related to practice, HIPAA, 42 CFR,
3  we may loop in Mr. Schulze.  If there are issues
4  related to overreaching subpoenas, foolish
5  information requests, other information that we
6  don't believe are -- are relevant or entitled, then
7  they will loop in Mr. Wynne.
8      Q.  (BY MR. FLORES) Okay.  You said Mike
9  Schulze was the Louisiana lawyer's name?
10     A.  Correct.
11     Q.  And where is he located again?
12     A.  His office is in New Orleans and
13 Lafayette.  He typically works out of the Lafayette
14 office.
15     Q.  From the records maintained by Elite
16 Medical Wellness, it would be possible to determine
17 the revenue to Elite Medical Wellness deriving from
18 Access Healthcare Management --
19         MR. GRINNAN:  Object to the form and asked
20 and answered -- and answered and answered in a
21 different way.
22     A.  No, sir.  That's not practicably
23 answerable.
24     Q.  (BY MR. FLORES) It's possible to -- the
25 records are in existence.  Let's put that way.

---

Page 140

1  Correct?
2         MR. GRINNAN:  Object -- object to the
3  form.  It's been asked and answered.
4      A.  No, sir.  I don't believe that they are,
5  not -- not in a fashion that's useful to the spirit
6  of your question.
7      Q.  (BY MR. FLORES) Well, I'm not sure what --
8  what -- how you would define useful to the spirit of
9  my question.  But your clinic maintains payment
10 records, right?
11     A.  They do.  Yes, sir.
12     Q.  And those payment records typically
13 reflect the identity of the person or entity making
14 the payment, correct?
15     A.  They do.  Yes, sir.  And I do not believe
16 those records have been maintained for 10 years.
17 Again, I do not micromanage the business aspects of
18 the operation.  I rely on people to do that for me.
19 I have good counsel in Mr. Wynne, Mr. Schulze.
20 Mr. Wynne in particular would be likely responsible
21 for subpoena-type stuff.
22         But, you know, as soon as we can destroy
23 old paperwork or unnecessary paperwork, we're going
24 to.  And I do not believe there would be any way of
25 going back and constructing, even with manual

---

35  (Pages 137 to 140)

PATRICK HAYES, MD - 1/9/2025

Page 141

1    analysis, 10 years of our relationship with MLS or
2    Access.
3            MR. FLORES: Object as nonresponsive.
4        Q.   (BY MR. FLORES) All right, sir. I'm going
5    to show you Exhibit 5 to your deposition. By the
6    way, are there other case management companies aside
7    from Access Healthcare Management that refer
8    patients to Elite Medical Wellness?
9            MR. GRINNAN: Form.
10       A.   Yeah. I believe we have over the years.
11   Another one just reached out recently. I actually
12   have to loop back around with Mr. Schulze and
13   establish the contract for that. I'm not sure who
14   else we're contracted with at this point. But we do
15   -- we'll accept referrals from essentially anybody.
16   We just don't work directly with insurances.
17       Q.   (BY MR. FLORES) What is the name of that
18   company you're going to be signing a contract with?
19           MR. GRINNAN: Object to the form. That's
20   not what he said.
21       A.   I don't know offhand. I'd have to look.
22       Q.   (BY MR. FLORES) What are the names of any
23   other case management companies that refer patients
24   to Elite Medical Wellness?
25           MR. GRINNAN: Form.

Page 142

1        A.   I would have to look.
2        Q.   (BY MR. FLORES) Does Access Healthcare
3    Management refer more patients to Elite Medical
4    Wellness than these other case management companies
5    that you're going to have to look for?
6            MR. GRINNAN: Form.
7        A.   Yeah. I don't know how many of my
8    patients are referred to me from Access Healthcare
9    Management.
10       Q.   (BY MR. FLORES) Well, my question was a
11   little different. Does Access Healthcare Management
12   refer more patients to Elite Medical Wellness than
13   these other case management companies that you're
14   talking about?
15           MR. GRINNAN: Form, asked and answered.
16       A.   It's the same knowledge basis. And for
17   example, in Mr. Perry's case, how he got to me is
18   largely irrelevant. So I don't sit and spend any
19   time with him in the initial assessment on, who are
20   you working with on the administering side? What
21   kind of lawsuit are you in? Are you in a lawsuit?
22   Are you in some sort of comp claim? All of that's
23   largely irrelevant to what's going on with him. We
24   start out with a chief complaint. I give him the
25   opportunity to discuss what's going on with him, and

