# Exhibit 7

CV59562

Filed 11/15/2024 5:43 PM
Alex Archuleta
District Clerk
Midland County, Texas
/s/ Roxanna Galindo

CAUSE NO. CV 59562

| | | |
|---|---|---|
| DANIEL SUNDE | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| DIUBER REYES PEREZ | § | |
| *Intervenor Plaintiff* | § | |
| | § | |
| RAYMOND SMITH | § | OF MIDLAND COUNTY, TEXAS |
| *Intervenor Plaintiff* | § | |
| | § | |
| v. | § | |
| | § | |
| MBC ENERGY SERVICES, INC., | § | |
| AND | § | 385TH JUDICIAL DISTRICT |
| ROBERT DOUGLAS WOODS JR. | § | |
| *Defendants.* | § | |

---

## DEFENDANTS' JOINT MOTION TO COMPEL DISCOVERY

---

## TABLE OF CONTENTS

I.   SUMMARY OF THE ARGUMENT .................................................................................4

II.  FACTUAL BACKGROUND ......................................................................................5

  A.   Emergency room physicians do not diagnose Sunde with a traumatic brain injury or concussion on the day of the accident. ...............................................5

  B.   Sunde's lawyers, along with their medical funding and factoring companies, send him to handpicked doctors who are willing to provide inaccurate diagnoses, charge inflated rates, and testify favorably on his behalf. ...........................................6

    1.  Access Healthcare Management sends Sunde from Alabama to see Dr. Gassan Chaiban with Allied Health in Lake Charles, Louisiana, who diagnoses Sunde with a possible concussion. ...........................................6

    2.  Elite Medical Care sends Sunde from Alabama to see Dr. M.K. Hamza in Houston, Texas, who diagnoses Sunde with post-concussion syndrome and a neurocognitive disorder among other things...............................................7

    3.  Sunde's lawyers send him to see Dr. Gina Armstrong and Dr. Ramiro Hernandez in Houston, Texas, who diagnose Sunde with a traumatic brain injury, post-concussion syndrome, post-traumatic headaches, and cognitive and memory deficits, among other things. ........................................8

    4.  Sunde's lawyers have established business relationships with Access Healthcare Management, Elite Medical Care / Dr. Nadia Ramsey, River Oaks Hospital & Clinics / The Texas Brain Center / Dr. Gina Armstrong / Dr. Ramiro Hernandez, and Care Capital..........................................9

  C.   The handpicked doctors charge inflated amounts to artificially increase Sunde's damages and the amounts they, the funding and factoring companies, and Sunde's lawyers ultimately receive. .....................................................16

  D.   Sunde's retained life care planner relies exclusively on the opinions of his handpicked medical providers to grossly expand the scope and cost of Sunde's alleged future medical needs. ..........................................................17

    1.  Sunde's life care planner routinely testifies for Sunde's lawyers. .....................17

    2.  She disregards any opinions that contradict those of Sunde's handpicked medical doctors and claims Sunde will need lifelong medical care at a cost of almost $ 4 million. ................................................................19

  E.   Sunde designates the handpicked doctors and his retained life care planner as testifying experts. .............................................................20

  F.   Defendants' pleaded defenses make clear they intend to cross-examine Sunde's doctors on their bias and the reasonable value of the services they rendered. ..........20

  G.   Sunde and Elite Medical Care stonewall discovery into the funding and factoring agreements and the terms of those agreements. ...........................................22

**III.    ARGUMENT AND AUTHORITIES** ..............................................................23

**A.    The evidence is relevant to the bias of Sunde's medical providers.** ...................23

**1. A witness's bias is relevant to their credibility, and therefore, to the case.** .........23

**2. The agreements incentivize Sunde's medical providers to make inaccurate diagnoses favorable to him, provide unnecessary treatment, and testify favorably on his behalf.** ....................................................................................24

**3. Defendants' probing of the bias of Sunde's medical providers is especially important because he is trying to pass them off as neutral, disinterested "treating physicians."** ....................................................................................29

**B.    The evidence is also relevant to the reasonable value of the medical services provided to Sunde.** ....................................................................................29

**1. Medical providers often charge significantly more than what they are ultimately paid.** ....................................................................................29

**2. Sunde can only recover the reasonable value of the medical services provided to him, which is not necessarily commensurate with the amounts charged.** ..............30

**3. Evidence of the amounts charged is not dispositive of the reasonable value of medical services.** ....................................................................................31

**4. Defendants' discovery requests seek information relevant to the determination of the reasonable value of the medical services, rather than simply what Sunde's doctors charged.** ....................................................................................32

**C.    Sunde's and Elite Medical Care's likely counterarguments fail to negate Defendants' right to this discovery.** ....................................................................33

**1. The collateral source rule does not preclude Defendants' discovery into the terms of the medical funding and factoring agreements.** ......................................33

**2. Defendants' designation of a medical billing expert does not preclude Defendants' discovery into the terms of the medical funding and factoring agreements.** ....................................................................................36

**D.    In the alternative, Sunde and/or Elite Medical Care should produce the agreements for *in camera* review, and they should be made part of the record for appellate review.** ....................................................................................37

**IV.    CONCLUSION** ..............................................................37

**CERTIFICATE OF SERVICE** ..............................................................40

**CERTIFICATE OF CONFERENCE** ..............................................................40

# I.    SUMMARY OF THE ARGUMENT

Plaintiff Daniel Sunde lives in Alabama, was involved in a motor vehicle accident in Midland County, retained counsel from Houston, and filed suit in Midland.  His lawyers worked with medical funding and factoring companies to send Sunde to handpicked doctors throughout Louisiana and Texas who were willing to provide, and did provide, specious diagnoses and unnecessary treatment at inflated rates to increase Sunde's alleged damages. The funding and factoring companies paid (or will pay) these doctors who will, in turn, testify favorably on behalf of Sunde to continue receiving referrals from the funding and factoring companies.  Sunde's lawyers will then pay the funding and factoring companies out of any settlement or judgment in the case.

Sunde's retained life care planner relied exclusively on the handpicked doctors' specious diagnoses, while ignoring other medical opinions, to grossly expand the scope, and therefore the cost, of Sunde's alleged future medical needs, opining the purported cost to be almost $4 million.  Sunde then designated the handpicked doctors as "non-retained" experts to try to pass them off as neutral, disinterested treating physicians, and he and one of the funding companies—Elite Medical Care—stonewalled discovery into the various agreements at play and the terms thereof.

Defendants now request that the Court order Sunde and Elite Medical Care to produce the relevant agreements and related documents and communications and that Elite Medical Care present itself for deposition.  The discovery Defendants seek is relevant to the bias of Sunde's testifying medical doctors, the reliability, or lack thereof, of their medical opinions, the reliability, or lack thereof, of his retained life care planner's opinions, and the reasonable value of the medical services his testifying medical doctors provided.  This discovery is

particularly important in light of Sunde's attempt to present the testifying medical doctors as neutral and disinterested "treating physicians." Needless to say, this discovery goes to the heart of Defendants' damages defense.

## II.  FACTUAL BACKGROUND

### A. Emergency room physicians do not diagnose Sunde with a traumatic brain injury or concussion on the day of the accident.

Sunde was involved in a motor vehicle accident in Midland County on April 6, 2023. *See* Ex. 1, Accident Report. He was transported to the emergency room at Midland Memorial Hospital where he was attended by physicians and other medical personnel. *See* Ex. 2, Midland Memorial Hospital Records. Sunde had not yet retained counsel, and his employer's workers compensation plan provided the applicable insurance coverage. *Id*. at 1 (listing Trifecta Oilfield Services' workers compensation plan as the applicable insurance).

Dr. Ernest Buck was the attending emergency room physician. *Id*. Diana Ahlstrand, a registered nurse, assisted Dr. Buck. *Id*. at 4. Dr. Buck consulted with Dr. Cook, a plastic surgeon, regarding the laceration on Sunde's forehead. *Id*. at 9. Dr. Bedro Jin served as the radiologist. *Id*. at 11-12.

Sunde denied having lost consciousness as a result of the accident, was alert and oriented, and was able to follow all of Dr. Buck's command. *Id*. at 45. Sunde answered all of the medical staff's questions and was cooperative. *Id*. at 44. Dr. Jin read and interpreted Sunde's brain and facial CT scans and determined Sunde did not have any intracranial bleeding. *Id*. at 11-12.

After being admitted at about 7:32 am, Sunde was discharged at 11:10 am on the same day. *Id*. at 1. Sunde understood all discharge instructions, was able to "teach back" all instructions to the nurse, and had no further questions. *Id*. at 42. He was sent home with

discharge instructions for a facial laceration, facial fracture, and orbital floor fracture.  *Id*. at

13-18.  Neither his diagnoses nor his discharge instructions made any mention of a concussion

or traumatic brain injury.  *Id*.

