**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **LANDON PERRY,** | § | |
| | § | |
| ***Plaintiff,*** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:23-CV-04441** |
| | § | |
| **HALLIBURTON ENERGY SERVICES, INC.,** | § | |
| | § | |
| | § | |
| | § | |
| ***Defendant.*** | § | |

## HALLIBURTON'S MOTION TO EXCLUDE OR LIMIT THE TESTIMONY OF PLAINTIFF'S EXPERTS

Halliburton files this Motion to Exclude or Limit the Testimony of Plaintiff's Experts presenting two questions to the Court:

1. Should the Court exclude John Puskar, Jeffrey Perlstein, and Joe Thompson from testifying about liability or fault for negligence when fault is not relevant to a claim for maintenance-and-cure?

   and,

2. Should the Court further exclude Perlstein's opinions about "seaman" status as unreliable *ipse dixit* when Perlstein failed to research or apply any objective standards or methods in support of his analysis other than his own subjective opinion?

The answer to both questions is "Yes." Accordingly, the Court should issue an order under Rule 702 and *Daubert* excluding Plaintiff's experts from this maintenance-and-cure case.

**CONTENTS**

I. BACKGROUND ....4

II. STANDARD ....5

III. ARGUMENT ....6

**A.** Because liability for negligence is not relevant in this case, all expert opinions on that subject are unhelpful to the jury and must be excluded under *Daubert* and Rule 702. ....6

**B.** Perlstein's "seaman" opinion is unsupported by any reliable principles or objective methodology and should be excluded as *ipse dixit*. ....7

1. The basis of Perlstein's opinion on seaman status is entirely unclear. ....8

2. Perlstein's methodology is similarly vague. ....11

3. Perlstein admitted that objective standards exist, but he failed to review them. ....13

4. Perlstein has shown he can do the research, he just failed to do it here. ....14

5. Unreliable opinions from experienced experts are inadmissible *ipse dixit*. ....15

IV. CONCLUSION ....17

## TABLE OF AUTHORITIES

*Boudreaux v. U.S.*,

280 F.3d 461 (5th Cir.2002) ........ 6

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,

509 U.S. 579 (1993). ........ 5

*Grdinich v. Bradlees,*

187 F.R.D. 77 (S.D.N.Y.1999) ........ 18

*Jenkins v. Helmerich & Payne Int'l Drilling Co.,*

577 F. Supp. 3d 587 (S.D. Tex. 2021). ........ 7, 16

*Kumho Tire Co. v. Carmichael*,

526 U.S. 137 (1999). ........ 5

*Moore v. Ashland Chem. Inc.,*

151 F.3d 269 (5th Cir. 1998). ........ 5, 7

*Orthoflex, Inc. v. ThermoTek*, Inc.,

986 F. Supp. 2d 776 (N.D. Tex. 2013) ........ 13

*Semien v. Parker Drilling Offshore USA LLC*,

179 F. Supp. 3d 687 (W.D. La. 2016) ........ 6

*Smith v. Goodyear Tire & Rubber Co.*,

495 F.3d 224 (5th Cir.2007) ........ 6

*Viterbo v. Dow Chem. Co.,*

826 F.2d 420 (5th Cir. 1987) ........ 7

## I. BACKGROUND

Plaintiff is simultaneously pursuing two cases against Halliburton in state and federal court relating to injuries he alleges he sustained on April 22, 2023. The state court case alleges negligence and gross negligence under the Jones Act. The case in this Court relates solely to an alleged failure to pay maintenance and cure under general maritime law.

Three of Plaintiff's designated experts are the subject of this Motion.