Page 143

1    then we figure out from a differential diagnostic
2    standpoint how we can be useful.
3            So I just -- I don't spend time tap
4    dancing around in those administrative questions.
5    So I -- I don't know. Like, the patients I saw this
6    week, I don't know where they came from. I don't
7    know who sent them to me because it's irrelevant.
8            MR. FLORES: Object as nonresponsive.
9        Q.   (BY MR. FLORES) What percentage -- what
10   percentage of Elite Medical Wellness' patients are
11   referred by Access Healthcare Management or some --
12           MR. GRINNAN: Form.
13       Q.   (BY MR. FLORES) -- other case management
14   --
15           MR. GRINNAN: Form, asked and answered
16   several times.
17       A.   Yeah. I don't know.
18       Q.   (BY MR. FLORES) This is Exhibit 5 to your
19   deposition.
20           (Exhibit 5 was marked for identification.)
21       Q.   All right. You see this document on the
22   screen, sir?
23       A.   I do. Yes, sir.
24       Q.   Okay. Does this document look familiar to
25   you?

Page 144

1        A.   It's pretty small. I mean, it appears to
2    be my Rule 26 CV.
3        Q.   Okay. Now, looking at these firms -- I
4    forgot to highlight this one. One second. Looking
5    at these firms -- okay. Never mind. Here's the
6    answer. So the last column here states whether you
7    were testifying on behalf of the plaintiff or the
8    defense, correct?
9            MR. GRINNAN: Object to the form,
10   misrepresents the document.
11       Q.   (BY MR. FLORES) Sir, what was your answer?
12           MR. GRINNAN: Object to form.
13       A.   I said, yes, sir.
14           MR. GRINNAN: It says requester.
15       Q.   (BY MR. FLORES) Okay. And so it's fair to
16   say that the vast majority of your testimony dating
17   back to 2020 has been on behalf of plaintiffs,
18   correct?
19           MR. GRINNAN: Object to the form,
20   misrepresents the document.
21       A.   Yeah. There's some unusual
22   vicissitudes to the Rule 26 CV. So that's matters
23   that have gone before formal testimony under oath.
24   Deposition, trial, of course. For some reason, I do
25   a significant amount of independent work. That

36 (Pages 141 to 144)

PATRICK HAYES, MD - 1/9/2025

Page 145

1  would be for agencies, such as a judge or QTC,
2  Lockheed Martin, the VA.  And I do a fair amount of
3  defense work as well.  For some reason, it appears
4  that I get deposed and brought to trial more on
5  plaintiff work.  So you see more count in that
6  column on the plaintiff side, and that's by number.
7      So that also doesn't account for workload
8  by volume.  Many of the defense cases I've taken are
9  quite large.  I just finished a -- this is a
10  criminal case, so it would be on a different CV.
11  But forget that.  There was a civil defense case
12  where I had something like 9,000 pages of records.
13  So I was not deposed on that one.  That one did not
14  go to trial.  Ultimately, my report was used to
15  seemingly settle the case, so it doesn't show up at
16  all.  But that 9,000 pages, the 120 hours that went
17  into it, they're just going to show up as a one
18  count anyways.
19      MR. FLORES:  Object as nonresponsive.
20      Q.  (BY MR. FLORES) All right, sir.  Of the
21  law firms listed on your Rule 26 testimony
22  disclosure, is it fair to say that Arnold & Itkin is
23  the most commonly identified firm on this
24  disclosure?
25      MR. GRINNAN:  Object to the form.