    **B.  Sunde's lawyers, along with their medical funding and factoring companies, send him to handpicked doctors who are willing to provide inaccurate diagnoses, charge inflated rates, and testify favorably on his behalf.**

    Sunde's lawyers arranged for medical funding and factoring companies called Access

Healthcare Management and Elite Medical Care to fund Sunde's medical treatment with

handpicked providers in Louisiana and Texas willing to give inaccurate diagnoses, charge

inflated rates, and testify favorably on his behalf.  Similarly, Sunde's lawyers sent him to see

Dr. Gina Armstrong at the Texas Brain Center and Dr. Ramiro Hernandez at River Oaks

Hospital & Clinics, with whom they have established business relationships, and who likewise

are willing to give specious diagnoses, charge inflated rates, and testify favorably on Sunde's

behalf in light of that business relationship.

    **1. Access Healthcare Management sends Sunde from Alabama to see Dr. Gassan Chaiban with Allied Health in Lake Charles, Louisiana, who diagnoses Sunde with a possible concussion.**

    Access Healthcare Management sent Sunde from his home in Andalusia, Alabama to

Lake Charles, Louisiana, to see Dr. Gassan Chaiban, a pain management doctor, on May 18,

2023 for complaints of neck pain.  *See* Ex. 3 at 1, 5-8, Allied Health Medical Records.  Lake

Charles, Louisiana is 446 miles and a 6 hour and 40 minute drive from Andalusia, Alabama.

Driving Direction from Andalusia, AL, to Lake Charles, LA,

https://www.google.com/maps/dir/?entry=wc

    Forty-two days after the accident, and despite the emergency room physicians not

diagnosing a traumatic brain injury or concussion on the very day of the accident, Dr. Chaiban

(again, a pain management doctor) diagnosed Sunde with a possible concussion and directed

that he follow up with a neurologist.  *Id*. at 8.

**2. Elite Medical Care sends Sunde from Alabama to see Dr. M.K. Hamza in Houston, Texas, who diagnoses Sunde with post-concussion syndrome and a neurocognitive disorder among other things.**

Sunde then traveled to Houston, Texas on March 8, 2024, and March 22, 2024 to see

Dr. M.K. Hamza, a neuropsychologist with The Neurobehavioral Clinic.  *See* Ex. 4 at 16-20,

The Neurobehavioral Clinic Medical Records.  Houston is 588 miles and an 8 hour and 49

minute drive from Andalusia, Alabama.  Driving Directions from Andalusia, AL, to Houston,

TX, https://www.google.com/maps/dir/?entry=wc.

Elite Medical Care, which has an ongoing business relationship with Dr. Hamza and

Sunde's lawyers, funded these visits.  *See* Ex. 5 at Daniel Sunde R000470.  Dr. Nadia Ramsey,

a chiropractor, is the founder, owner, and manager of Elite Medical Care.  *See* Ex. 6, Elite

Medical Care Corporate Documents.  Dr. Hamza's records include several references to Dr.

Ramsey.  *See* Ex. 5 at 11-13, 15, The Neurobehavioral Clinic Medical Records.  One of those

references states:

I, Daniel Sunde, understand that Dr. M.K. Hamza, Consulting Neuropsychology (sic) at the Neurobehavioral Clinic, has been requested **by my attorney**; and **by Dr. Ramsey** to perform a clinical evaluation on me for the purpose of rendering a neuropsych status or the like.  The evaluation will present a clinical opinion of my mental and neuropsychological status based on the **referral request by Dr. Ramsey** for whatever purpose is needed.

*Id*. at 13.

Dr. Hamza performed various neuropsychological tests, and, almost a full year after

the accident, diagnosed Sunde with post-concussion syndrome, a neurocognitive disorder, and

an adjustment disorder with mixed anxiety and depressed mood, among other things. *Id*. at

16-20 (Hamza report dated April 4, 2024).

**3. Sunde's lawyers send him to see Dr. Gina Armstrong and Dr. Ramiro Hernandez in Houston, Texas, who diagnose Sunde with a traumatic brain injury, post-concussion syndrome, post-traumatic headaches, and cognitive and memory deficits, among other things.**

Sunde's lawyers then sent him to Dr. Gina Armstrong at the Texas Brain Center and Dr. Ramiro Hernandez at River Oaks Hospital & Clinics, with whom they have established business relationships. Sunde had a telehealth visit with Dr. Armstrong, a physical medicine and rehabilitation doctor at the Texas Brain Center in Houston, on June 27, 2024. *See* Ex. 7 at 1-2, Texas Brain Center Medical Records. Based on this one telehealth visit alone, fourteen months after the accident, Dr. Armstrong diagnosed Sunde with a traumatic brain injury, post-concussion syndrome, post-traumatic headaches, cognitive deficits, memory deficits, and a sleep disorder or insomnia. *Id.*

Sunde then saw Dr. Ramiro Hernandez, a neurologist with River Oaks Hospital & Clinics/AD Hospital East, in Houston on August 15, 2024. *See* Ex. 8 at 1-4, River Oaks Hospital & Clinics Medical Records. Again, Houston is 588 miles and an 8 hour and 49 minute drive from Andalusia, Alabama. Driving Direction from Andalusia, AL, to Houston, TX, https://www.google.com/maps/dir/?entry=wc. Following that one visit, Dr. Hernandez diagnosed Sunde with a traumatic brain injury, post-concussion syndrome, post-traumatic headaches, vestibular dysfunction, and blurry vision. *Id.* at 2.

**4. Sunde's lawyers have established business relationships with Access Healthcare Management, Elite Medical Care / Dr. Nadia Ramsey, River Oaks Hospital & Clinics / The Texas Brain Center / Dr. Gina Armstrong / Dr. Ramiro Hernandez, and Care Capital.**

### Access Healthcare Management

Access Healthcare Management advertises itself as providing "innovative lien-based medical funding for injured patients and providers."  *See* Access Healthcare Management, accesshealthcare.biz (last visited Nov. 14, 2024).   Under the heading, "Why Use Access Healthcare Management?" its website states the following:



*See* Ex. 9, Extract of Access Healthcare Management website.

When describing how Access Healthcare Management can help medical providers, its website says:

> Access Healthcare Management offers medical lien funding to help medical providers increase cash flow and eliminate financial risks while treating personal injury patients. We purchase accounts receivables from physicians, hospitals, ambulatory surgery centers, physical therapy, imaging centers, pain management clinics, pharmacies, surgical hardware, durable medical equipment (DME) and many other entities. We also assist the medical provider with administrative tasks, coordinating medical records among other providers, patient management, and law firm communications. Inquire as to how we can help your medical office work more efficiently with law firms and increase your business cash flow.

*See* Ex. 10, Extract of Access Healthcare Management website.

Dr. Patrick Hayes is a psychiatrist in Lake Charles, Louisiana. He gave deposition testimony in a case in November 2023 and discussed how Sunde's lawyers have a relationship with Access Healthcare Management, which, in turn, refers him personal injury plaintiffs as patients. He then bills Access Healthcare Management in accordance with the written agreement between Access Healthcare Management and his practice, Elite Medical Wellness (whose name bears a striking resemblance to Elite Medical Care, one of the funding companies involved in this case).

**"My particular relationship in this case… is with Access Healthcare Management,"** Dr. Hayes noted. *See* Ex. 11, Hayes Deposition Excerpts, at 44:20-23. **"I think they have a relationship with Arnold & Itkin,"** he continued. *Id*. at 44:25-45:1. **"And then if there's a case that Access needs to send to a psychiatrist or an addictions or a cognitive doc, Access sends them to me,"** he explained." *Id*. at 45:1-3. When asked whether Access Healthcare Management would pay his office directly, Dr. Hayes responded: "That's correct, yes, sir." *Id*. at 57: 14-16. And, when asked about the method of compensation, Dr. Hayes testified that **"we have a contracted rate for their case**

**management, which is a percentage of the fees, consistent with any of the case managers that I've worked with over the years, but that's going to be defined in the contract."** *Id.* at 57:21-25. The contract between Access Healthcare Management and Elite Medical Wellness was made an exhibit to that deposition, and reflected that, in Dr. Hayes' case, **Access Healthcare Management would purchase his accounts receivable for fifty cents on the dollar for services involving clinical care and full value for other services**. *See* Ex. 42, Lien and Receivables Purchase and Assignment Agreement.