Plaintiff's first designated expert is Jeffrey A. Perlstein. In a cursory two-page summary titled "Opinion and Conclusion," Perlstein primarily offers opinions relating to fault and negligence, discussing his perceived "failures" by Halliburton to provide a safe work environment.[1]

In passing, Perlstein summarily asserts that "Perry performed the traditional role of a seaman."[2] And, the Opinion and Conclusion section of Perlstein's report states that "as a seaman," Perry was entitled to certain expectations, but it does not include any analysis or support for why, in Perlstein's opinion, Plaintiff was "a seaman."[3]

Plaintiff's other two designated experts are Joe Thompson and John Puskar. Both expert's reports and designations relate solely to alleged negligence and fault. Puskar's disclosed report and opinions relate solely to alleged "failures on Halliburton's part," purportedly reflecting Halliburton's negligence.[4] Thompson's opinions likewise relate solely to liability for negligence, alleging "this was a preventable incident that should not have occurred" and providing various opinions for why he believes Halliburton was at fault.[5]

---

[1] Exhibit 1 (Perlstein Report at 9-10).
[2] Exhibit 1 (Perlstein Report at 3).
[3] Exhibit 1 (Perlstein Report at 10).
[4] Exhibit 2 (Puskar Report at 3)
[5] Exhibit 3 (Thompson report at 21-23).

Neither Puskar nor Thompson's reports disclose any opinions relating to the maintenance-and-cure claim at issue in this case.

## II. STANDARD

Under *Daubert*, trial courts function as gatekeepers and determine whether expert testimony should be presented to the jury.[6] Courts act as gatekeepers of expert testimony "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[7] The party seeking to introduce expert testimony bears the burden of demonstrating that the expert's findings and conclusions are reliable.[8]

When evaluating expert testimony, the overarching concern is whether it is relevant and reliable.[9] Federal Rule of Evidence 702 requires that an expert's testimony must be "based on sufficient facts or data," and be "the product of reliable principles and methods." Rule 702 further requires a purported expert to show that that those principles and methods were "reliably applied."

In *Daubert*, the Supreme Court offered the following, non-exclusive list of factors that courts may use when evaluating the reliability of expert testimony: (1) whether the expert's theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the challenged method; and (4) whether the theory or technique is generally accepted in the relevant scientific community.[10]

In summary, when a Plaintiff fails to demonstrate that an expert's conclusions are based on a reliable methodology, courts should exclude the testimony as being improperly based on the

---

[6] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590–93 (1993).
[7] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).
*8 See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir.1998) (en banc), *cert. denied*, 526 U.S. 1064 (1999).
[9] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).
[10] *Daubert* at 593–94.

"*ipse dixit*" of the proffered expert.[11]

## III. ARGUMENT

### A. Because liability for negligence is not relevant in this case, all expert opinions on that subject are unhelpful to the jury and must be excluded under *Daubert* and Rule 702.

Rule 702's requirement that expert testimony "assist the trier of fact" goes "primarily to relevance."[12] Expert testimony which does not relate to "any issue in the case is not relevant and, ergo, non-helpful" and is barred under Rule 702.[13] Because the only claim in this case is for an alleged failure to pay maintenance and cure, expert testimony unrelated to that issue is irrelevant.

The obligation to pay maintenance and cure "is contractual and arises independently of tort law."[14] The obligation to provide maintenance and cure "**does not depend on any determination of fault**," but rather, is treated as an implied term of the contract for maritime employment.[15]

Simply put, as noted above, the testimony of Puskar and Thompson relates solely to issues of liability and fault, and the same is true for Perlstein, other than his brief references to "seaman" status.[16] Those issues are not relevant to the maintenance and cure claim in this case. Accordingly, testimony by Puskar, Thompson, and Perlstein relating to negligence or fault should be excluded under Rule 702 and *Daubert* as unhelpful to the trier of fact because it does not relate to any issue in this case.

---

[11] *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 157 (1999).

[12] *Smith v. Goodyear Tire & Rubber Co.*, 495 F.3d 224, 227 (5th Cir.2007) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 580 (1993)).

[13] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993).

[14] *Boudreaux v. U.S.*, 280 F.3d 461, 468 (5th Cir.2002), *citing Bertram v. Freeport McMoran, Inc.*, 35 F.3d 1008, 1013 (5th Cir.1994).