Page 146

1      A.  Yeah.  I'll defer to you on that.  I
2  haven't gone through and counted it myself.
3      Q.  (BY MR. FLORES) You wouldn't dispute it?
4      MR. GRINNAN:  Object to the form.
5      A.  Again, if that's what -- if you have sat
6  down and counted those and that's the -- the most
7  preponderant number, then sure.
8      Q.  (BY MR. FLORES) Okay.  How would you
9  describe the relationship with Arnold & Itkin,
10  between Elite Medical Wellness and Arnold & Itkin?
11      MR. GRINNAN:  Object to the form.
12      A.  There is no relationship between Elite
13  Medical Wellness and Arnold & Itkin.
14      Q.  (BY MR. FLORES) How many of these cases in
15  which Arnold & Itkin was the plaintiff's firm
16  involved also involved Access Healthcare Management?
17      MR. GRINNAN:  Object to the form.
18      A.  I don't know.  You'd have to ask Access
19  Healthcare Management and Arnold & Itkin.
20      Q.  (BY MR. FLORES) In other words, for all
21  these Arnold & Itkin cases, do you know whether it
22  was Access Healthcare Management that referred the
23  plaintiff to Elite Medical Wellness?
24      MR. GRINNAN:  Object to the form.
25      A.  I think you asked me the same thing.  I

Page 147

1  mean, you would have to ask those guys.
2      Q.  (BY MR. FLORES) Now, this goes back to
3  2020, correct?
4      A.  Correct.  Rule 26 says four years of
5  testimony.
6      Q.  Okay.  But you were testifying in cases in
7  which Arnold & Itkin was the plaintiff's firm well
8  before 2020 as well, correct?
9      MR. GRINNAN:  Object to the form.
10      A.  Sure.
11      Q.  (BY MR. FLORES) How long have you been
12  testifying on behalf of plaintiffs being represented
13  by Arnold & Itkin?
14      MR. GRINNAN:  Object to the form.
15      A.  Oh, I think my first experience with that
16  firm was the Williams Geismar explosion in
17  Plaquemine, Louisiana.  And it was some 90 or so
18  individuals.
19      Q.  (BY MR. FLORES) When was that?
20      A.  2015, 2016, somewhere around then.
21      Q.  This will be Exhibit 6 to your deposition.
22      (Exhibit 6 was marked for identification.)
23      Q.  All right.  Do you see a spreadsheet on
24  your screen, sir?
25      A.  It's wee.  It's very small.  Can't see it

Page 148

1  very well, but I can see that you -- you have a
2  document up there.
3      Q.  Okay.  Does this look familiar to you,
4  this spreadsheet?
5      A.  That's probably an older version of the
6  Rule 26 CV.
7      Q.  Okay.  And same sort of columns, including
8  requester as the last column on the right, correct?
9      A.  Yes, sir.
10      Q.  Okay.  And, again, the vast majority of
11  those cases were for plaintiffs, correct?
12      MR. GRINNAN:  Form, misrepresents the
13  document.
14      A.  That document has some errors in it, too.
15  So one of the lines you had up top, I saw Wanek
16  Kirsch Davies.  That's a group I've done.  I think
17  it's line 15, if I can read it.  It says plaintiff
18  on -- on the right side.  That's actually a defense
19  case.
20      So I don't -- I don't do these.  I don't
21  maintain the Rule 26 CVs.  I have staff do so.  But
22  you train them right.  You supervise them.  There's
23  still going to be errors in there.  So that -- that
24  document -- it's -- it's outdated anyways, but deal
25  with a grain of salt.

37 (Pages 145 to 148)

PATRICK HAYES, MD - 1/9/2025

---

Page 149

1    Q.   (BY MR. FLORES) Sure.  The -- I mean, like
2    anything else, there may be some mistakes, but you
3    wouldn't dispute that the vast majority of the cases
4    reflected here were on behalf of plaintiffs, right?
5        MR. GRINNAN:  Object to the form,
6    misrepresents the document.
7        A.   Yeah.  Subject to the errors that I just
8    described and my comment earlier, that it does
9    appear that more of my plaintiff's side work has
10   been brought before or under testimony under oath
11   than on the defense side.  If that's what the
12   document says, that's what it says.
13       Q.   (BY MR. FLORES) Okay.  And we see this
14   goes back to 2016, correct?
15       A.   Can't really read it, but I'm going to
16   trust that's what that top date is.
17       Q.   Yeah.  Let me make it bigger for you.  All
18   right.  Is that -- is that any better?
19       A.   Yes, sir.  I can see it.
20       Q.   All right.  So this goes back to 2016,
21   right?
22       A.   It does.
23       Q.   And it ends in 2021, correct?
24       A.   That's the last date I see.  Yes, sir.
25       Q.   And these are all cases you recognize as