In that particular case, which involved 23 plaintiffs represented by Sunde's lawyers, they sent 21 of those plaintiffs from all over the country to see Dr. Hayes in Louisiana. *See* Ex. 12, *Transocean's Submission of Evidence and Authorities in Support of Permitting the Introduction of Evidence Concerning Plaintiff's Healthcare Billing and Funding Entities*, filed on Sep. 3, 2024, in the 113th Judicial District Court of Harris County, Texas, at Attachment A. Presumably, Access Healthcare Management then purchased Dr. Hayes' accounts receivables in accordance with their written agreement and is now waiting to be paid by Sunde's lawyers out of any settlement or judgment.[1]

Similarly, here, Sunde's lawyers referred him to Access Healthcare Management who referred him to Dr. Chaiban at Allied Health in Lake Charles. Allied Health then billed Access Healthcare Management for its services (at inflated rates, as discussed in more detail below).

---

[1] Transocean's brief also describes the funding and factoring agreements in place between Elite Medical Wellness (Dr. Patrick Hayes) and Access Healthcare Management and between Advanced Diagnostics (aka River Oaks Hospital & Clinics, AD Hospital East, Texas Brain Center) and CareCapital.

3:29 PM
11/01/23
Accrual Basis

**Allied Health, LLC**
**Find Report**
**All Transactions**

| | Type | Date | Num | Name | Memo | Paid | Open Balance | Balance |
|---|---|---|---|---|---|---|---|---|
| | Invoice | 10/03/2023 | 26112 | Access Healthcare Management:Daniel Sunde | Sunde, Daniel; Chiaibn IV 10/03/2023 | Unpaid | 250.00 | 250.00 |
| | Invoice | 08/24/2023 | 23733 | Access Healthcare Management:Daniel Sunde | Sunde, Daniel; Chaiban IV 08/24/2023 | Unpaid | 250.00 | 500.00 |
| | Invoice | 07/25/2023 | 24313 | Access Healthcare Management:Daniel Sunde | Sunde, Daniel; Chaiban IV 07/25/2023 | Unpaid | 50.00 | 550.00 |
| | Invoice | 07/18/2023 | 24076 | Access Healthcare Management:Daniel Sunde | Sunde, Daniel; Chaiban IV 07/18/2023 | Unpaid | 10,500.00 | 11,050.00 |
| | Invoice | 07/06/2023 | 23550 | Access Healthcare Management:Daniel Sunde | Snude, Daniel; Wickboldt IV 07/06/2023 | Unpaid | 250.00 | 11,300.00 |
| | Invoice | 05/23/2023 | 24052 | Access Healthcare Management:Daniel Sunde | Sunde, Daniel; Chaiban IV 05/23/2023 | Unpaid | 250.00 | 11,550.00 |
| | Invoice | 05/18/2023 | 24013 | Access Healthcare Management:Daniel Sunde | Sunde, Daniel; Chaiban IV 05/18/2023 | Unpaid | 500.00 | 12,050.00 |
| | Invoice | 05/18/2023 | 24014 | Access Healthcare Management:Daniel Sunde | Sunde, Daniel; Chaiban Inv 05/18/23 | Unpaid | 7,500.00 | 19,550.00 |
| | Invoice | 04/18/2023 | 23043 | Access Healthcare Management:Daniel Sunde | Sunde, Daniel; Chaiban Inv 04/18/2023 | Unpaid | 1,000.00 | 20,550.00 |
| Total | | | | | | | 20,550.00 | 20,550.00 |

*See* Ex. 13, Allied Health Billing Summary; Ex. 14, Allied Health Insurance Claim Forms.

Next, Sunde's lawyers will pay Access Healthcare Management out of any settlement or judgment in the case. Assuming Access Healthcare Management has not already paid Allied Health by then, it will then "settle up" with them.

**Elite Medical Care / Dr. Nadia Ramsey**

Dr. Nadia Ramsey is a chiropractor who owns and serves as the managing director for several medical funding and factoring companies including, but not limited to, Elite Medical Care and Ace Group Management (aka Ace Physician Services, Ace Physician Management). *See* Ex. 6, Elite Medical Care Certificate of Formation; Ex. 15, Ace Corporate Documents. Ace Group Management is the managing entity for Elite Medical Care. *See* Ex. 16, Elite Medical Care Public Information Report.

Dr. Ramsey and Sunde's lawyers have an ongoing business relationship whereby she, through one of her companies, refers personal injury plaintiffs represented by Sunde's lawyers to handpicked doctors who are willing to provide inaccurate diagnoses, charge inflated rates, and testify favorably on behalf of those plaintiffs.

While Elite Medical Care does not seem to have a website, Ace Physician Services does. *See* Ex. 17, Extract of Ace Physician Services website. As is evident, Ace Physician Services both refers potential plaintiffs to certain law firms and refers actual plaintiffs to

certain doctors. *Id.* It is a symbiotic relationship between plaintiffs' lawyers and doctors with Dr. Ramsey's companies in the middle of it, as is further evidenced in this case with Elite Medical Care.

Ace Physician Services is heavily involved in a case pending in a sister court in Midland County also involving Sunde's lawyers. *See James Steverding v. GEO Drilling Fluids, Inc. and Ernest Serena*, Cause No. CV59261, in the 142nd Judicial District Court of Midland County, Texas.

Elite Medical Care is also involved in the *Steverding* case in exactly the same way it is involved here—working with the plaintiff's lawyers (the same lawyers representing Sunde here) to refer the plaintiff in that case to Dr. M.K. Hamza at The Neurobehavioral Clinic and funding his visits.

After accepting Sunde's referral by his lawyers, Elite Medical Care referred Sunde to Dr. Hamza at The Neurobehavioral Clinic who then provided favorable diagnoses for Sunde. Elite Medical Care then purchased Dr. Sunde's accounts receivable relating to Sunde and is now awaiting payment from any settlement or judgment in this case.

**Elite Medical Care, PLLC**
**1750 Skylark Lane, Suite 905**
**Houston Texas, 77056**
Phone 866-374-6066    Fax 832-460-3110

| INVOICE | | |
|---|---|---|
| BILL TO | | |
| Daniel Sundae | Physician: Dr. Hamza | |
| DATE OF SERVICE | DESCRIPTION | TOTAL |
| 3/8/24 and 3/22/24 | Initial Testing | $6500.00 |
| 5/10/24 | Follow Up | $1000.00 |

*See* Ex. 5, The Neurobehavioral Clinic Bills.

**River Oaks Hospital & Clinics / The Texas Brain Center / Dr. Gina Armstrong / Dr. Ramiro Hernandez / CareCapital**

Sunde's lawyers likewise have a longstanding relationship with River Oaks Hospital & Clinics (aka Advanced Diagnostics Healthcare System, AD Hospital East) and the Texas Brain Center, which is a department within River Oaks Hospital & Clinics.

## Texas Brain Center

For patients who are dealing with a traumatic brain injury, the best medicine is that which helps them achieve the most improvement in the least amount of time. At Advanced Diagnostics' Texas Brain Center, our traumatic brain injury recovery program is a multi-specialty program specifically focused on rapid response and aggressive treatment, with the goal of achieving every patient's Maximum Medical Improvement.

*See* Ex. 18, Extract of Texas Brain Center website; *see also* Exs. 7, Texas Brain Center Records and Ex. 8, AD Hospital East Records (both showing same address of 4200 Twelve Oaks, Houston, Texas 77027).

In the same case in which Sunde's lawyers sent 21 of 23 plaintiffs to see Dr. Patrick Hayes for psychiatric diagnoses, they sent 14 of those 23 plaintiffs to see Dr. Ramiro Hernandez at River Oaks Hospital & Clinics and Dr. Gina Armstrong at the Texas Brain Center.  *See* Ex. 12, Transocean Brief at Appendix A.  Similarly, Sunde's lawyers have sent him to see Dr. Hernandez and Dr. Armstrong.  *See* Exs. 7-8, Texas Brain Center and AD Hospital East Records, respectively.

And, in the litigation resulting in the Texas Supreme Court's *In re ExxonMobil Corp.* opinion on the discoverability of medical providers' reimbursement rates and related information, Sunde's lawyers represented numerous plaintiffs and the defendant sought discovery from the same providers involved here—the Texas Brain Center and AD Hospital

East (River Oaks Hospital & Clinics).[2] *See In re ExxonMobil Corp.*, 635 S.W.3d 631, 632 (Tex. 2021) (listing numerous attorneys from the law firm of Arnold & Itkin, LLP as representing numerous plaintiffs/real parties in interest and identifying the Texas Brain Center and AD Hospital East as additional real parties in interest).