15 *Semien v. Parker Drilling Offshore USA LLC*, 179 F. Supp. 3d 687, 697 (W.D. La. 2016) (emphasis added).

[16] Exhibits 1; 2; 3. (Expert reports)

## B. Perlstein's "seaman" opinion is unsupported by any reliable principles or objective methodology and should be excluded as *ipse dixit.*

While the majority of Perlstein's opinions on liability should be excluded as irrelevant, his remaining opinion on "seaman" status should also be excluded as unreliable and improper *ipse dixit* that is not supported by any objective or reliable methodology.

When evaluating Daubert challenges, courts primarily focus "on [the experts'] principles and methodology."[17] Indeed, as the Fifth Circuit clarified in *Viterbo*, when an expert shows up to court with only "credentials and a subjective opinion," their testimony that "it is so" is not admissible.[18] Trial courts routinely observe this mandate by excluding testimony even when an expert is otherwise qualified by their background or experience on the basis that the expert has failed to demonstrate that they have "reliably applied" reliable principles or methods.[19]

A party seeking to have the district court admit expert testimony "must demonstrate that the expert's findings and conclusions are based on the scientific method," and are therefore reliable which "requires some **objective**, independent validation of the expert's **methodology**."[20] This must be demonstrated by the proponent of the testimony, and an expert's mere "assurances that he has utilized generally accepted scientific methodology is insufficient."[21]

Perlstein fails to show that he reliably applied any principles or methods to support his assertion that Perry was a "seaman" other than his own say-so. The factual basis of Perlstein's opinion is unclear, and Perlstein failed to demonstrate any objective methodology to validate his conclusion—it is based purely on his own subjective conclusion. Accordingly, the Court should

---

[17] *Daubert*, at 595 (emphasis added).
[18] *Viterbo v. Dow Chem. Co.,* 826 F.2d 420, 424 (5th Cir. 1987).
[19] *Jenkins v. Helmerich & Payne Int'l Drilling Co.,* 577 F. Supp. 3d 587, 591 (S.D. Tex. 2021).
[20] *Moore v. Ashland Chem. Inc.,* 151 F.3d 269, 276 (5th Cir. 1998).
[21] *Moore v. Ashland Chem. Inc.,* 151 F.3d 269, 276 (5th Cir. 1998).

exclude this opinion.

### 1. The basis of Perlstein's opinion on seaman status is entirely unclear.

Perlstein first claimed that he had an informative conversation with Plaintiff wherein Plaintiff provided him with numerous facts relevant to his opinion that Plaintiff is a seaman.

> Q. … And you recall a specific conversation with Mr. Perry?
>
> A. I do, yes.
>
> Q. And what did he tell you with respect to his work for Halliburton?
>
> A. That he was a crew member. Emphatic that he was a crew member for Halliburton. And he discussed the work that he performed, and it was a performance (sic) he worked as the work of a mariner, of a deckhand. He loaded and secured cargo. He unlashed cargo so it can go up to the rig. He was directed to perform maintenance on the deck: scaling, chipping, needle gunning, painting the vessel, picking up the deck. Basic – basic duties of an entry-level seaman.
>
> Q. That's what he told you?
>
> A. That's what Mr. Perry told me, yeah… Based on what Mr. Perry told me, that what I have deduced, that he did the work of an entry-level seaman. He did a sailor's job.[22]

Perlstein then doubled down on the purported conversation with Plaintiff, identifying a specific Halliburton supervisor who allegedly directed Plaintiff to perform maintenance on the Stim Star III vessel at the Captain's direction.

> Q. Did Perry give you the name of any Halliburton supervisor who directed him to do maintenance on the hull of a vessel?
>
> **A.** The supervisor who was making the trip with him on that hitch.
>
> Q. What was his name?
>
> A. One of them was Mr. Harris.

---

[22] Exhibit 4 at 27:15–28:9.