---

Page 150

1    having testified in, right?
2        MR. GRINNAN:  Form.
3        A.   I mean, you-all -- you-all use different
4    ways of characterizing these.  So sometimes the name
5    that's on the style or the caption is not the name
6    of the patient.  Sometimes it's the name of a family
7    member.  Sometimes it's another individual in a
8    cohort.  I do recognize several of those names, many
9    of them.
10       Q.   (BY MR. FLORES) Okay.  And you recognize
11   the names of the firms that you've worked with?
12       MR. GRINNAN:  Form.
13       A.   Yes, sir.  I recognize those.
14       Q.   (BY MR. FLORES) Okay.  And once again,
15   from 2016 to 2021, it would appear that Arnold &
16   Itkin was the most common and frequent of those
17   plaintiffs' firms.  Would you agree with that?
18       MR. GRINNAN:  Form.
19       A.   If that's what that form says, and as you
20   have them highlighted, if you have tallied those and
21   that's the biggest number, then sure.
22       Q.   (BY MR. FLORES) Okay.  So this shows a
23   McNeely versus Allstate case -- well, scratch that.
24   The first Arnold & Itkin case identified here
25   appears to be this Thompson versus Williams Olefins'

---

Page 151

1    & Bailey.  Do you see that?
2        A.   Yes, sir.
3        Q.   Is that that -- that large case you were
4    talking about in 2016?
5        A.   Correct.  Yeah.  That was the Williams
6    Geismar petrochemical explosion.
7        Q.   So was that the first case you worked with
8    Arnold & Itkin on?
9        MR. GRINNAN:  Form, misrepresents the
10   relationship.
11       A.   With the qualification that I often don't
12   really know, so -- this case that we're talking
13   about today, Mr. Perry, I did not know he was
14   represented by Arnold & Itkin until I began
15   preparing for this deposition over the -- the past
16   few days, when I saw Dr. Savant's letter referencing
17   one of the Arnold & Itkin attorneys. I don't talk
18   with the attorneys on -- on clinical cases on a
19   regular basis.  I've not had any input from those
20   guys.  So the administrative steps are where I learn
21   who's working with whom and how.  I'm going to hear
22   stuff in deposition.  I'm going to hear stuff in
23   trial.
24       So I'm going to tell you that's the first
25   one I'm aware of ever having worked with Arnold &

---

Page 152

1    Itkin and having been in a room with the attorneys
2    from that group.  But I don't know if that's the
3    first one I ever worked with one of their referrals.
4        MR. FLORES:  Okay.  All right.  Give me
5    just -- let's go off the record.
6        THE VIDEOGRAPHER:  We're off the record.
7    Time is 12:50 p.m.
8        (Short recess.)
9        THE VIDEOGRAPHER:  Back on record.  Time
10   is 12:55 p.m.
11       Q.   (BY MR. FLORES) Dr. Hayes, this will be
12   Exhibit 7 to your deposition.
13       (Exhibit 7 was marked for identification.)
14       Q.   All right.  Do you see an email on your
15   screen?
16       A.   I do.  I can't read it.
17       Q.   Can you read it now where it says,
18   Dr. Savant Summary Letter for Dr. Hayes?
19       A.   Yes.
20       Q.   Okay.  And if we scroll down, we see
21   there's an email from Miranda Owens at Arnold &
22   Itkin to Caitlin McGroarty at your clinic and
23   Kourtney Sittig and -- right?  Correct?
24       A.   Yes, sir.  And that's Melissa's last name.
25       Q.   Melissa Jenkins.