In the case of these particular entities and providers, Defendants believe a factoring company called CareCapital, with whom Sunde's lawyers appear to have an agreement, purchased the accounts receivables relating to Sunde. If Sunde's lawyers have not already paid Care Capital, they will do so out of any settlement or judgment in this case.[3]

CareCapital's corporate representative discussed this factoring scheme in deposition testimony earlier this year. *See* Ex. 19, CareCapital Deposition Excerpts. First, the corporate representative testified she believed there was an agreement between CareCapital and Sunde's lawyers (who were also representing numerous plaintiffs in that case). *Id*. at 40:22-25. Second, she stated that the amounts paid by CareCapital to purchase a doctor's accounts receivable were typically set by oral agreement between the doctor and CareCapital. *Id*. at 15:23-16:4. And, it appears that the amounts doctors are willing to accept from CareCapital are far less than their full billed charges.[4] *Id*. at 25:18-25 (discussing charge of $46,413.90 for which CareCapital paid $10,000).

---

[2] The defendant also initially sought discovery from Elite Medical Wellness, which, as discussed above, is Healthcare Management.

[3] Defendants have served CareCapital with a notice of deposition and deposition subpoena but expect Sunde and/or CareCapital to move to quash them. *See* Ex. 45, Notice and Subpoena and Service Notification.

[4] This is consistent with Dr. Hayes' description of his agreement with Access Healthcare Management.

**C. The handpicked doctors charge inflated amounts to artificially increase Sunde's damages and the amounts they, the funding and factoring companies, and Sunde's lawyers ultimately receive.**

Access Healthcare Management referred Sunde to Allied Health (including Dr. Chaiban). *See* Ex. 3, Allied Health Medical Records, at 1, 68; Ex.13, Allied Health Billing Summary; Ex. 14, Allied Health Insurance Claim Forms. Between April 18, 2023 and February 27, 2024, Allied Health billed Access Healthcare Management a total of $21,400 for medical services provided to Sunde, which Sunde now seeks as part of his damages claim in this case.[5] *See* Ex. 20, Report of Defense Medical Billing Expert, at 32-33.

Had Allied Health billed Medicare instead, it would have been entitled to payment of only $1,535.72. *Id.* Alternatively, had Allied Health, which is in Louisiana, billed a Louisiana workers compensation carrier, it would have been entitled to payment of just $3,363.62. *Id.* In fact, the average charge in Louisiana across all providers for the same services Allied Health provided to Sunde is only $4,822.39. *Id.* Allied Health's charges to Access Healthcare Management are thus many multiples of the Medicare, workers compensation, and average statewide charges in Louisiana:

| CMS RATIO % | WC RATIO % | MPV RATIO % | AVG CHG RATIO % |
| --- | --- | --- | --- |
| 1393% | 636% | 673% | 444% |

*Id.* at 33.

Dr. M.K. Hamza and The Neurobehavioral Clinic billed Elite Medical Care a total of $7,500 for Sunde's visits with Dr. Hamza. *Id.* at 38-39. The Medicare, Texas workers compensation, and average statewide charges in Texas for those same services were $915.86,

---

[5] Sunde cannot remember having paid for any of the medical treatment he has received thus far. *See* Ex. 41, 26:3-27:1.

$1,865.70, and $2,214.39, respectively.  *Id*.  Thus, Dr. Hamza's charges to Sunde were 819%, 402%, and 339% higher than the Medicare and workers compensation rates and the average statewide charge for those same services.  *Id*.

Dr. Gina Armstrong and the Texas Brain Center charged Sunde $1,950 for the one visit.  *Id*. at 40-41.  The Medicare, Texas workers compensation, and average statewide charges in Texas for the same services provided during that visit were $226.77, $461.94, and $502.16, respectively.  *Id*.  These providers' charges were 860%, 422%, and 388% higher than the Medicare, workers compensation and average statewide charges.  *Id*.

Dr. Hernandez and River Oaks Hospital & Clinics billed Sunde $2,625.  *Id*. at 39-40. The Medicare, Texas workers compensation, and average statewide charges in Texas for the same services were $396.83, $803.72, and $627.78, respectively.  *Id*.  In other words, these providers' charges were 661% and 327% higher than the corresponding Medicare and workers compensation rates and 418% higher than the average statewide charge in Texas.[6] *Id*.

**D. Sunde's retained life care planner relies exclusively on the opinions of his handpicked medical providers to grossly expand the scope and cost of Sunde's alleged future medical needs.**

**1. Sunde's life care planner routinely testifies for Sunde's lawyers.**

Sunde's lawyers retained Dr. Catherine Wakeham of Physician Life Care Planning as a life care planner.  *See* Ex. 21, Sunde's Expert Designations, at 1-2.  The vast majority of Physician Life Care Planning's work consists of producing life care plans for personal injury

---

[6] Given that Sunde's fractures healed within a few weeks, his past medical costs are relatively small, even when inflated as discussed herein.  Nonetheless, Defendants expect them to continue to rise, and, as discussed next, Sunde's retained life care planner, Dr. Catherine Wakeham, relied entirely on the specious diagnoses of Drs. Chaiban, Hamza, Armstrong, and Hernandez to grossly expand the scope— and, therefore, the ultimate cost—of Sunde's purported *future* medical needs.

plaintiffs and testifying on their behalf.  Indeed, Physician Life Care Planning has provided the retained life care planner not just for Sunde in this case, but for Intervenor-Plaintiff Raymond Smith as well.  *See* Ex. 22, Smith Expert Designations, at 4-5 (identifying Dr. Daniel Santa Maria of Physician Life Care Planning as Smith's retained life care planner).

Sunde's lawyers frequently retain life care planners from Physician Life Care Planning.  In the *Steverding* case discussed above, for example, Sunde's lawyers have designated Dr. Jason Marchetti from Physician Life Care Planning.  *See* Ex. 23, Designation of Dr. Jason Marchetti, at 1-2.  And, in another recent case, Sunde's lawyers designated Dr. Todd Cowen who is also with Physician Life Care Planning.  *See* Ex. 24, Designation of Dr. Todd Cowen, at 1-2.

As for Dr. Wakeham, a review of her testimony history reflects that, between August 2020 and May 2024, Dr. Wakeham gave deposition testimony on behalf of 94 plaintiffs, constituting 100 percent of her deposition testimony.  *See* Ex. 25, Wakeham Testimony History, at 1-10.  Similarly, between July 2021 and December 2023, Dr. Wakeham testified at trial 6 times, and, again, every time was on behalf of a plaintiff.  *Id*. at 10-11.  Of the 94 plaintiffs for whom Dr. Wakeham testified at deposition, 53 of them were being represented by Sunde's lawyers.  *Id*. at 1-10.  Of her 6 instances of trial testimony, 3 of them were for Sunde's lawyers (and one was for the lawyers now representing Intervenor-Plaintiff Smith). *Id*. at 10-11.

Suffice it to say, plaintiffs' firms in general, and Sunde's lawyers in particular, provide a substantial amount of revenue to Physician Life Care Planning as a whole and to Dr. Wakeham specifically.

**2. She disregards any opinions that contradict those of Sunde's handpicked medical doctors and claims Sunde will need lifelong medical care at a cost of almost $ 4 million.**

Dr. Wakeham opines that the cost of Sunde's future medical needs totals $3,949,475.78.

| Mr. Sunde's Future Medical Requirements | Nominal Value | Percentage |
|---|---|---|
| Physician Services | $283,085.73 | 7.17% |
| Routine Diagnostics | $91,412.73 | 2.31% |
| Medications | $1,624,343.90 | 41.13% |
| Laboratory Studies | $15,380.04 | 0.39% |
| Rehabilitation Services | $393,687.90 | 9.97% |
| Equipment & Supplies | $103,243.32 | 2.61% |
| Nursing & Attendant Care | $1,298,147.40 | 32.87% |
| Acute Care Services | $140,174.76 | 3.55% |
| Total | $3,949,475.78 | 100% |

*See* Ex. 26, Wakeham Life Care Plan, at 1.

Dr. Wakeham also opines that "Sunde will have lifelong disfigurement, progressive symptoms, as well as, physical, cognitive, behavioral and psychological impairments and disabilities, which require lifelong medical care." *Id*. at 39.

She identifies the following "diagnostic conditions" relating to Sunde: (1) multiply traumatic injuries, (2) traumatic brain injury, (3) post-traumatic headaches, (4) cervical strain/contusion with multilevel intervertebral disc injury, (5) post-traumatic stress disorder, and (6) major depressive disorder. *Id*. at 81.