> Q. Okay. And so Mr. Perry – I just want to make sure I'm on the same page as you here. So Mr. Perry told you that Mr. Harris directed him to perform maintenance on the hull of a vessel.
>
> A. They were pretty much on the same hitch together; so, yeah, Mr. Harris would have told him to do so.
>
> Q. Would have told him or did tell him to do so?
>
> A. Did tell him. Did tell him, because the maintenance was performed. Mr. – Mr. Perry just didn't pick up a needle gun and go to work. All right? He was directed to perform these jobs.
>
> Q. And how many times did Mr. Harris supposedly direct Mr. Perry to do maintenance on the hull of a vessel?
>
> A. We didn't get into the number of times. I was satisfied with our conversation that was a very frequent occurrence.[23]

Eventually, Perlstein admitted he had never had a conversation with Plaintiff and claimed the information upon which he based his opinion that Plaintiff is a seaman came from Plaintiff's deposition instead.

> Q. Do you have notes in that note – notepad or notebook from your conversation with Mr. Perry?
>
> A. Actually, no, I don't… If I don't have notes of a conversation with Mr. Perry, I did not have a conversation with Mr. Perry… we can correct that… I did not have a conversation with Mr. Perry.
>
> Q. Okay. So when you – so your testimony now is you have never spoken with Mr. Perry, correct?
>
> A. That is correct.[24]
>
> * * * * * * *
>
> Q. … It would not have been in a phone call with Mr. Perry where Mr. Perry told you he was directed to do maintenance on a vessel; correct?

---

[23] Exhibit 4 at 38:16–39:22.

[24] Exhibit 4 at 122:1–17;

A. No because I didn't… I didn't speak with Mr. Perry.[25]

* * * * * * *

Q. … It would not have been on a phone call with Mr. Perry that he told you that he did security for the vessel.

A. I – I did not speak with Mr. Perry…

Q. Likewise, it would not have been on a phone call with Mr. Perry where he told you that he handled cargo, loaded and lashed cargo; correct?

A. … no,. it wasn't through a conversation.

Q. And it would not have been in a conversation or a call with Mr. Perry where he described any hitches that he worked on or the amount of time he spent on the vessel or what he did on the vessel, right?

A. No, I did not have a conversation.

Q. So any such information you would have would have come either from his deposition or his attorneys; correct?

A. Depositions.

Q. Not the attorneys?

A. No.

Q. Solely the deposition?

A. Correct.[26]

The problem with Perlstein's evolving position, however, is that Plaintiff's deposition did not take place until August 30, 2024, almost **two months after** Perlstein issued his report (on June

[25] Exhibit 4 at 123:13–18.

[26] Exhibit 4 at 124:8–125:14.

25, 2024) opining, in passing without any analysis, that Plaintiff is "a seaman."[27]

Perhaps the next evolution of Perlstein's claim will be that he was again mistaken and that, rather than gather information through a conversation with Plaintiff or through Plaintiff's deposition, he instead relied on Plaintiff's declaration. The problem with any such claim would be that Plaintiff's declaration did not discuss the majority of the factual issues Perlstein claims are the foundation of his opinion that Plaintiff is a seaman.

According to Perlstein, Plaintiff performed the following "functions of a seaman": (1) loaded cargo, (2) lashed cargo, (3) provided for the security of the vessel, (4) performed maintenance on the vessel as directed by the captain, and (5) lived on the vessel two weeks at a time.[28] Of these alleged "functions of a seaman," Plaintiff's declaration fails to mention (1) through (3), and, while claiming Plaintiff did maintenance, it fails to state that he did so at the captain's direction.[29] Moreover, it fails to mention the specific types of maintenance—"scaling, chipping, needle gunning, painting the vessel, picking up the deck"—that Perlstein claims Plaintiff did (and which, during his deposition, he claimed "Mr. Perry told me.")[30]

**2. Perlstein's methodology is similarly vague.**

Perlstein claims he "used the scientific method to form a hypothesis."[31] His report provides no further explanation for what that method entails, and Perlstein was unable to adequately describe the "scientific method" he purportedly applied:

> Q. What is the scientific method?