---

38  (Pages 149 to 152)

PATRICK HAYES, MD - 1/9/2025

Page 153

1          Okay.  And have you seen this email
2    before?
3          A.   No, sir.
4          Q.   Okay.  Well, I'll give you a second to
5    read it.
6          A.   I read it.
7          Q.   Okay.  And so Arnold & Itkin was asking
8    you to sign off on a summary letter for Dr. Savant,
9    correct?
10         MR. GRINNAN:  Object to the form,
11   foundation, misrepresents the document.
12         A.   I mean, that appears to be what the email
13   says, yes.
14         Q.   (BY MR. FLORES) And on June 26th, Caitlin
15   McGroarty responded, saying, I've attached the
16   signed summary, correct?
17         A.   That's correct.
18         Q.   And you did, in fact, sign a summary
19   letter for Dr. Savant, correct?
20         A.   Correct, on June 26th, 2024.
21         Q.   Okay.  And so is it your understanding
22   that this email thread relates to that summary
23   letter that you signed on that date?
24         MR. GRINNAN:  Form and foundation.
25         A.   Yes, sir.

Page 154

1          Q.   (BY MR. FLORES) Do you recall seeing a
2    number of plaintiffs involved in a multidistrict
3    litigation relating to an offshore rig caught in the
4    path of a hurricane?
5          MR. GRINNAN:  Object to the form.
6          A.   I've worked with numerous sailors and
7    offshore workers that have been affected by
8    hurricanes, multiple storms.
9          Q.   (BY MR. FLORES) Do you recall being --
10   seeing patients involved in multidistrict litigation
11   in that context?
12         MR. GRINNAN:  Object to the form and calls
13   for information protected by HIPAA.
14         A.   Yeah.  You're asking me to speculate on --
15   I don't even really know what multidistrict
16   litigation means.  I mean, I -- I'm a well-traveled,
17   well-read adult.  I can speculate what that is, but
18   I'm not an attorney.
19         And back to our fundamental discussion
20   earlier, what's going on administratively with these
21   folks, until and unless it matters, it doesn't
22   matter.  So if somebody tells me that they need a --
23   like you just highlighted, a -- a form signed and
24   sent back, then I may catch wind of something.  Or
25   if somebody -- a patient tells me that, an

Page 155

1    investigator is following me, and my kids were in
2    the yard, and it made me freak out, then that
3    injects itself into the clinical care.  But, no, I'm
4    not on the -- on the legal team.  I'm not an
5    attorney.  I'm not part of the multidistrict
6    litigation, as you say.
7          MR. FLORES:  I'm going to object as
8    nonresponsive.
9          Q.   (BY MR. FLORES) Is it -- would you say
10   it's common or uncommon for patients to travel from
11   other states to see you?
12         A.   Oh, it's not uncommon at all.  As I said
13   earlier, I'm licensed in multiple states.  I've got
14   providers on the psychotherapeutic side that are
15   licensed in multiple states.  I have done
16   administrative and forensic work all over the
17   country, and I'm sought out by other providers,
18   other care teams and major pharmaceutical companies
19   to travel the country and explain novel medications
20   to other providers.  So I have worked overseas.
21   I've presented overseas.  I have done assessments
22   overseas.  I have done IMEs from here to Britain.  I
23   have cross-covered patients that were traveling in
24   Spain.  I mean, I have worked globally, certainly
25   nationally.

Page 156

1          Q.   What percentage of your patients travel
2    from outside the state of Louisiana to see you at
3    Elite Medical Wellness in Lake Charles --
4          MR. GRINNAN:  Object to the form,
5    foundation.
6          Q.   (BY MR. FLORES) Or at the -- or at the
7    West location in Houston.
8          A.   That has changed over the years.  And most
9    recent rough count, which is a little old at this
10   point, we probably have 2,300 or so patients at
11   Elite Medical Wellness.  And one of the -- the
12   rationales for establishing a -- hard site in --
13   in Houston, first, I have a house in Houston, and
14   that allows me to travel to do the -- the national
15   work that I do more readily than from Lake Charles,
16   which is a regional hub.
17         But in the same way it's difficult for me
18   to travel nationally, it's difficult for patients to
19   come nationally and see us in Lake Charles or more
20   difficult.  So Houston is a very easy place for
21   people to get.  Many locations, even small regional
22   hubs, can come direct.  If not direct, it's usually
23   a one stop.  And it's the largest medical center in
24   the world.  So it just made sense to have that
25   platform.  Of the 2,300 patients who come through