To arrive at these conclusions, which she uses as the basis for her opinion that Sunde's future medical needs will cost almost $4 million, Dr. Wakeham relies on the opinions and diagnoses of Drs. Chaiban, Hamza, and Armstrong, along with the records from River Oaks Hospital & Clinics. *Id*. at 7-8. In doing so, she contradicts the opinions of the emergency

room physicians who did not diagnose any cervical spine injury, traumatic brain injury, or concussion. *See* Ex. 2, Midland Memorial Hospital Records; Ex.

**E. Sunde designates the handpicked doctors and his retained life care planner as testifying experts.**

Sunde has designated Drs. Chaiban, Hamza, Armstrong, and Hernandez as testifying "non-retained" experts. *See* Ex. 21, Sunde's Expert Designations, at 6-7. He has also designated Dr. Wakeham as a retained testifying expert. *Id*. at 1-2. With respect to his so-called "non-retained" experts, Sunde states he may call upon them "to testify about care, treatment, diagnosis, prognosis, medical causation, physical restrictions, reasonable costs for medical care in the past and future, and the need, if any, for future treatment." *Id*. at 5-6. He goes on to say that "[t]hese providers will in all likelihood testify that the injuries they have treated Plaintiff for were caused by the underlying incident and that all of their care and treatment provided to Plaintiff was medically necessary and reasonable and caused by the underlying incident." *Id*. at 6. Furthermore, Sunde states that "[t]these providers will also in all likelihood testify that their charges for care are reasonable given their geographic location, their training and skill as a healthcare provider, and the medical needs of Plaintiff." *Id*. Sunde then directs Defendants to his medical and billing records and the provider's deposition testimony for "additional mental impressions." *Id*. Finally, Sunde states that the providers' custodians of records "will provide testimony necessary to prove up the medical and billing records." *Id*.

**F. Defendants' pleaded defenses make clear they intend to cross-examine Sunde's doctors on their bias and the reasonable value of the services they rendered.**

Defendants' pleadings make clear that the discovery they seek regarding the funding and factoring agreements and the relationship between the medical funding and factoring

companies and his doctors is directly relevant to their defenses.  Defendants' live answers include the following:

- Defendant pleads and invokes all protections to which it is entitled under due process principles and Texas Civil Practice and Remedies Code §§ 41.001-.013.  Plaintiff's recovery of medical or health care expenses is limited to the amount actually paid or incurred by or on behalf of Plaintiff and by any reasonableness standards under applicable law.

- Defendant asserts that Plaintiff has received unnecessary medical treatment.

- Defendant asserts that Plaintiff has received medical treatment not causally related to the accident made the basis of this suit.

- Defendant asserts that the future medical treatment Plaintiff alleges is needed is, in whole or in part, unnecessary or not causally related to the accident made the basis of this lawsuit

- Defendant asserts that the amounts Plaintiff seeks for past and future medical expenses do not constitute the reasonable value of the medical services provided, or to be provided, to him.

- Defendant asserts that Plaintiff's medical providers, in whole or in part, are not neutral, disinterested treating physicians but are instead biased witnesses with a financial interest in this case.

- Defendant asserts that, as a result of the financial interest of his medical providers, in whole or in part, in this case, the involvement of medical referral, funding, factoring, and financing companies in Plaintiff's medical treatment, and/or the existence of oral or written deferred compensation agreements with said medical providers, Plaintiff has received medical treatment that is not necessary or not causally related to the accident made the basis of this suit, Plaintiff seeks future medical treatment that is not necessary or not causally related to the accident made the basis of this suit, and Plaintiff seeks past and future medical expenses exceeding the reasonable value of the medical services provided, or to be provided, to him.

*See* Ex. 27, Def. MBC's Amended Answer ¶¶ 4, 6-11; Ex. 28, Def. Woods' Amended Answer ¶¶ 4, 6-11.

### G.  Sunde and Elite Medical Care stonewall discovery into the funding and factoring agreements and the terms of those agreements.

Defendants served deposition subpoenas on Elite Medical Care, Dr. Nadia Ramsey, and Mayra Zuniga.  *See* Exs. 31-33, Returns of Service with Subpoenas and Notices of Deposition.  Elite Medical Care, Dr. Ramsey, and Zuniga immediately moved to quash those deposition subpoenas.[7]  *See* Exs. 34-35; Elite Medical Care and Ramsey and Zuniga Motions to Quash.

Defendants then served notices of depositions for the depositions of Dr. Gina Armstrong and Dr. Ramiro Hernandez and the corporate representatives of AD Hospital East/River Oaks Hospital & Clinics and the Texas Brain Center.  *See* Exs. 36-39, Notices of Deposition with Deposition Subpoenas.   Immediately, Sunde moved to quash those depositions.  *See* Ex. 40, Sunde Motion to Quash.  While Sunde objected to the noticed dates and times, he has failed to provide alternate dates and times for these depositions to proceed.

Defendant Robert Woods served interrogatories and document requests on Sunde.  *See* Exs. 29-30, Woods Interrogatories and Requests for Production, respectively.  With respect to Woods' interrogatories and document requests, Sunde's responses make clear that, while funding and factoring agreements may (likely) exist, he is asserting numerous boilerplate objections while taking the position that the documents and information are not in his custody or control.  *See* Ex. 29, Woods, Interrogatories, at Nos. 6-11; Ex. 30, Requests for Production, at Nos. 7-16.

---

[7] The same lawyer representing Elite Medical Care represents various medical providers and medical funding and factoring companies working with Sunde's lawyers in opposition to discovery into the details of their agreements.  *See e.g.*, Exs. 34-35, Elite Medical Care, Ramsey, and Zuniga Motions to Quash (*Sunde* case); Exs. 43-44, Ace Physician Management, Ramsey and Zuniga Motions to Quash (*Steverding* case); Ex. 19, CareCapital Deposition Excerpts, at 3 (*Transocean* MDL).

Notably, Dr. Nadia Ramsey, Mayra Zuniga, Dr. Gina Armstrong, Dr. Ramiro Hernandez, and the corporate representatives of Elite Medical Care, River Oaks Hospital & Clinics, the Texas Brain Center, and CareCapital are all located in the Houston area, well outside of subpoena range for trial. *See e.g,*, Exs. 6-8, 16, 36-39; *see also* Tex. Civ. Prac. & Rem. Code § 22.002 (setting 150-mile limit on trial subpoenas). Accordingly, the depositions Defendants seek, and which Sunde and Elite Medical Care are attempting to block, may well be Defendants' only opportunity to obtain evidence that goes to the heart of their damages defense.

### III.   ARGUMENT AND AUTHORITIES

**A. The evidence is relevant to the bias of Sunde's medical providers.**

**1. A witness's bias is relevant to their credibility, and therefore, to the case.**

"Evidence is 'relevant' if 'it has any tendency to make a fact [of consequence to the action] more or less probable than it would be without the evidence." *In re North Cypress Med. Center Operating Co., Ltd.*, 559 S.W.3d 128, 129 (Tex. 2018) (citing Tex. R. Evid. 401). "Relevant evidence is generally admissible at trial…" *In re K&L Auto Crushers, LLC*, 627 S.W.3d 239, 248 (Tex. 2021). "But for purposes of pre-trial discovery, evidence is relevant even if it's not admissible at trial, so long as it's 'reasonably calculated to lead to the discovery of admissible evidence." *Id*. (citing Tex. R. Civ. P. 192.3(a)).

"Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony." *United States v. Abel*, 469 U.S. 45, 52 (1984). The term "bias" refers to "the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party."

*Id.* Among other grounds, "[b]ias may be induced by a witness'… self-interest." *Id.*

"A party may discover the following information regarding a testifying expert… any bias of the witness." Tex. R. Civ. P. 192.3(e)(5).  Texas specifically allows the examination of a witness about his or her bias or interest.  *See* Tex. R. Evid. 613(b).  Unless the witness unequivocally admits that bias or interest, the examining party may introduce extrinsic evidence of the witness's bias.  *Id.* at (4) ("Extrinsic evidence of a witness's bias or interest is not admissible unless the witness is first examined about the bias or interest and fails to unequivocally admit it.").  Like the United States Supreme Court, the Texas Supreme Court has held that "[e]vidence of bias of a witness is relevant and admissible." *Walker v. Packer*, 827 S.W.2d 833, 839 (Tex. 1992) (citing Tex. R. Evid. 613(b)).

### 2. The agreements incentivize Sunde's medical providers to make inaccurate diagnoses favorable to him, provide unnecessary treatment, and testify favorably on his behalf.

The emergency room doctors who saw Sunde on the date of the accident did not diagnose him with a concussion or traumatic brain injury.  *See* Ex. 2, Midland Memorial Hospital Records.  As a result, Sunde must rely on the opinions and ultimate testimony of Drs. Chaiban, Hamza, Armstrong, and Hernandez to support his claims of traumatic brain injury, concussion, post-concussion syndrome, cognitive and memory problems, and related psychological issues.