---

[27] Compare Exhibit 1 at 10 (Perlstein Report is dated and signed "25 June 2024") with Exhibit 5 (Reporter's Certification states that Plaintiff's deposition was taken "August 30, 2024").

[28] *See* Exhibit 4 at 34:1–24.

[29] *See generally* Exhibit 6 (Perry Declaration).

[30] Compare Exhibit 4 at 27:24–28:6.

[31] Exhibit 1 (Perlstein Report at 12).

> A. That – it's almost like forensics. All right? I go through it piece by piece of information. All right. And I look at it, and I compare what they did, what the company documents say they should have done, and what an industry best practice would be, or what the government or the law requires them to do. That, I consider scientific.[32]
>
> * * * * * * *
>
> Q. Yeah. My quick Google search of the scientific method says there are seven steps to the scientific method. Are you familiar with those steps?
>
> A. No. I've always declared it as a scientific method, and it has never been called into question. I'm sure there's a lot of things that happen that don't involve seven steps. I mean, I think I'm missing four or five of them right here.
>
> Q. Can you name any of the seven steps of the scientific method?
>
> A. Probably not…
>
> Q. So you use the term "scientific method" to mean just the methodology you applied in this case; right?
>
> A. Yeah, that's my methodology. It's my – it's my definition of "scientific." I'm sure I could find nine others online.[33]

Notably, while Perlstein purports to apply a methodology for the negligence portions of his opinion, he does not even attempt to offer a method or basis for his seaman opinion. Though *Daubert* does not strictly require experts to name the steps of "the scientific method" it does require them to identify objective methods and to be able to explain how they reliably applied them.[34] The

---

[32] Exhibit 4 at 142:12-19.

[33] Exhibit 4 at 143:12-144:13.

[34] *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (Citing *Daubert v. Merrell–Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1316 (9th Cir.1995) (on remand)) (Demonstrating reliability "requires some objective, independent validation of the expert's methodology. The expert's assurances that he has utilized generally accepted scientific methodology is insufficient."); *Orthoflex, Inc. v. ThermoTek*, Inc., 986 F. Supp. 2d 776, 798 (N.D. Tex. 2013) (excluding expert testimony as "subjective believe and unsupported speculation" where the expert failed to demonstrate any "objective methodology.").

fact that Perlstein did not apply the very method he claimed to apply, and could not even explain what it was, reflects an utter lack of objective principles or methods. For these reasons, it is inadmissible under *Moore*, *Daubert*, and Rule 702 which require a party offering an expert to prove their analysis is based on an "objective" methodology.[35]

**3. Perlstein admitted that objective standards exist, but he failed to review them.**

Perlstein's seaman opinion is purely subjective. Beyond failing to apply any objective methodology, he failed to review publications he admits would have had relevant information. Specifically, he admitted that Navigation and Vessel Circulars (NVICs) are published by the Coast Guard and are "how the Coast Guard brings information to the industry."[36] He further admitted that his relevant opinions about seaman status were based on the job duties of a seaman as described in NVIC Coast guard standards:

> Q. Okay. And so is it your testimony that in one of these releases or -- or electronic publications by the Coast Guard that they identified the handling, loading, and lashing of cargo as the function of a seaman?
>
> A. When they address -- yes. Yes. Yes, they do.[37]
>
> * * * * * * *
>
> Q. … you did not consult this NVIC when coming to your opinions in this case; correct?
>
> A. I did not.[38]
>
> Q. But your contention is that the NVIC, in one of its many publications, identifies the handling, loading, and lashing of cargo as the function of a seaman; correct?

[35] *Id.*
[36] Exhibit 4 at 89:12–23.
[37] Exhibit 4 at 90:3-9.
[38] Exhibit 4 at 90:19-23.