HANNA & HANNA, INC.
713.840.8484

PATRICK HAYES, MD - 1/9/2025

## Page 157

1    Elite Medical Wellness at this point, I don't have
2    an exact estimate, but many of them now are serviced
3    through West.
4              MR. FLORES: I'll object as nonresponsive.
5              THE WITNESS: I think we're at time, sir.
6              MR. FLORES: To everything other than, I
7    don't have an exact estimate.
8              All right. I'll pass the witness.
9              MR. GRINNAN: Are you out of time,
10   Dr. Hayes?
11             THE WITNESS: Yeah, effectively so. I
12   mean, I -- I can stretch and apologize for a couple
13   minutes, but I'm really out of time.
14             MR. GRINNAN: Okay. Well, I don't want to
15   keep you. We can reserve the right to -- we can
16   reserve our questions for the time of trial.
17             THE VIDEOGRAPHER: All right. So are we
18   -- are we -- are you reserving? Are we --
19             MR. GRINNAN: Yeah. We'll reserve.
20             THE VIDEOGRAPHER: Okay. This -- Chris,
21   do you need anything?
22             THE REPORTER: Yeah. Mr. Grinnan, are you
23   purchasing a copy of this deposition?
24             MR. GRINNAN: Yes.
25             THE REPORTER: All right. And, Mr. Hayes,

## Page 158

1    are you reading the transcript or --
2              THE WITNESS: No, I'll waive.
3              THE REPORTER: You'll waive, you said?
4              THE WITNESS: Yeah.
5              THE REPORTER: Okay. All right. That's
6    it.
7              THE VIDEOGRAPHER: This concludes today's
8    deposition. Off record. Time is 1:02 p.m.
9              (At 1:02 p.m., the deposition was
10   concluded.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 159

1              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF TEXAS
2                HOUSTON DIVISION
3    LANDON PERRY,        |
                         |
4         Plaintiff,     |
                         | Civil Action No.
5    v.                  | 4:23-CV-04441
                         |
6    HALLIBURTON ENERGY   |
     SERVICES, INC.,      |
7                         |
          Defendant. |
8
9    ---------------------------------------
10        REPORTER'S CERTIFICATION
     VIDEOTAPED ORAL DEPOSITION OF
11          PATRICK HAYES, MD
12          JANUARY 9, 2025
13         (REPORTED REMOTELY)
14   ---------------------------------------
15
16
17        I, Christopher D. Reho, RPR, a Certified
18   Shorthand Reporter in and for the State of Texas,
19   hereby certify to the following:
20        That the witness, PATRICK HAYES, MD, was
21   duly sworn by the officer and that the transcript of
22   the oral deposition is a true record of the
23   testimony given by the witness;
24        I further certify that the signature of
25   the deponent:

## Page 160

1        ___ was requested by the deponent or a
2    party before the completion of the deposition and is
3    to be returned within 30 days from the date of
4    receipt of the transcript. If returned, the
5    attached Errata contain any changes and the reasons
6    therefor;
7        _X_ was not requested by the deponent or a
8    party before the completion of the deposition.
9        I further certify that I am neither
10   counsel for, related to, nor employed by any of the
11   parties or attorneys in the action in which this
12   proceeding was taken, and further that I am not
13   financially or otherwise interested in the outcome
14   of the action;
15        Subscribed and sworn to on this 13th day
16   of January, 2025.
17
18
19   _____
20   CHRISTOPHER D. REHO, RPR, CSR #12055
     Expiration Date: 06/30/2025
21   HANNA & HANNA, INC.
     CRF # 10434; Expires 10-31-2026
22   8582 Katy Freeway, Suite 105
     Houston, Texas 77024
23   713-840-8484 - 713-583-2442
     www.hannareporting.com
24
25

HANNA & HANNA, INC.
713.840.8484