Drs. Chaiban, Hamza, Armstrong, and Hernandez, in turn, rely on their ongoing relationship with Access Healthcare Management, Elite Medical Care, and Sunde's counsel for their financial benefit.  Indeed, it is these providers' financial self-interest that has caused them to inaccurately diagnose Sunde with the above conditions, charge inflated rates for the services they provided him, and that will ultimately cause them to testify favorably on his

behalf during their depositions and at trial.

While not surprising that these doctors and the medical funding/factoring companies (and Sunde's lawyers) would not want the details of their financial entwinement disclosed, Defendants are entitled to discover those details since they bear on the doctors' bias and credibility and the reliability of their medical diagnoses and opinions. Similarly, because Sunde's retained life care planner, Dr. Wakeham, has based her opinions on the opinions of Drs. Chaiban, Hamza, Armstrong, and Hernandez, the reliability, or lack thereof, of their opinions bears directly on the reliability, of lack thereof, of Dr. Wakeham's opinions.

The United States Court of Appeals for the 11th Circuit examined the precise issue presented here and affirmed the same arguments Defendants make through this motion. *See ML Healthcare Services, LLC v. Publix Super Markets, Inc.*, 881 F.3d 1293, 1296 (11th Cir. 2018). During discovery, the defendants in that case learned that ML Healthcare Services would contract with doctors to provide medical care for personal injury plaintiffs with viable tort claims, refer plaintiffs to those doctors, purchase the accounts receivable from the doctors for that medical care, then seek payment for those accounts receivable from any settlement or judgment. *Id.* Furthermore, the doctors would testify at the plaintiff's trial concerning the extent and cause of her medical injuries. *Id.* The defendant sought to introduce at trial evidence of the relationship between the doctors and ML Healthcare Services (a medical funding and factoring company) "to show that Plaintiff's doctors were biased in their testimony and that Plaintiff's claimed medical expenses were unreasonable." *Id.*

As a starting point, **the district court "concluded that the business model used by ML Healthcare, which included the fronting of medical expenses for plaintiffs to the treating doctors that ML Healthcare had selected, was 'highly relevant and probative'**

25

as to the bias of those doctors, as well as the reasonableness of the medical bills." *Id*. at 1299.  The trial court therefore allowed the defendant to introduce evidence at trial of the relationship between the doctors, ML Healthcare Services, and the plaintiffs ML Healthcare Services had referred to those doctors.  *Id*.  Following an eight-day trial, the jury returned a verdict for the defendant, and the plaintiff and ML Healthcare Services appealed, claiming the trial court erred in initially requiring them to produce evidence regarding their relationship then allowing that evidence to be introduced at trial.  *Id*. at 1296.

**The defendant's theory of bias in *ML Healthcare Services* is identical to Defendants' theory of bias in this case**—that the agreements between a plaintiff, his or her lawyers, and the medical funding and factoring companies "creates the risk of bias on the part of doctors who receive referrals from [the funding and factoring companies] and who subsequently testify on behalf of the plaintiffs they have treated pursuant to those referrals." *Id*. at 1301.  The risk of bias exists "because if a doctor did not provide a favorable causation analysis—which is necessary to win a tort action—[the funding and factoring companies] likely would find other doctors who would."  *Id*.  Therefore, "in order to continue to receive referrals from [the medical funding and factoring companies]—and the guaranteed income stream they generate—the treating doctors have an incentive to provide analyses that help these patients—and, by extension, [the medical funding and factoring companies]—win their case." *Id*.

Finding that the trial court did not err in permitting evidence of the payment arrangement to be admitted at trial to show the testifying doctors' bias, the 11th Circuit held that:

- **"[T]he evidence was relevant," as "[i]ndeed, proof of bias will typically be**

relevant." *Id*. at 1302 (citing *Abel*, 469 U.S. at 52 ("Proof of bias is almost always relevant because, the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of the witness' testimony.")).

- In order to probe potential bias, **the defendant "needed only to show that [the medical funding and factoring company's] payment arrangement had 'any tendency' to make bias more probable than it would be without the evidence,"** and finding that requirement "easily satisfied here." *Id*. (citing Fed. R. Evid. 401(a)).

- While the plaintiff argued that none of her doctors admitted to bias while testifying, the Court of Appeals noted that was "hardly a surprising revelation," and, in any event, "[a] witness's refusal to admit bias does not bar the opposing party from introducing evidence that might contradict such a protestation." *Id*.

- The trial court's determination that the probative value of the evidence of the agreements at issue outweighed any potential for prejudice to the plaintiff was not in error. *Id*. at 1303 (citing Fed. R. Evid. 403).

Of course, the issue now before this Court is not whether evidence of the agreements between Sunde's lawyers, the medical funding and factoring companies, and Sunde's doctors should be admitted at trial, but simply whether Defendants should be entitled to obtain discovery into the terms of those agreements. And, **as the Texas Supreme Court has made clear, "for purposes of pre-trial discovery, evidence is relevant even if it's not admissible at trial, so long as it's 'reasonably calculated to lead to the discovery of admissible evidence.'"** *In re K&L Auto Crushers, LLC*, 627 S.W.3d 239, 248 (citing Tex. R. Civ. P. 192.3(a)).

Numerous other courts have come to same conclusion as the 11th Circuit. *See e.g.*, *Barnes v. Dolgencorp, LLC.*, No. CV 22-2179, 2023 WL 7403450, at *5 (E.D. La. Nov. 9, 2023) (finding records reflecting purchase of plaintiff's medical accounts receivable from his doctor by a factoring company relevant to the doctor's potential bias); *Tarleton v. DG Louisiana LLC*, No. 6:20-CV-00294, 2022 WL 2347346, at *4–5 (W.D. La. June 29, 2022)

(holding medical factoring records "relevant to bias, credibility, and the reasonableness of Plaintiff's medical bills"); *McClain v. Sysco New Orleans*, No. CV 19-1801, 2020 WL 11028497, at *7–8, 10–11 (E.D. La. July 17, 2020) (finding that "accounts receivable by factoring companies are one of the most lucrative of the options" to cover "the cost of plaintiff's treatment"); *Thomas v. Chambers*, No. CV 18-4373, 2019 WL 8888169, at *3–4 (E. D. La. Apr. 26, 2019) (finding records relating to medical funding agreement relevant because "[t]he financial arrangement between plaintiffs' healthcare providers and the third-party funding companies could create an incentive for plaintiffs' treating physicians to want plaintiffs to win their case, because a victory could result in more referrals… [and] [t]hat incentive could lead a jury to question the treating physicians' testimony regarding causation"); *In re: American Medical Systems, Inc.*, MDL No. 2325, 2016 WL 3077904, at * (S.D.W. Va. May 31, 2016)  (finding document and deposition subpoenas to third-party factoring companies sought relevant information relating to financial motive, credibility, and damages); *Houston v. Publix Supermarkets, Inc.*, No. 1:13-CV-206, 2015 WL 4581541, at *1 (N.D. Ga. Jul. 29, 2015) ("Testimony about [the medical factoring company's] relationship with [the plaintiff's] doctors is admissible for the purpose of attacking the credibility of their opinions"); *Rangel v. Anderson*, No. 2:15-cv-81, 202 F.Supp.3d 1361, 1373 (S.D. Ga. Aug. 23, 2016) ("the medical funding company's] involvement in Plaintiff's treatment is highly relevant to the issue of Plaintiff's treating physician's credibility and potential bias").

It bears repeating that the emergency room physicians who saw Sunde on the day of the accident, *before* he retained counsel, did not diagnose him with a concussion or brain injury.  *See* Ex. 2, Midland Memorial Hospital Records.  It was not until Sunde began seeing the doctors hand selected by his lawyers and their medical funding and factoring companies,

weeks and months after the accident, that the diagnoses of traumatic brain injury, post-concussion syndrome, and similar alleged injuries come about. *See* Exs. 3-4, 7-8, Allied Health, Neurobehavioral Clinic, Texas Brain Center, and River Oaks Hospital & Clinics Records, respectively. Those doctors have established, ongoing relationships with Sunde's lawyers and their medical funding and factoring companies, and Defendants contend it is that relationship, and the associated financial benefit to the doctors, that makes them biased in Sunde's favor.

### 3. Defendants' probing of the bias of Sunde's medical providers is especially important because he is trying to pass them off as neutral, disinterested "treating physicians."