> A. It will address many functions, and those are one of the functions of a seaman.
>
> *  *  *  *  *  *  *
>
> Q. … can you point us to a specific release or publication from the NVIC that supports your contention?
>
> A. Not without considerable research.
>
> Q. And as you sit here today, you have not done that research; correct?
>
> A. I have not done that research…[39]

#### 4. Perlstein has shown he can do the research, he just failed to do it here.

Despite Perlstein's refusal to do the research in this case, public reports from Perlstein demonstrate that he regularly tracks down and applied objective standards and authority in other cases where he has been designated as an expert. For example, in *Ganpat*, Perlstein was designated by a plaintiff to provide expert opinions in a case where a plaintiff allegedly became ill while on a ship registered in Liberia.[40] There, Perlstein was able to identify numerous specific and objective Liberian Maritime regulations that he applied in support of his opinions, including:

- Liberian Maritime Regulations RML-108, 10.296(1-3) Masters Duties and Responsibilities;
- Liberia Maritime Authority MLC-005, Requirements, Medical care on board ship and ashore, and;
- The Maritime Labour Convention 2006, Title 4, Regulation 4.1-Medical Care on board ship and ashore.

And Perlstein managed to put in the work in yet another case where he opined on maritime safety regulations, identifying the specific provisions of the International Safety Management Code,

---

[39] Exhibit 4 at 91:19–92:2.

[40] Kholkar Vishveshwar GANPAT, v. EASTERN PACIFIC SHIPPING PTE, LTD., d/b/a/ "Eps", 2022 WL 11305275 (E.D.La.)

which he identified that "establishes a global standard for the safe management and operation of ships."[41] Again in *Matthews* like in *Ganpat*, Perlstein managed to identify the specific objective standards that supported his analysis and which provided validation to his opinions, citing Sections 4, 7, 12, 12.1, and 12.2 of the ISM code and applying them in his report.[42] Critically, by identifying these standards, the courts were provided an objective yardstick by which to evaluate Perlstein's opinions beyond simply his "say so."

Here, unlike his reports in *Matthews* and *Ganpat*, Perlstein chose to not even attempt to identify or apply objective standards in any reliable manner in support of his opinions about Plaintiff's purported "seaman" status.

### 5. Unreliable opinions from experienced experts are inadmissible *ipse dixit.*

Perlstein entire opinion on seaman status is based on his "experience in the industry,"[43] but this Court has repeatedly and properly excluded experts who fail to do the research or support their opinions objectively because such opinions are purely subjective and unreliable.

For example, in *Perkins*, this Court considered the report of another expert retained by Plaintiff's counsel, Russel Kendzior, who submitted a report in a slip-and-fall case.[44] Like in Perlstein's case, Kendzior attempted to argue that his testimony was based on "his education, knowledge, training,. . . years of experience in a specialized trade. . . and hundreds of pages of relevant records."[45] But the *Jenkins* court rejected that argument because, despite that training and

---

[41] Marek MATTHEWS, et al., Plaintiff, v. TIDEWATER CREWING LTD, et al., Defendant., 2022 WL 4380008 (E.D.La.)
[42] Marek MATTHEWS, et al., Plaintiff, v. TIDEWATER CREWING LTD, et al., Defendant., 2022 WL 4380008 (E.D.La.).
[43] *See id.*
[44] *Jenkins v. Helmerich & Payne Int'l Drilling Co.*, 577 F. Supp. 3d 587, 591 (S.D. Tex. 2021).
[45] *Jenkins* at 595.

experience, Kendzior's opinions were "impermissible *ipse dixit* because he did not utilize a reliable methodology to reach the conclusions outlined in his expert report."[46]

For example, the first opinion the court considered was Kendzior's assertion that the stairs in that case "posed an unreasonable risk of harm" because they were no longer slip-resistant.[47] Kendzior admitted to not knowing what material the stairs were made of, and he ran no tests on the steps or the contaminating material.[48] Because Kendzior failed to prove any testable or objective methodology for this opinion, the court excluded it as "not sufficiently reliable to pass muster under Rule 702" and sustained the defendant's argument that the opinion was "impermissible *ipse dixit.*"[49]