The emergency room doctors who saw Sunde on the date of the accident did not diagnose him with a concussion or traumatic brain injury. *See* Ex. 2, Midland Memorial Hospital Records. As a result, Sunde must rely on the opinions and testimony of Drs. Chaiban, Armstrong, Hernandez, and Hamza to support his claims of traumatic brain injury, concussion, post-concussion syndrome, cognitive and memory problems, and related psychological issues. Yet, not only did Sunde's lawyers steer him to these particular doctors—directly in the case of Drs. Armstrong and Hernandez and indirectly in the case of Drs. Chaiban and Hamza—but they are now attempting to pass these doctors off as neutral, disinterested "treating physicians" rather than the biased witnesses with a financial stake in the resolution of this case they truly are. *See* Ex. 21, Sunde's Expert Designations, at 5-7 (identifying these doctors as non-retained experts and describing their anticipated testimony). This makes the discovery at issue in this motion all the more important for Defendants.

### B. The evidence is also relevant to the reasonable value of the medical services provided to Sunde.

### 1. Medical providers often charge significantly more than what they are ultimately paid.

The Texas Supreme Court has discussed, at length, the modern health care industry's "two-tiered billing structure—consisting of higher 'chargemaster' (or 'full' or 'list') rates for uninsured patients and lower rates charged to private and public insurers," and has highlighted the fact that "chargemaster rates are both 'increasingly arbitrary' and 'frequently uncollected.'" *In re K&L Auto Crushers, LLC*, 627 S.W.3d 239, 248 (Tex. 2021) (citing *In re North Cypress Medical Center Operating Co., Ltd.*, 559 S.W.3d 128, 132 (Tex. 2018)).

### 2. Sunde can only recover the reasonable value of the medical services provided to him, which is not necessarily commensurate with the amounts charged.

Section 41.0105 of the Texas Civil Practice and Remedies Code limits a claimant's recovery to the amount of medical expenses actually "paid or incurred." Tex. Civ. Prac. & Rem. Code § 41.0105. So, if a provider bills a patient at a certain rate, but the provider is only legally entitled to collect a lower rate, the patient "can only recover the reduced amount from the tortfeasor because that's the amount 'actually paid or incurred.'" *In re K&L Auto Crushers*, 627 S.W.3d at 249.

"But section 41.0105 is not the only limit on a claimant's recovery of medical expenses." *Id*. Another such limitation "is **the common law requirement that the amount of recoverable expenses be reasonable**." *Id*. In fact, "[i]t has long been well-settled that 'recovery of [medical] expenses will be denied in the absence of evidence showing that the charges are reasonable." *Id*. (citing *Dall. Ry. & Terminal Co. v. Gossett*, 294 S.W.2d 377, 380, 383 (Tex. 1956)); *see also* Tex. Civ. Prac. & Rem. Code § 18.001 (confirming claimants can recover medical expenses from a tortfeasor only if the amount charged "was reasonable at the time and place that the service was provided").

Indeed, "even if [the plaintiff] were legally bound to pay the providers an unreasonable amount for their services, [the defendant's] liability to [the plaintiff] would still be limited to

a reasonable amount." *Id.* at 250. This is so because "tortfeasors are responsible only for losses *caused by* their tortious conduct—that is, losses that are 'the necessary and usual result of their tortious act.'" *Id.* (citing *J&D Towing, LLC v. Am. Alt. Ins. Corp.*, 478 S.W.3d 649, 655 (Tex. 2016)). So, **"[i]f a claimant agrees or is required to pay a medical provider more than a reasonable amount, the difference between the amount paid and a reasonable amount is not a 'necessary and usual result of the tortious act,' but of the claimant's or provider's conduct."** *Id.*

### 3. Evidence of the amounts charged is not dispositive of the reasonable value of medical services.

"[C]hargemaster rates 'are not dispositive of what is reasonable.'" *Id.* at 248-49 (citing *In re North Cypress*, 559 S.W.3d at 133). Indeed, the Texas Supreme Court has found evidence regarding numerous alternatives to "chargemaster" or "full" rates to be relevant to the determination of the reasonable value of medical services. *See e.g.*, *Daughters of Charity Health Services of Waco v. Linnstaedter*, 226 S.W.3d 409, 411 (Tex. 2007) (finding amounts paid by workers compensation carrier to be "fair and reasonable reimbursement"); *Haygood*, 356 S.W.3d at 398-99 (finding Medicare rates presumptively reasonable and the proper measure of medical expenses in that case); *In re North Cypress*, 559 S.W.3d at 129 (finding "reimbursement rates from private insurers and public payers" to be "at least relevant to what constitutes a reasonable charge"); *In re K&L Auto Crushers*, 627 S.W.3d at 248-49 (finding "information regarding the medical providers' negotiated rates and costs" to be relevant to the reasonableness of their charges); *In re ExxonMobil*, 635 S.W.3d at 634 (finding "amounts and rates these providers have accepted from the majority of their patients for the same procedures performed around the same time" to be relevant to the reasonableness of their charges); *In re Central Oregon Truck Co., Inc.*, 644 S.W.3d 668, 669 (Tex. 2022) (agreeing with *In re K&L*

*Auto Crushers* regarding the information relevant to a determination of the reasonableness of medical provides' charges).

### 4. Defendants' discovery requests seek information relevant to the determination of the reasonable value of the medical services, rather than simply what Sunde's doctors charged.

Sunde seeks to limit Defendants' discovery to the amounts his medical providers charged. As discussed above, the amount his doctors charged is not dispositive of the reasonableness of those charges, and Defendants are entitled to discovery bearing on the reasonable value of the medical services provided to him.

As such, Defendants seek discovery regarding the terms of any agreements relating to Sunde's medical care, the terms of any agreements for compensation to his medical providers for that medical care, and the terms of any agreements for compensation to the medical funding and factoring companies involved in his medical care.

The Texas Supreme Court has looked approvingly at discovery requests seeking similar information:

- The amount of billed charges.

- The amount of any adjustments or write-offs.

- The amount paid to the provider and by whom it was paid.

- The amount of any outstanding balances.

- Copies of any contracts for services with [the plaintiff's] health-insurance carrier.

- Any letters of protection, contracts, liens, or other guarantees of payment.

*In re Central Oregon Truck Co., Inc.*, 644 S.W.3d at n. 1, 670 ("that information, which the

Relators have subpoenaed from [the plaintiff's] third-party medical providers, is relevant to determining the extent to which [the plaintiff] may recover her post-accident medical expenses as damages.").

And, as the exemplar agreement between Dr. Hayes and Access Healthcare Management (Ex. 42) shows, the agreements between Sunde's doctors and medical funding and factoring companies likely set out the amounts the providers have agreed to accept as payment for the services they provided to Sunde, which is relevant to a determination of the reasonable value (as opposed to simply the amounts charged) of the medical services rendered to Sunde.

### C. Sunde's and Elite Medical Care's likely counterarguments fail to negate Defendants' right to this discovery.

#### 1. The collateral source rule does not preclude Defendants' discovery into the terms of the medical funding and factoring agreements.

Sunde might argue that the collateral source rule precludes Defendants' discovery into the terms of the funding and factoring agreements. Sunde's collateral source rule argument, should he make it, would be wrong, misguided, nothing more than a red herring, and based on an incorrect interpretation of the law.

First, a medical funding and factoring company is not a collateral source. *See e.g.*, *Houston*, 2015 WL 4581541, at *2 (finding factoring company "is not in the nature of a traditional collateral source" but is instead "an investor in the lawsuit"); *Rangel*, 202 F.Supp.3d at 1373 ("a medical lien funding company, is not a traditional collateral source" thus "excluding any evidence regarding [the funding company] would not serve the underlying rationale of the collateral source rule.").

Additionally, Defendants are not seeking to take a credit against the reasonable value

of the medical services provided to Sunde.  Rather, Defendants are seeking to *determine* the reasonable value of those services, *see* Sec. B, *supra*, and to impeach the credibility of Sunde's medical providers.  *See e.g.*, *Houston*, 2015 WL 4581541, at *1 ("the Defendant does not seek to offer evidence of the relationship between [the medical funding company] and the Plaintiff and [the medical funding company] and the Plaintiff's doctors in order to reduce its liability, but rather to attack the credibility of the Plaintiff's experts and the reasonable value of medical services."); *Rangel*, 202 F.Supp.3d at 1373-74 ("Defendant is not attempting to take any credit towards his liability…").

The 11th Circuit also addressed the collateral source argument in the same *ML Healthcare Services* case discussed at length above.  *See ML Healthcare Services*, 881 F.3d at 1298-1301.  As a starting point, the court noted that "evidence of collateral benefits is inadmissible if the only proposition for which it is offered is in reduction of damages…" *Id.* at 1298 (internal quotes omitted) (emphasis added).  "On the other hand," the court continued, "there may be another issue in a case to which evidence of collateral benefits is material." *Id.* (internal quotes omitted) (emphasis added).