The Northern District of Texas also considered a similar situation in *Orthoflex*.[50] There, the defendant challenged one of the plaintiff's experts, Yates, on the basis that "even if [he was] qualified,. . . his testimony was unreliable because he [did] not base his conclusions on any identifiable methodology and [did] nothing more than repeat the legal conclusions of plaintiff's attorneys."[51]

Like in *Jenkins*, the *Orthoflex* court found that there were "serious challenges" with Yate's reliability that warranted his exclusion. In his report and at deposition, Yates offered several damages opinions, but when challenged on the basis of those opinions, Yates attempted to justify his opinions by saying they were based on his experience and "reliable business principles" without "any further specificity" such as any published industry standard that could be used to

---

[46] *Jenkins* at 593.
[47] *Jenkins* at 596.
[48] *Jenkins* at 596.
[49] *Jenkins* at 596; 593.
[50] *Orthoflex, Inc. v. ThermoTek, Inc.*, 986 F. Supp. 2d 776, 795 (N.D. Tex. 2013)
[51] *Orthoflex* at 795–96.

validate his theory.[52]

The *Orthoflex* court held that this failed to satisfy the demands of Rule 702, relying on *Grdinich*, a case from the Southern District of New York that also excluded expert testimony where the expert claimed to have "relied on 'industry standards' without identifying specific industry standards to support conclusion.[53] Based on Yates failure to identify or apply any objective and reliable standards on which he based his opinion, the *Orthoflex* court held that the plaintiff had "failed to demonstrate that Yates's testimony [wa]s more than subjective belief or unsupported speculation" despite Yate's experience and qualifications.[54]

The Court's reasoning in *Jenkins* and *Orthoflex* is exactly on point in this case. Despite the unquestioned experience of Kendzior and Yates, the court in both cases properly excluded their unsupported opinions as subjective *ipse dixit*.[55] This case calls for the same result. Because Perlstein failed to do the research to support his "seaman" opinion with any independent or objective standards, it should be excluded.

**IV. CONCLUSION**

For the foregoing reasons, Defendant Halliburton respectfully request this Court exclude any expert testimony offed by Plaintiff in this case relating to fault or liability for negligence as irrelevant and to further exclude the unreliable testimony of Jeffrey Perlstein on the question of whether Perry was a "seaman."

---

[52] *Orthoflex* at 798.
[53] *Orthoflex* at 798 (citing *Grdinich v. Bradlees,* 187 F.R.D. 77, 81–82 (S.D.N.Y.1999)).
[54] *Orthoflex* at 798.
[55] *See Jenkins* at 597 (Permitting Kendzior's opinion #3 because it was "reliably rooted in nationally recognized industry standards.")

Dated: February 28, 2025

Respectfully submitted,

**AHMAD, ZAVITSANOS & MENSING, PLLC**

*/s/ Joe Ahmad*
Joseph Y. Ahmad
Texas State Bar No. 00941100
Federal I.D. No. 11604
joeahmad@azalaw.com
Rey Flores
Texas State Bar No. 24068777
Federal I.D. No. 3351160
rflores@azalaw.com
Sammy Ford
Texas State Bar No. 24061331
Federal I.D. No. 950682
sford@azalaw.com
Kevin Leyendecker
Federal I.D. No. 28415
State Bar No. 00784472
kleyendecker@azalaw.com
1221 McKinney, Suite 2500
Houston, Texas 77010
Telephone: 713-665-1101
Facsimile: 713-655-0062

***ATTORNEYS FOR DEFENDANT HALLIBURTON ENERGY SERVICES, INC.***

**CERTIFICATE OF CONFERENCE**

I hereby certified that I attempted to confer with counsel for Plaintiff but have not yet received a response. The undersigned counsel will continue to attempt to confer and file a separate certificate of conference accordingly.

*/s/ Thomas Frashier*
Thomas Frashier

**CERTIFICATE OF SERVICE**

This is to certify that a true and correct copy of the above and foregoing instrument was served on all counsel of record by electronic service on February 28, 2025.

*/s/ Rey Flores*
Rey Flores