As described above, the 11th Circuit upheld the district court's decision compelling production of evidence relating to the funding and factoring agreements on the grounds that such evidence was relevant to the doctors' bias. *Id.* at 1302.  "The fact that the evidence also implicates the collateral source rule does not render it irrelevant for impeachment purposes," the court rightly concluded. *Id.* (citing *Barrera v. E. I. Du Pont De Nemours & Co., Inc.*, 653 F.2d 915, 921 (5th Cir. Unit A 1981) (holding that "evidence, properly offered and clearly relevant for impeachment purposes, was improperly excluded simply because, under the collateral course rule, it would have been inadmissible as direct evidence.").

Again, however, the only issue currently before this Court is the discoverability, rather than the admissibility, of the evidence at issue. *See e.g.*, *Spears v. Wal-Mart Stores East, LP*, No. 2:18-cv-152, 2020 WL 12676397, at *5 (S.D. Ga. Sep. 21, 2020) ("the collateral source rule generally concerns the admissibility of certain evidence, not discoverability.").   In that context, the 11th Circuit also upheld the district court's partial denial of ML Healthcare Services' motions to quash, which it filed in response to the defendant's document subpoenas seeking "evidence related to its business model and payment arrangement with Plaintiffs." *Id*. at 1306-07.   In doing so, the appellate court wrote that "the evidence sought under the subpoena was admissible to impeach the causation analysis of Plaintiff's treating doctors and was potentially relevant to challenge the reasonableness of her claimed medical expenses." *Id*. at 1307.

Similarly, in *In re Jarvis*, the court of appeals held that that collateral source rule did not bar discovery of insurance agreements and communications relating to payment for medical services rendered to a personal injury plaintiff.  *In re Jarvis*, 431 S.W.3d 129, 136 (Tex.App.--Houston [14th Dist] 2013, orig. proceeding).  "[W]hether Blue Cross Blue Shield is a 'collateral source' is of no consequence to the determination of the discovery issues in this case," the court noted.  *Id*. at 137 (internal quoted omitted).  This was so, it continued, because "the Texas Supreme Court in *Haygood* made it clear that… contracts affecting the legal right of healthcare providers to be paid are the very issues that are relevant at trial." *Id*.; *see also Haygood v. De Escabedo*, 356 S.W.3d 390, 391 (Tex. 2011) ("Health care providers set charges they maintain are reasonable while agreeing to reimbursement at much lower rates… resulting in great disparities between amounts billed and payments accepted.).

**2. Defendants' designation of a medical billing expert does not preclude Defendants' discovery into the terms of the medical funding and factoring agreements.**

Sunde might argue that discovery into the medical funding and factoring agreements is unnecessary because Defendants have retained an expert, Marcus Murphy, who will opine that the amounts charged by Sunde's medical providers are unreasonable. The Texas Supreme Court has squarely rejected this exact argument. *See In re K&L Auto Crushers, LLC*, 627 S.W.3d at 254 ("we do not agree with the providers' argument that all of the requested discovery is unnecessary because… K&L Auto can and did hire experts to opine that the providers' chargemaster rates are unreasonable.").

Indeed, Mr. Murphy's opinions "must be based on relevant facts and data." *Id*. As it stands now, however, his opinions are based entirely on generally available information from state and national markets rather than information specific to Sunde's medical providers. *See* Ex. 20, Report of Defense Medical Billing Expert, at 19-26.

Furthermore, two of his four comparators – the midpoint value and the average statewide charge – are based entirely on chargemaster rates rather than reimbursement rates (*i.e.*, amounts actually paid to providers). *Id*..at 22-26. The other two comparators – the standard Medicare and workers compensation reimbursement rates – are set by statute and administered by governmental authorities and are likely to be challenged as such by Sunde's counsel at trial. *Id*. at 19-22.

Discovery into the medical funding and factoring agreements will allow Defendants "to rebut the alleged damages at trial by offering concrete evidence – rather than speculative evidence in the form of affidavits and cross-examination based on generalized data…" *In re K&L Auto Crushers, LLC*, 627 S.W.3d at 255. Denial of this discovery, on the other hand,

"significantly impairs [Defendants'] ability to argue reasonableness in general, but it also undercuts [Defendants'] ability to convince a jury that any of [their] speculative information is credible when the providers are arguing that the charges were reasonable without having to reveal relevant underlying data." *Id*. at 257.  In short, such a denial "prevents [Defendants] from both adequately presenting and defending the heart of [their] argument against the claimed damages." *Id*.

Accordingly, the fact that Defendants have retained a medical costs expert does not preclude their further discovery of documents and information that are relevant to that expert's analysis and the strength of his opinions.

### D. In the alternative, Sunde and/or Elite Medical Care should produce the agreements for *in camera* review, and they should be made part of the record for appellate review.

Should the Court deny Defendants' motion, Defendants respectfully request that the Court conduct an *in camera* review of the documents and communications sought by Defendants and that they be made a part of the court's records such that they will be available for appellate review.

## IV.    CONCLUSION

Sunde's lawyers and the medical funding and factoring companies with whom they regularly work sent Sunde to handpicked doctors who provided favorable diagnoses and charged inflated rates and will testify favorably on his behalf at trial.  These doctors depend on Sunde's lawyers and the funding and factoring companies for patient referrals and payment, and the companies depend on Sunde's lawyers for payment out of any settlement or judgment in a case.  Accordingly, these handpicked doctors are not neutral and disinterested

treating physicians, as Sunde is attempting to portray them, but are biased witnesses with a stake in a favorable outcome in this case for Sunde.

The discovery defendants seek through this motion is relevant to the bias and credibility, or lack thereof, of Sunde's so-called "treating physicians," to whom he was referred by his lawyers and their funding and factoring companies, and to the reasonable value—as opposed to the inflated rates they charged—of the medical services they rendered. Furthermore, because Sunde's retained life care planner bases her opinions on those of these so-called "treating physicians," the discovery is also relevant to the reliability of her opinions and her credibility.

Defendants respectfully request that the Court compel and order the following:

- That Elite Medical Care present a representative to testify on the topics set forth in Defendants' notice of deposition and subpoena attached to this motion.

- That Dr. Nadia Ramsey present herself for oral deposition.

- That Mayra Zuniga present herself for oral deposition.

- That Sunde remove all objections and provide all information and documents responsive to Woods Interrogatories 6-11 and Requests for Production 7-16.

- That the deposition of River Oaks Hospital & Clinics proceed without further inference from Sunde.

- That the deposition of the Texas Brain Center proceed without further interference from Sunde.

- That the deposition of Dr. Gina Armstrong proceed without further interference from Sunde.

- That the deposition of Dr. Ramiro Hernandez proceed without further interference from Sunde.

- Should CareCapital or any party move to quash the deposition subpoena served by Defendants, that Elite Medical Care present a

representative to testify on the topics set forth in Defendants' notice of deposition and subpoena attached to the motion, and that said deposition proceed without further interference.

The importance of this discovery to Defendants' damages defense cannot be overstated.   Indeed, this discovery goes to the very heart of Defendants' defense. Accordingly, Defendants respectfully request that the Court compel the production of the documents and depositions discussed herein within 45 days of the Court's Order.


Respectfully Submitted,

**AHMAD, ZAVITSANOS & MENSING, PLLC**

/s/ Rey Flores
Todd W. Mensing
State Bar No. 24013156
tmensing@azalaw.com
Rey Flores
Texas Bar No. 24068777
rflores@azalaw.com
Jarmonique Smith
Texas Bar No. 24110374
jsmith@azalaw.com
Carl J. Gustafson
Texas Bar No. 24125261
cgustafson@azalaw.com
1221 McKinney, Suite 2500
Houston, Texas 77010
Phone: 713.655.1101
Fax: 713.655.0062

**ATTORNEYS FOR DEFENDANTS**

## **CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing document was served on all counsel of record in accordance with the Texas Rules of Civil Procedure on November 15, 2024.

*/s/ Rey Flores*
Rey Flores

## **CERTIFICATE OF CONFERENCE**

I hereby certify that I have attempted to confer with counsel for Plaintiff Daniel Sunde regarding Defendant Woods' written discovery requests, and she has not responded to repeated attempts to confer. Furthermore, counsel for Sunde has not provided her availability for the depositions discussed herein despite repeated requests. Accordingly, Defendants assume Plaintiff is opposed to the requested relief.

Furthermore, I certify that I have conferred with counsel for Elite Medical Care, Dr. Nadia Ramsey, and Mayra Zuniga who is opposed to the requested relief.

*/s/ Rey Flores*
Rey Flores