Exhibit

2

exhibitsticker.com

# Engineering Report in Support of:

# Landon Perry
# Vs.
# Halliburton

**Prepared for: The Arnold & Itkin Law Firm**
**6/30/24**

**Prepared by: John R. Puskar, P.E.**

PRESCIENT LLC
TECHNICAL SERVICES

# Table of Contents

**1.0 Project Assignment……………………………………………………………………………………..3**

**2.0 Introduction……………………………………………………………………………………………….3**

**3.0 Fundamentals of the Incident…………………………………………………………………………..3**

**4.0 Summary of Conclusions and Opinions……………………………………………………………4**

**5.0 Discussion of Overall Findings……………………………………………………………………………5**

5.1. Halliburton had consistent and systematic process safety management failures………..5
A. Halliburton did not conduct proper risk assessments……………………………………….5
B. Halliburton did not provide adequate JSA, (Job Safety Analyses)………………….. 8
C. Halliburton did not implement its own 5 to Go safety program…………………….11
5.2 Halliburton Failed to Comply Codes & Standards…………………………………………………..11
5.3 Halliburton failed to provide required training……………………………………………………15
5.4 Halliburton failed to provide SDSs and technical bulletin requirements……………………..21

**6.0 Signature………………………………………………………………………………………………………25**

**Annex – Materials Reviewed………………………………………………………………………………..26**

**1.0 Project Assignment**

This report summarizes the findings of an investigation into injuries that occurred during a chemical blending incident on 4/22/23 at the Port Fourchon Halliburton Facility in Port Fourchon, Louisiana. This document identifies failures on Halliburton's part in its facilities, processes, corporate governance, and supervision related to the work instructions and circumstances surrounding the injury of its employee, Landon Perry. This investigation also provides evidence of Halliburton's failures to comply with its own internal workplace safety standards, nationally recognized safety codes and standards, and requirements Halliburton created and published related to its own chemicals to keep its workers like Mr. Perry safe.

**2.0 Introduction**

On April 22, 2023, Landon Perry and his work partner, Desmond Brown, were working together to fulfill a work assignment to create 2 - 4,750-gallon batches of a product known by Halliburton as ClayFix5. This product was to be created from a very specific recipe. The 2 men were on top of one of the tanks holding tanks (called a 5,400 - referring to the tank capacity) loading chemicals when the tank underwent a violent reaction, sending an eruption of chemicals from the tank opening and vents onto Mr. Perry and his coworker.

**3.0 Fundamentals of the equipment, facilities, and processes in use at the time of the incident**

The Halliburton Energy Services Facility at Port Fourchon provides materials and services for offshore Gulf of Mexico drilling rigs. These services include blending and transporting drilling-related fluids to rigs. The blending and formulation of specific compounds are customized for specific clients and applications. These typically involve some combination of specialty chemicals, clays or other solids, and water to tanks in very specific combinations to achieve a desired effect within the well. Halliburton maintains tanks for holding the resultant mixtures, smaller containers with specialty chemicals, and bags and drums of solids. In addition, cranes and specialized material handling equipment are used to position and mix various loads. Hoses and pumps are also used for transporting materials and water. Employees are given various formulations and asked to load these materials with the equipment provided into larger tanks to be loaded onto ships and transported to the drill rig sites.

**4.0 Summary of Conclusions and Opinions – Authors Background**

My experience and basis for being qualified to conduct this analysis and prepare this report includes working at and analyzing processes at refineries, chemical plants, and other industrial facilities involving flammable, hazardous, and reactive chemicals. I have had formal training regarding risk assessments, have facilitated dozens of risk assessments, provided training to hundreds of persons on risk assessments, and have published a risk assessment-related paper at NFPA's (National Fire Protection Association's) annual conference. In addition to this, I have investigated more than 50 industrial explosions and fires over the past 40 years. I have the following conclusions and opinions regarding this incident.

**4.1. Halliburton's consistent and systematic process safety management and corporate governance failures were a direct cause of this incident and Mr. Perry's injuries.**

Process safety management, in the context used in this document, refers to the general branch of safety that relates to low-probability, high-consequence events and not specifically to OSHA's PSM (process safety management) requirements. The Halliburton Fourchon facility may be exempt from OSHA's PSM program because it is associated with oil and gas operations.

A. Halliburton Failed to Conduct Risk Assessments in accordance with generally accepted industry practices. This resulted in an unrealistic perspective on blending risks and a lack of safeguards that could have prevented Mr. Perry's injuries.

*i) Halliburton had not done a risk assessment for blending in the 5,400-gallon tanks.*

*ii) An improper team was selected to conduct the Halliburton's Fourchon blending facility risk assessment.*

*iii) Halliburton's risk assessment shows no change in Risk Profile Code (RPC) for any of the scenarios prior to or after the application of safeguards (not realistic and in error).*

*iv) Halliburton's risk assessment does not identify worst-case consequences (outcomes) for the most serious chemical blending scenarios.*

*v) Halliburton only identifies one administrative safeguard for many of the most severe scenarios presented.*

*vi) Halliburton did not apply industry-standard LOPA (Layers or Protection Analysis) techniques to scenarios that had few safeguards identified and consequences that could have made for severe injury or death.*

*vii) Halliburton failed to conduct a risk assessment specific to the blending process procedure.*

B. Halliburton did not provide adequate JSA (Job Safety Analyses) and other work instructions for blending in the 5,400-gallon tanks.

C. Halliburton did not implement its own 5 to Go safety program correctly for the blending operations.

**4.2 Halliburton failed to comply with nationally recognized codes and standards and its own internal standards related to chemical safety.**

*i) Failure to comply with NFPA 30 – Flammable Liquids Code.*

*ii) Failure to comply with OSHA, SDS sheet, and internal standards requiring PPE and access to safety showers.*

**4.3 Halliburton failed to provide workers and supervisors with the required training in accordance with its published policies and program standards.**

*i) Halliburton was not compliant with its own internal standards for required training.*

*ii) Halliburton did not provide special training to employees performing non-routine tasks.*

*iii) Halliburton's training program did not provide employees with training regarding all of the hazards related to the chemicals they were working with, including blending operations.*

*iv) Halliburton did not provide refresher training for Mr. Perry as required when introducing a more severe chemical hazard.*

*v) Halliburton's management team failed in its duties to implement its own hazard communication program training.*

*vi) There was no record provided that Mr. Perry ever received initial PPE training or the 3-year refresher training required for PPE.*

*vii) Halliburton failed to ensure that training standards for PPE were in compliance.*

**4.4 Halliburton failed to provide for basic protections required in their own SDSs and technical bulletins.**

*i) Halliburton's internal accident investigation report identified that chemical safety Technical Bulletins are not readily available for front-line employees.*

*ii) Halliburton's technology bulletin for FE1A identifies the scenario that directly caused Mr. Perry's injuries and warns against the blending that took place, but this information was not made available.*

**5.0 Discussion of Overall Findings**

**5.1 Halliburton had consistent and systematic process safety management failures, which were a direct cause of this incident and Mr. Perry's injuries.**

Halliburton claims to have considerable process safety expertise on its website, but this is not evident in its practices or even level of compliance with its internal safety-related protocols at this site and related to this incident. These systematic management process failures were direct causes of the incident and Mr. Perry's injuries. These systematic management process failures included a) Inadequate risk assessments, b) Improper JSA's Job Safety Analyses, and c) "5 To Go " internal Halliburton safety system failures.

**A. Halliburton failed to conduct risk assessments in accordance with generally accepted industry practices. This made for an unrealistic perspective on acid blending risks and a lack of safeguards that could have prevented the injuries to Mr. Perry.**

***i) Halliburton had not done a risk assessment for blending in the 5,400-gallon tanks.***
*Risk assessments are vital to maintaining worker safety. Although a risk assessment was performed for chemical handling and blending operations, it did not include performing those operations within the 5,400-gallon tanks. The risk assessment, done on July 21, 2021, discusses blending equipment associated with the acid plant. Blending operations at the site's acid plant contain engineering controls to facilitate blending. Conducting these blending operations on the 5400-gallon tank without understanding the risks prevented safeguards from being applied that would have prevented Mr. Perry's injuries.*

***ii) An improper team was selected to conduct the risk assessment (marked #1 below).***
*Risk assessment success and effectiveness are only as good as the team that is selected to perform the analysis. Halliburton records indicate that only 3 persons participated in creating the document that was used as the basis for identifying and mitigating blending risks. These persons included Mirella Hanks, Service Quality Manager; Travis Randazzo, Materials Foreman, and Nicholas Savoie (position unknown). Industry guidelines for risk*

*assessment teams identify the need for at least 5 to 7 persons who represent a variety of backgrounds and areas of expertise at the facility, including persons from operations.*

***iii) Halliburton's risk assessment shows no change in Risk Profile Code (RPC) for any of the scenarios prior to the application of safeguards or after the application of safeguards, (marked #2 below).*** *Every scenario, regardless of probability and consequences, is marked as 3 and colored green as being within Halliburton's acceptable risk appetite. No changes in risk profiles, regardless of the implementation of safeguards, make for an erroneous and dangerous perspective on risk. This risk assessment was not done correctly. Its results are in error.*

| Risk ID | Assessment Version | PSL/Support Function | Location | Date Completed / Revised | Approver | Minimum PPE Required |
|---|---|---|---|---|---|---|
| RA-GOM-PE-00758 | 4 | Production Enhancement | 1037-HES Port Fourchon Yard #3 | 7/21/2021 | Brett Cooper; steve.abney@halliburton.com | Hard Hat, Steel Toes, Impact Gloves, Eye Protection and Review SDS for additional required PPE |
| Sub PSL | | Product Line | | | Category | Chemical Handling |
| Sub Category | Mixing & Blending Chemicals | Risk Assessment Lea | Mirella Hanks | | Risk Assessment Participants | Nicholas Savoie; travis.randazzo@halliburton.com |

1

| Activity # | Activity Description | Steps associated with the activity | Hazard Category | Specific Source | Exposure potential | Specific Consequence | SEV | PROB | RPC | The most effective controls consist of modifying product design and processes prior to execution to eliminate hazards. | SEV | PROB | RPC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Prepare Resources | Identify materials | SQ - Product and Service Realization Planning | Loadout | Downtime (DT) : Incorrect version of loadout, lack of communication with third party, customer and personnel involved in the activity. Incorrect DoS information. | NPT, COPQ, Negative customer satisfaction | III | C | 3 | Check #1 - Review Loadout (FO-GOM-HAL-SCS-250) and verify with coordinator the correct version is being used. | III | C | 3 |
| 1 | Prepare Resources | Verify chemical availability | SQ - Resource Provision | Resources to perform the job as Personnel, Equipment, Materials, Technology. | Downtime (DT) :Resources are not enough or sufficient to comply with the contracts | NPT, COPQ, Negative customer satisfaction | III | C | 3 | Check #1 - Service Coordinator and Material Supervisor to order all materials and chemicals needed to perform task. Follow Acid Plant Job Checklist ( FO-GOM-HAL-SCS-202). | III | C | 3 |

2

***iv) Halliburton's risk assessment does not identify worst-case consequences (outcomes) for some chemical blending scenarios.*** Halliburton's SDS sheets for FE1A and FE10 show the skull and crossbones symbol, indicating *that the product can cause poisoning or death. Even though this is provided in SDS sheets, "death" is not listed among any of the chemical hazard scenarios in the company's risk assessment. This made for an inaccurate assessment of risk and a lack of safeguards that could have prevented Mr. Perry's injuries. None of the scenarios presents death or severe injury as a possible outcome, (marked as #3 below).*

**FE-1A ACIDIZING COMPOSITION** **Revision Date:** 22-Oct-2021



***v) Halliburton only identifies one administrative safeguard for many of the most severe scenarios presented (marked as #4 below).***

*The safeguards presented do not follow industry-standard guidelines, which prioritize engineering controls over administrative controls. Administrative controls are primarily rules and policies. Engineering controls usually involve physical changes to a job site or process that makes for an expenditure of capital dollars. This lack of multiple safeguards and engineering controls resulted in inadequate risk mitigation that could have prevented Mr. Perry's injuries or made them less severe.*

| Activity # | Activity Description | Steps associated with the activity | Hazard Category | Specific Source | Exposure potential | Specific Consequence | E V | R O B | P C | [illegible] product design and processes prior to execution to eliminate hazards. | E V | R O B | P C |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4 | Blend | Add acid | HSE - Chemical | Chemical spill from incorrectly valve line up or damaged PVC piping | People: Chemical exposure to personnel | "Skin burns, blindness, lung damage Damage to [illegible] | II | E | 3 | 1-Check condition of every O-ring before and make sure its totally clean before making up the connection. 2-Check O-ring material compatibility 3-Keep neutralizing agent in case of spill | II | E | 3 |
| 4 | Blend | Add acid | HSE - Chemical | Wrong valve operation during mixing wrong sequence of chemical mixing | People and Equipment: chemical reaction/ acid contact with equipment, placing additive in the wrong order | "Skin burns, blindness, lung damage Damage to equipment" | II | E | 3 | Check #1 - Only competent operator should handle blending equipm[illegible] | II | E | 3 |
| 4 | Blend | Add acid | SQ - Equip./Materials Handling, Storage and Preservation | Incompatible fluid used | Downtime (DT) wrong batch or chemical put into mix | Loss of batch | III | C | 3 | Check #1 - Check before mixing chemicals- Review SDS Sheets all acids to be blended (Acid Plant Job Checklist FO-GOM-HAL-SCS-202). | III | C | 3 |
| 5 | Transfer | Transfer fluids with blender centrifugal pump | HSE - Chemical | Acid spill from incorrect rig up or damaged hose or connections | Environment: Releases to Atmosphere | Environmental damage | IV | D | 3 | Check #1 - Covered under Hydrocarbon Pumping Checklist ( FO-GOM-HAL-SCS-202 Acid Plant Farpack) 1-Establish clear lines of communication between personnel operating blending equipment and receiver 2- Inspect hoses 3-Check condition of every O-ring before making up the connection. 4-Check O-ring material compatibility 5-Keep neutralizing agent in case of spill 6-Pressure test before fluid transfer 7- Ensure tanks are properly grounded before any transfer | IV | D | 3 |
| | | | | | | | | | | Check #1 - Covered under Hydrocarbon Pumping [illegible] | | | |

*Many engineering controls were possible for blending within the 5400-gallon tank vessels, which would not have exposed Mr. Perry to the hazards that caused his injuries. Halliburton provided no instrumentation and no remote pumps, which could have been used to provide distance from the mixing operation. Cameras could have been used for anything that needed to be observed at the top of the tanks instead of positioning persons there.*

*Halliburton had engineering controls available to minimize exposure to personnel. There is no technical reason for employees to be positioned atop the tanks and near the tank opening or vent areas. Technologies that deliver precise amounts of fluids to tanks from remote locations are commonplace. Instead, Halliburton chose to accept considerable risk in the manner that these materials were handled and submitted to tanks for mixing.*

***vi) Halliburton did not apply industry-standard LOPA (Layers or Protection Analysis) techniques to scenarios that had few safeguards identified and consequences that made for severe injury or death.*** *This kind of analysis is known throughout the risk management industry to provide a robust assessment of safeguards to better understand their effectiveness and add independent protection layers. If Halliburton had used these industry-standard techniques for the worst-case scenarios, additional and more robust safeguards could have prevent*ed Mr. Perry's injuries or made them less severe.

***vii) Halliburton failed to conduct a risk assessment specific to the blending process procedure.*** *Halliburton technical bulletins make it clear that errors in the procedure for blending acids make for extreme hazards. Even with this knowledge, they did not choose to do a specific risk assessment on this and other safety-critical procedures. These kinds of risk assessments are usually done directly with operations personnel and consider what happens if things such as the wrong sequence in a procedure is followed or tasks are completed out of order. These risk assessments also consider human factors in completing the required tasks such as ergonomics, labeling, and other things that could facilitate a procedural error. Safeguards related to safety critical procedures, such as the blending operations, could have prevented Mr. Perry's injuries or made them less severe*.

**B. Halliburton did not provide adequate job instructions or JSA (Job Safety Analyses) for blending in the 5,400-gallon tanks**. Failures of job safety instructions and the JSA process included the following:

**i)** The JSA hazard exposures did not include anything related to the blending or reactivity of the chemicals involved. The SDS sheet requirements and the hazards involved were not considered except for a mention of PPE and gloves for operating valves. Most of the items mentioned are occupational safety related and not associated with process safety even though the tasks involved hazardous chemicals. This lack of proper application of the JSA concept and its intent shows Halliburton's egregious systematic process safety management failure that led directly to Mr. Perry's injuries.

| Title: Gulf of Mexico JSA Form, SEMS Compliant (Word Version) | | | | HALLIBURTON MANAGEMENT SYSTEM DOCUMENT NUMBER: FO-GOM-HAL-HSE-103A | |
|---|---|---|---|---|---|
| Region: Gulf of Mexico | | FUNCTION\PSL: HSE | | | |
| Owner: Jack Gilbert | Approved By: Robert Richard | Revised By: Jack Gilbert | Revision Date: 12/20/18 | | Revision: 2 |
| DATE: 4/22/23<br>PLANT/LOCATION: Stim Star III and yard | JOB ACTIVITY / TASK: Loading 5400's<br>SUPERVISOR CONDUCTING ANALYSIS: (Print and Sign) Ben Harris<br>PSL / DEPARTMENT: Production Enhancement/Sand Control | | REVIEWED BY: (All involved with Job Activity must sign. Use back of form or attach roster.) | | |
| PPE REQUIRED: (In addition to Halliburton Minimum) Harness, Chemical gloves, face shield, apron, steel toe boots, and safety glasses | | | APPROVED BY: (Person In Charge of Facility) | | DATE: 4/22/23 |

| Job / Task Steps | Hazardous Energy Key Word & Specific Sources | Hazard Exposure and Effect | RPC | Barriers/Controls to Prevent Incident | RPC | Person(s) Responsible for Implementing Controls: |
|---|---|---|---|---|---|---|
| 1 Pre-Job Safety Meeting with all involved in task | | 1a Unfamiliar with task<br>1b Poor communication<br>1c Hazards not identified, discussed, or documented<br>1d JSA not reviewed | 2 | 1a Discuss the tasks involved to ensure what it to be accomplished.<br>1b Ensure all persons involved with the task understands his/her role in completing the task safely and efficiently.<br>1c Identify any hazards involved with the task to be performed and ways to mitigate the hazards through the JSA process.<br>1d Review JSA prior to performing the task and document | 3 | Ben Harris |
| 2 Stage tanks/additives | Gravity<br>Motion<br>Mechanical<br>Temperature<br>Chemical | 2a Equipment failure<br>2b pinch points | 2 | 2a Check forklift for readiness<br>2b Check surrounding when moving totes | 3 | Ben Harris |
| 3 Open valves to fluid tanks Working at heights | Gravity<br>Motion<br>Mechanical | 3a Pinch points operating valves on tanks and pumps<br>3b Strains to back and abdomen while operating valves<br>3c Slips, trips, falls due to hoses and lines on top of tank<br>3d Slipping while ascending and descending equipment<br>3e Tripping over fall harness lanyards, | 2 | 3a Use chemical gloves where needed to operate valves to avoid chemical exposer<br>3b Use proper body placement, bending at knees, while operating valves. Open valves slowly to avoid sudden body movements.<br>3c Walk slowly while crossing over hoses and lines to avoid slips, trips and falls. Be aware of walking surfaces Always know your surroundings while on top the tanks. Plan you movements while stepping down to the man cover to operate valves. While moving around on the tanks always be aware of you lanyards. Keep the extra lanyard tied off to harness when not needed. 100% tied off is one lanyard tied off at all times. Always be aware of your surroundings. | 3 | D. Brown |
| 4. lift 5400 | Gravity<br>Motion | 1a Equipment failure<br>1b pinch points | 2 | 1a inspect crane and rigging equipment prior to use<br>1b be aware of over head lifts. Always have an out | 3 | Ben Harris |

Page 1 of 3

CONFIDENTIAL HESI_00000501

Halliburton's JSA process included "Stop Work" authority. However, Halliburton failed to provide a safety culture, and even though the material handler lead told the supervisor that combining the FE1A and the FE10 would pose a serious hazard, no one felt comfortable enough with the process to stop work.

| | | | | | | |
|---|---|---|---|---|---|---|
| | Mechanical | 1c dropped object | | 1c inspect tanks for any objects | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| USE STOP WORK AUTHORITY AND NOTIFY YOUR SUPERVISOR WHEN YOU BELIEVE AN IMMINENT DANGER OR RISK HAS NOT BEEN IDENTIFIED OR MAY NOT BE ADEQUATELY CONTROLLED. | | | | | | |

*RPC- RISK PRIORITY CODE*

***ii)*** *Halliburton's "Acid Plant Job Checklist" shows safety protocols followed in the acid blending plant that are not adopted for acid blending in the 5400-gallon tank. These additional safety steps would have prevented the incident and Mr. Perry's injuries.*

Owner: PE GOM Quality Manager

FO-GOM-HAL-SCS-202

HALLIBURTON | Production Enhancement

**Acid Plant Job Checklist**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Customer:** | Hess | **Well:** | SA-003 | **Job Type:** | | **Vessel:** | SS3 |
| **Location:** | GC 468/GC 512 | **Lease:** | OCSG-26315 | **SO#** | | **Date:** | 4/22/2023 |

**Note: Complete the below checklist before each job. The person actually performing the check will initial the appropriate line next to each task performed. No item should be left blank. Initial "NA" if task was not performed. Use the comments section for any maintenance performed.**

| | | |
|---|---|---|
| 1. | TR | Material Coordinator to obtain and review the loadout with Service Coordinator. Verify loadout calculations and additive concentrations. |
| 2. | TR | Inventory the materials to ensure there is enough to complete the job. |
| 3. | TR | Complete the Acid Plant Blend Sheet (FO-GOM-HAL-SCS-249). Ensure it is checked for accuracy by co-worker. |
| 4. | TR | Perform JSA and review SDS with all personnel involed with the mixing and shipping process. |
| 5. | TR | Ensure the blend tubs have been flushed before loading to eliminate cross contaminating blends. |
| 6. | TR | Run pilot test on all acids to be blended. This will be used to check the titration of HCL blends. |
| 7. | TR | Mix acids / materials in the chemical plant blenders. Ensure all air actuators are working properly and visually inspect to ensure that the correct chemical is being pumped. |
| 8. | TR | Draw a sample of the blend from each blend. Titrate then document results on acid plant blend sheet. NOTE: Document the sample for each batch. |
| 9. | TR | If applicable, pressure test vessel transfer hose to 15 psi before starting transfer. |
| 10. | TR | After transfer is complete, blow transfer hose down with air to ensure the chemical is out of the hose. Ensure camlock plugs/caps are installed after the hose is disconnected. |
| 11. | TR | Flush eductor and system after job is complete with water. Ensure all valves are closed. (i.e. eductor, blender suction) |

**COMMENTS**

Signature:

*a) Mr. Perry and his co-workers never reviewed the SDS sheets for FE1A or FE10 prior to starting work. They were also never provided with the technical bulletins for each product, which contained much more information about the hazards of each chemical.*

*b) Mr. Perry and his coworker were never provided with the document presented below, which showed a blending order. They were not told that the order of addition of chemicals was critical to safety. Had this information been communicated, it is probable that Mr. Perry would not have been injured.*

Mixing order

1. Water or base fluid
2. Dry adds
3. Inhibitors
4. Surfactants and Additives
5. FE-1A
6. Acid HCL or Formic
7. Cla-Sta FS if needed
8. AF if needed

*c) Mr. Perry and his coworker were never provided with instructions for conducting a pilot test. This is given as standard operating procedure when mixing is done in the acid plant. Had this been done, (i.e., mixing some very small test batch), the violent reaction would have been observed and Mr. Perry and his coworker would have had an opportunity to prevent further blending under the same conditions of larger quantities. Failure to provide this kind of instruction lead directly to Mr. Perry's injuries.*

**C. Halliburton did not implement its own "5 to Go" safety program correctly for the blending operations**. On the day of the accident, the form used for this activity was inconsistent with other documents related to this process. In the form below, it is indicated that Check 3 and Check 4 were not performed. If this process had been performed properly and according to the intent of this program, the risks related to the tasks assigned to Mr. Perry would have been identified, including the sequence for blending. There could have also been additional safeguards put into place to prevent his injuries. Halliburton's failure to implement its own program was a direct cause of Mr. Perry's injuries.

Owner: PE GOM Quality Manager FO-GOM-HAL-SCS-114

**Daily Safety Meeting Form**

| Days Since Last Accident: | | We have worked ______ days since our last Lost Time Accident. | | | | | |
|---|---|---|---|---|---|---|---|
| Date: | 4/22/2023 | Location: | N/A | Job Site Leader: | B. Harris | Safety Monitor: | N/A |
| Well: | N/A | OCSG: | N/A | Rig: | N/A | Co. Rep.: | N/A |

Attendance required by all involved in tasks at the location/job site (if *not* participating, Note N/A and explain why):

THIS CERTIFIES THAT I HAVE ATTENDED THE DAILY SAFETY MEETING AND ABIDE BY THE CONDITIONS OF THIS REPORT

| EMPLOYEE NAME | EMP NO. | Time In / Time Out | EMPLOYEE NAME | EMP NO. | Time In / Time Out |
|---|---|---|---|---|---|
| S. Colson | 677423 | | | | |
| L. Map | 701524 | | | | |
| | | | D. B[illegible] | 583884 | |
| | | | | | |
| | | | | | |
| B. B[illegible] | 649491 | | | | |
| | | | L. Perry | 665991 | |
| | | | | | |
| J. Wilson | 461203 | | [illegible] | 428814 | |

*Attach Confirmation of communication page if more attendees are required.*

Value Moment Topic:

5 Checks to GO

Requires engagement of all team members in an open-ended conversation - "Walk me through"

| | |
|---|---|
| Check 1<br>Review Plan | Work Instructions, Core JSA. Tasks, Roles, Responsibilities. Communication - Radios, Hand Signals, Signage. Personnel and Process Safety. |
| Check 2<br>Verify Readiness | Walk Area (level, clear path, housekeeping, red zones). Check Equipment (Damage, certs, calibration, tested, rated, backup). Simultaneous Operations - beside, below, above |
| Check 3<br>What's Different | Ask team questions using 10 key hazards and SQ Categories. Identify additional risks, controls, individual responsible, update JSA. |
| Check 4<br>Validate Controls | Are the most effective controls in place and verified - Elimination, Substitution, Engineering |
| Check 5<br>Final Check | Final walk the line - contingencies, emergency response plan. 100% ready to go. |

| | | Check 1 | | Check 2 | | Check 3 | | Check 4 | | Check 5 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Communication / Activity detail | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| 1 | Load For HESS | x | | x | | | x | | x | x | |
| 2 | | | | | | | | | | | |
| 3 | | | | | | | | | | | |
| 4 | | | | | | | | | | | |

**5.2 Halliburton Failed to Comply with Nationally Recognized Codes & Standards and its own internal standards related to chemical safety. These failures led directly to the incident that injured Mr. Perry.**

**i) Failure to comply with NFPA 30 – Flammable Liquids Code**

*NFPA 30 provides safety guidelines for preventing explosions and fires related to the handling of flammable liquids. Halliburton's FE1A has a flashpoint of 103F. Liquids with flashpoints less than 140F are classified as flammable liquids. NFPA 30 requires bonding and grounding to avoid having electrical charges become an ignition source when handling flammable liquids.*

*Halliburton's investigation document states that this kind of protective bonding and grounding was not done. This Halliburton failure exposed Mr. Perry and his coworker to additional risks of injury and was further evidence of a lack of basic safety practices at this facility.*

**ii) Failure to comply with OSHA, SDS sheet, and internal standards requiring PPE and access to safety showers.**

Halliburton had a duty to protect workers from hazards identified in its risk assessment. Halliburton's risk assessment identified the need to review the SDSs for the chemicals being handled to validate that the proper protections were being provided. SDS sheets for FE1A and FE10 identified the need for specific PPE and access to flushing water and safety showers.

**Required access to safety showers were not provided.**

Halliburton failed to provide immediate access to safety showers. The delay in accessing this equipment made Mr. Perry's injuries more severe. OSHA cited Halliburton with a serious violation for this failure as follows.

29 CFR 1910.151(c): Where employees were exposed to injurious corrosive materials, suitable facilities for quick
drenching or flushing of the eyes and body were not provided within the work area for immediate emergency use.
a) On or about April 21, 2023, south of the acid plant near the shipyard, employees were not provided with equipment capable of delivering quick drenching fluids to eyes and body while blending corrosive chemicals in a 5,400-gallon tank.

**PPE required but not provided**

Halliburton failed to provide all of the PPE required for the chemicals being handled. OSHA cited Halliburton with a serious violation for this failure, as follows. This lack of PPE caused more severe injuries to Mr. Perry.

29 CFR 1910.132(d)(1)(i): The employer did not select and have each affected employee use, the types of personal protective equipment that would protect the affected employee(s) from the hazards identified in the hazard assessment:
a) On or about April 21, 2023, south of the acid plant near the shipyard, employees were not provided with adequate PPE while blending corrosive chemicals in a 5,400-gallon tank.

**1. Chemical Goggles not provided**

Source of Requirement: FE1A and FE10 SDS sheets, OSHA, and risk assessments

**2. Fully Protective Chemical Resistant Clothing not provided**

Source of Requirement: OSHA, Risk assessments, and the SDS (Safety Data Sheet) for Halliburton FE10 states that the following PPE is required:

a. Fully protective chemical-resistant clothing. The only clothing provided to Mr. Perry was a partially protective apron. Complete "Fully Protective" clothing could have provided protection for over 95% of Mr. Perry's skin and prevented or greatly minimized his injuries.




**3. Respirator not provided**

Source of Requirement: FE1A and FE10 SDS Sheets. Halliburton exposed Mr. Perry to the. Inhalation of fumes from the chemical mixing process by requiring him to be positioned on top of the tank at the vent. Because of this, he should have been provided respiratory protection as described by the SDS sheets. The FE10 SDS document identifies the respiratory hazards associated with this product and the need for respiratory protection.

**Halliburton did not comply with its own internal standard for PPE.**

| **Title:** Personal Protective Equipment | | **HMS Document Number:** ST-GL-HAL-HSE-0701 | | |
|---|---|---|---|---|
| **Owner:** Global HSE/SQ | **Approver:** VP, HSE, SQ, and CI | **Rev Date:** 28-JUL-2021 | **Rev No:** 8 | **Page:** 1 of 6 |

4.2 Hazard Assessment and PPE Selection

The need for PPE shall be determined by considering various factors, such as performance of risk assessments and job safety analysis required to be performed, conditions present, duration of use, and the hazards and potential hazards identified in accordance with ST-GL-HAL-HMS-503 HSE and SQ Risk Management. The assessment shall include but not be limited to the following hazards:

A Skin contact with or inhalation of hazardous chemicals (e.g., particles, fibers, vapors, mists)

B Skin contact with extreme temperature (heat and cold) sources

C Impact with dropped objects, sharp objects, and rolling objects that may cause injuries by impact, penetration, and compression

D Noise

E Nonionizing radiation (e.g., visible light, ultraviolet radiation, infrared radiation)

PPE shall be of safe design and construction and shall comply with specifications established by a third-party standard-setting body such as ANSI, NFPA, NIOSH, or other similar regional, country, or international standard-setting organizations.

i) Halliburton failed in its duty to perform a risk assessment that would have identified all of the PPE required for conducting blending operations in the 5400-gallon vessels with no instrumentation or engineering controls. The blending operation risk assessments for this kind of work at the acid plant were not in accordance with generally accepted industry guidelines. This led to failures in selecting PPE that would have provided more protection for Mr. Perry. This lack of protection led directly to Mr. Perry's injuries and their severity.

4.3 Eye and Face Protection

Employees shall wear eye or face protection in accordance with GD-GL-HAL-HSE-0701 when exposed to flying particles, molten metal, liquid chemicals, acids or caustic liquids, chemical gases or vapors, or potentially injurious light radiation.

Employees who wear prescription eyewear must either wear approved prescription safety glasses (ANSI Z87.1 or CAN/CSA – Z94.3M approved) with side shields or wear approved eye protection over their prescription lenses that will not disturb the proper position of the prescription lenses.

Clear lenses shall be worn at night or when working indoors unless a specific task requires shading/filtering.

ii) Mr. Perry was not provided with chemical goggles. This was identified as a requirement in the OSHA citation and was a requirement of Halliburton's own internal PPE standard.

**Halliburton's PPE standard is not adequate. It does not consider or make provisions for protective clothing related to chemical exposures. The company provides NO guidance for this hazard for its workers. This is another management-related process safety failure by Halliburton that led directly to Mr. Perry's injuries.**

4.9 Protective Clothing

FRC meeting the test requirements of NFPA 2112 or other recognized similar regional, country, or international standard-setting organizations shall be worn at all operations supporting well site activity where there is a flash fire risk. FRC shall be worn when working with energized electrical conductors or circuits operating at 50 volts or greater (refer to ST-GL-HAL-HSE-0409 – *Electrical Safety* for proper hazard class).

Where workplace conditions require the use of FRC, it shall be the outermost layer of clothing (refer to Appendix B—Table 2 in GD-GL-HAL-HSE-0701 – *Personal Protective Equipment*).

FR raingear shall not be worn over non-FRC as a substitute for FRC.

FRCs shall have one reflective stripe on the lower sleeve to easily distinguish them from non-FR red coveralls, which must have two reflective stripes on the lower sleeve. Reflective tape shall be made of FR material.

FRC shall conform to company branding requirements (refer to Halliburton Branding webpage).

Laundering of FRC shall follow the garment manufacturer's instruction (refer to WM-GL-HAL-HSE-0701 – *Laundering FRC* for additional laundering information).

iii) The SDS sheets for the FE1A and FE10 call for fully protective chemical-resistant clothing. This concept is not recognized in Halliburton's corporate standard for PPE, which does not address chemical hazard protection. The lack of more complete protective clothing made Mr. Perry's injuries more severe.

**5.3 Halliburton failed to provide workers and supervisors with the required training in accordance with its published policies and program standards. This lack of key knowledge and skills led directly to the incident that caused Mr. Perry's injuries.**

Halliburton's lack of training for Mr. Perry, his work partner on the day of the incident, and his supervisor led directly to Mr. Perry's injuries.

i) Halliburton was not compliant with its own internal standards for required training. Halliburton's hazard communications program required the training indicated below.

| **Title:** Hazard Communication Program - 54 N. Doucet Road | | **HMS Document Number:** PRO-GOM-HAL-HSE-0501H | | |
|---|---|---|---|---|
| **Owner:** HSE - Gulf of Mexico | **Approver:** QHSE Region Manager | **Rev Date:** Sept 28, 2021 | **Rev No:** 3 | **Page:** 1 of 15 |

**8. Training**

Before an employee begins their job or are exposed to new hazardous chemicals, employees must attend a hazard communication training that covers the following topics:

- An overview of the requirements in OSHA's Hazard Communication Standard.
- Hazardous chemicals present in their workplace.
- Any operations in their work area where hazardous chemicals are used.
- The location of the written hazard communication plan and where it may be reviewed.
- How to understand and use the information on labels and in Safety Data Sheets.
- Physical and health hazards of the chemicals in their work areas.
- Methods used to detect the release of hazardous chemicals in the work area.
- Steps we have taken to prevent or reduce exposure to these chemicals.
- Emergency procedures to follow if an employee is exposed to these chemicals.
- How employees can protect themselves from exposure to these hazardous chemicals through use of engineering controls/work practices and PPE. e.g.:
  - PPE requirements and its proper use and maintenance
  - Work practices or methods to assure proper use and handling of chemicals
  - Procedures for emergency response.
- An explanation of any special labeling present in the workplace.
  - What are pictograms?
  - What are the signal words?
  - What are the hazard statements?
  - What are the precautionary statements?
- Where the "Right to Know" stations and SDS's are located and how to read and interpret the information on both labels and SDS's as well as how employees may obtain additional hazard information.

Facility management is responsible for ensuring that employees receive this training. After attending the training, employees will sign a form verifying that they understand the above topics and how the topics are related to our hazard communication plan.

Mr. Perry, his work partner, and the supervisor were either not trained, did not receive adequate refresher training, and/or were not trained effectively in relation to at least the issues identified in the arrows above. Evidence of this includes the following:

a) Lack of understanding of physical and health hazards
The team, “Mr. Perry, his work partner, and the supervisor” did not understand the reactivity hazard of mixing FE1A and FE10. Even when another employee directly told the supervisor he did not accept or process this information correctly. This lack of training was a direct cause of Mr. Perry’s injuries.

b) Emergency procedures to follow in the case of an exposure
Halliburton’s records indicated that safety showers were unavailable directly at the site. This was the subject of one of the OSHA citations. This shower's lack of immediate availability resulted in Mr. Perry’s injuries being more severe than they otherwise would have been.

Citation 1 Item 1 Type of Violation: **Serious**

29 CFR 1910.151(c): Where employees were exposed to injurious corrosive materials, suitable facilities for quick drenching or flushing of the eyes and body were not provided within the work area for immediate emergency use.

a) On or about April 21, 2023, south of the acid plant near the shipyard, employees were not provided with equipment capable of delivering quick drenching fluids to eyes and body while blending corrosive chemicals in a 5,400-gallon tank.

Showering and flushing with water after the event was not for the length of time recommended on the SDSs for the FE1A and FE10 chemicals in use. This lack of following the proper procedures made for more severe injuries to Mr. Perry.




c) How employees can protect themselves from exposure
Allowing employees to be on top of the 5400-gallon tank during mixing near a vent opening is certainly not a way to protect oneself from exposure. This positioning, suspending containers from cranes for pouring, and manually connecting and disconnecting hoses increased the risk when performing this blending task. The positioning near the tank vent, lack of information about blending order and hazards, and correct PPE contributed directly to Mr. Perry’s exposure and injuries.

d) PPE requirements and its proper use and maintenance
No record was provided of Mr. Perry having received PPE training. The PPE he was provided did not include chemical goggles, fully protective chemical-resistant clothing, or any respiratory protection. This lack of training regarding PPE was a factor in Mr. Perry's lack of protection and the direct cause of his injuries and their severity.

e) Work practices or methods to ensure proper use and handling of chemicals.
Mr. Perry and his work partner were not provided with a sequence to install the chemicals and perform the blending. Halliburton's own investigation report identified this lack of instruction as the root cause of the incident that directly caused Mr. Perry's injuries.

> **9. Employees Performing Non-Routine Tasks**
>
> Before employees perform special or non-routine tasks such as cleaning tanks, entering confined spaces, etc. that may expose them to hazardous chemicals, their supervisors will inform them about the chemicals' hazards.
>
> Their supervisors will also inform them about how to control exposure and what to do in an emergency. The supervisor will evaluate the hazards of these tasks and provide appropriate controls including Personal Protective Equipment all additional training as required.

ii) Halliburton did not provide special training to employees performing non-routine tasks. Mr. Perry was blending chemicals in the 5400-gallon tank for the first time. This was certainly a non-routine event. It was so non-routine that Halliburton had no risk assessment or detailed work instructions for performing such a task. Mr. Perry's supervisor had a duty to inform him about how to control any exposure, what to do in an emergency, and to provide him with the proper PPE and additional training. Halliburton, in its own investigation report, identifies that the supervisor did not understand that the FE1A and FE10 were reactive. Halliburton again failed in its overall chemical process safety management system and did not comply with its requirements for training supervisors and making sure they possess the knowledge and skills to be able to perform in accordance with Halliburton's published policies.

**Halliburton's lack of training in accordance with its own policies and internal standards extended to non-compliance with "Hazard Communication":**

| **Title:** Hazard Communication | | **HMS Document Number:** ST-GL-HAL-HSE-0501 | | |
|---|---|---|---|---|
| **Owner:** Director HSE/SQ | **Approver:** VP, HSE and SQ | **Rev Date:** 29-NOV-2021 | **Rev No:** 6 | **Page:** 1 of 6 |

4.3 Hazard Communication Program Documentation

4.3.1 The Hazard Communication Program shall:

A Be documented and maintained as a controlled document (e.g., HMS work method)

B Be made available to all employees required to work in areas where hazardous chemical products and substances are present

C Conform to the following criteria:

I Contain a listing of all hazardous chemical products and substances present in the workplace

II Describe the means of providing and using SDSs

III Describe the means to ensure that containers are labeled

IV Describe the means to provide employees with training regarding hazardous chemical products and substances

V Describe the hazardous properties of the hazardous chemical product or substance with which the employees work

VI Describe safe handling procedures

VII Describe measures employees must take to protect themselves from these chemical hazards

VIII Describe steps to help ensure that employees are informed of the chemical hazards associated with performing nonroutine tasks (e.g., cleaning tanks or entering confined spaces) and the hazards associated with chemicals in unlabeled pipes

iii) Halliburton's training program did not provide employees with training regarding all of the hazards related to the chemicals they were working with, including blending operations. Halliburton's hazard communication program was supposed to "Describe the means to provide employees with training regarding hazardous chemical products and substances." This did not happen. If Mr. Perry, his work partner, and the supervisor had been properly trained on the reactive hazards of the chemicals being mixed, Mr. Perry would not have been injured.

**5.0 Training**

5.1 Initial Training

5.1.1 At the time of initial employment, all employees shall complete hazard communication training in Learning Central (Course 8054).

5.1.2 At the time of assignment to a new workplace, all employees must review the SDSs for all hazardous chemical products and substances handled in each work area to which they are assigned.

5.2 Refresher Training

5.2.1 Refresher training shall occur as follows:

A As needed when identified by observing employee practices, inspections, audits, or incidents

B Whenever a new or more severe chemical hazard is introduced into the work area for which the employees have not previously received training

5.2.2 Training records of required training shall be documented, maintained, and made available upon request.

iv) Halliburton did not provide refresher training for Mr. Perry as required when introducing a more severe chemical hazard. Mr. Perry was assigned to a new work task he had never done before involving blending FE10 for the first time in the 5400-gallon tank. Halliburton failed in its duty, according to its own internal hazard communications program, to provide refresher training regarding the hazards associated with this work. This lack of training was the direct cause of Mr. Perry's injuries.

**Halliburton's overall management team and system of governance failed to provide compliant programs and work practices at this site, which was the direct cause of Mr. Perry's injuries.**

**8.0 Appendix**

| Personnel Type | Responsibility |
|---|---|
| HSE functional personnel | Communicating the requirements of this standard and any additional governmental HSE regulations to management in their area of responsibility |
| | Ensuring that training meets the requirements of this standard and any related governmental regulations |
| | Developing communications and training to alert employees when a new or more severe chemical hazard is introduced into the workplace |
| Management | Communicating the requirements of this standard, and coordinating employee training as applicable in this standard |
| | Identifying and ensuring that employees complete the required training and adhere to the requirements of this standard |
| | Confirming that only employees who meet the requirements specified in this standard are involved in the activities described in this standard |
| | Ensuring that contractors have complied with the requirements of ST-GL-HAL-HSE-0605 – *Contractor/Sub-Contractor Safety* |
| | Ensuring that training is provided to workers about potential hazards to which they could become exposed, and providing alerts to workers for new hazards introduced in the workplace |
| | Ensuring that the facility handling hazardous chemical substances or products has a Hazard Communication Program coordinator assigned to administer an up-to-date Hazard Communication Program that meets the minimum requirements of this standard and any additional governmental regulations (refer to GD-GL-HAL-HSE-0501 – *Guideline: Hazard Communication Program*) |

v) Halliburton's management team failed to implement its own hazard communication program training. Halliburton assigns responsibility to its management team to ensure that employees receive the required training and adhere to the training requirements. Mr. Perry did not receive the proper training, and employees at this site did not adhere to the internal Halliburton "Hazard Communications" standard requirements. This Halliburton failure was the direct cause of Mr. Perry's injuries. If Halliburton had corporate governance programs that made for effective periodic auditing of this program and validation of knowledge and skills transfer in its training, Mr. Perry's injuries could have been avoided.

**The Halliburton training records provided for Mr. Perry do not indicate PPE training, as required by the company's internal PPE standard.**

| **Title:** Personal Protective Equipment | | **HMS Document Number:** ST-GL-HAL-HSE-0701 | | |
|---|---|---|---|---|
| **Owner:** Global HSE/SQ | **Approver:** VP, HSE, SQ, and CI | **Rev Date:** 28-JUL-2021 | **Rev No:** 8 | **Page:** 1 of 6 |

**5.0 Training**

5.1 Initial Training

Employees shall complete web-based training course (00008032) – Personal Protective Equipment (PPE) Overview.

5.2 Refresher Training

Employees in job roles that require daily use of PPE shall complete refresher training every 3 years. Web based training course (00008032) – Personal Protective Equipment (PPE) Overview.

vi) There was no record provided that Mr. Perry ever received initial PPE training or the 3-year refresher training required for PPE. Proper selection and use of PPE is critical to worker safety. Mr. Perry's injuries were made worse by the fact that he did not have PPE such as chemical goggles, fully protective chemical-resistant clothing, or respiratory protection.

**8.0 Appendix**

| Personnel Type | Responsibility |
|---|---|
| HSE/SQ functional personnel | Communicating requirements of this standard and any additional governmental HSE regulations to management in their area of responsibility |
| | Ensuring training meets requirements of this standard and any related governmental regulations |
| Management | Communicating requirements of this standard, and coordinating employee training as applicable |
| | Identifying and ensuring that employees complete required training and adhere to the requirements of this standard |
| | Confirming that only employees who meet the requirements specified in this standard are involved in the activities described in this standard |
| | Ensuring that the responsibilities and authorities of all individuals involved within HSE are defined and understood at their respective levels within the organization |
| | Ensuring that contractors have complied with the requirements of ST-GL-HAL-HSE-0605 – *Contractor/Sub-Contractor Safety* |
| Employees | Complying with requirements of this standard and all applicable local/country safety standards |
| | Completing required training, and complying with the requirements set forth in this standard and any additional site-specific standards, regulations, or work methods |
| Contractors | Complying with requirements of this standard, or its equivalent, and all applicable local/country safety standards while working at Halliburton or customer properties/facilities |

**Appendix 1—Responsibilities**

vii) Halliburton failed to ensure that training standards for PPE were in compliance. Halliburton's overall management team and system of governance failed to provide compliant programs and work practices at this site. These Halliburton failures were the direct cause of Mr. Perry's injuries. The lack of required PPE training contributed directly to Mr. Perry's injuries.

**5.4 Halliburton failed to provide for basic protections required in their own SDSs and technical bulletins.** The FE1A and FE10 products are Halliburton products. Halliburton created the SDSs and technical bulletins. They should have better understood the hazards and how to work safely with these products than any other party. Despite this, they failed to follow their own requirements when handling these materials. These Halliburton failures lead directly to Mr. Perry's injuries.

**SDS documents describe specific hazards related to each chemical individually. The technical bulletins describe hazards related to the blending of these chemicals.**

**SDS Instruction Failures for FE1A and FE10.**

***FE1A SDS Failures***

i) Halliburton did not follow guidance for electrical bonding or grounding. This was required in the SDS and in NFPA 30 (Flammable Liquids Code). This is further evidence of Halliburton's systemic process safety management system failures. This failure could have resulted in a fire that could have caused greater harm to Mr. Perry and his coworkers.

**Precautionary Statements**

| | |
|---|---|
| **Prevention** | P210 - Keep away from heat, hot surfaces, sparks, open flames and other ignitio sources. No smoking.<br>P233 - Keep container tightly closed<br>P240 - Ground and bond container and receiving equipment.<br>P241 - Use explosion-proof electrical/ventilating/lighting/equipment<br>P242 - Use only non-sparking tools<br>P243 - Take action to prevent static discharges.<br>P260 - Do not breathe dust/fume/gas/mist/vapors/spray<br>P264 - Wash face, hands and any exposed skin thoroughly after handling<br>P270 - Do not eat, drink or smoke when using this product<br>P271 - Use only outdoors or in a well-ventilated area<br>P280 - Wear protective gloves/protective clothing/eye protection/face protection |
| **Response** | P301 + P330 + P331 - IF SWALLOWED: rinse mouth. Do NOT induce vomiting<br>P303 + P361 + P353 - IF ON SKIN (or hair): Take off immediately all contaminated clothing. Rinse skin with water [or shower].<br>P363 - Wash contaminated clothing before reuse |

**4. First Aid Measures**

**4.1. Description of first aid measures**

| | |
|---|---|
| **Inhalation** | If inhaled, move victim to fresh air and seek medical attention. |
| **Eyes** | Immediately flush eyes with large amounts of water for at least 30 minutes. Seek prompt medical attention. |
| **Skin** | In case of contact, immediately flush skin with plenty of soap and water for at least 30 minutes and remove contaminated clothing, shoes and leather goods immediately. Get medical attention immediately. Remove contaminated clothing and launder before reuse. Destroy or properly dispose of contaminated shoes. |
| **Ingestion** | Do NOT induce vomiting. Give nothing by mouth. Obtain immediate medical attention. |

ii) Halliburton did not provide any respiratory protection for Mr. Perry or his coworker even though they were positioned atop the 5400-gallon tank near an opening exposed to fumes.

iii) Mr. Perry and his coworker were not provided with chemical goggles or "fully protective" chemical-resistant clothing. The only clothing provided to Mr. Perry was a partially protective apron.

***FE10 SDS Failures***

**FE-10** **Revision Date:** 14-May-2019

**Hazard Pictograms**



iv) FE10 identifies respiratory hazards in an even more emphasized manner than what is provided for FE1A. Despite this clear warning, Halliburton chose not to provide Mr. Perry or his coworker with respiratory protection.

**Halliburton failed to provide technical bulletins describing mixing hazards to Mr. Perry, which led directly to the incident and his injuries**.

Despite full knowledge and even being the authors of the technical bulletins describing the hazards of mixing FE1A and FE10, Halliburton chose not to provide these to Mr. Perry before the incident and fully inform him of blending hazards.

i) Halliburton's internal investigation report, (excerpts presented below), indicated that Technical Bulletins are not readily available for front-line employees. This means they are not afforded information about the severe consequences and dangers related to the reactivity and blending of FE1A and FE10.


IP1 opened valve to drain FE-10 into 5400 tank containing 124 gal of FE-1A.
IP1 monitored amount of FE-10 being drained from tote.
FE-10 and FE-1A were mixed together without the presence of water/base fluid
Crew did not understand the hazards of mixing FE-10 to FE-1A
JSA reviewed for loading 5400's did not cover hazards of mixing acids
Initial Risk Assessment controls for chemical exposure states to review SDS.
First time mixing with FE-10 in raw form
Does not state to review tech bulletins which include more specific hazard control guidance.
Most of crew members knew FE-1A was a reactive chemical with water.
Tech Bulletins for chemicals or blend were not reviewed during planning discussions.
Loadout Sheet does not provide the order of additives, and does not include any warning statements.
Tech Bulletins are not readily available for front line employees.
Loadout Sheet does not include adding clayfix to 5400 tank first.




ii) Halliburton's Technical bulletins describe and warn in detail about the reactivity and severe danger that result from blending FE1A and FE10. This information was not made available to Mr. Perry and his coworker.

Halliburton's technology bulletin for FE1A identifies the scenario that directly caused Mr. Perry's injuries and warns against the blending actions. The document warns against mixing FE1A with HCl (hydrochloric acid). FE10 contains from 10-30% HCl. The document states, "An eruption of the acid blend from the container can occur". Halliburton's technical bulletin also

states that “Catalysts, such as HCl acid or possibly rust(iron oxides), can also cause a rapid hydrolysis reaction. When this reaction is initiated, it will generally proceed rapidly. Sufficient heat can build up to turn the water into steam that can produce a vigorous spewing of the liquid contents from an unsealed container. If the container is sealed, the pressure increase within the container can result in an explosion.”

This reaction occurs with certainty under the conditions that existed with these chemicals on the day of the incident. The reaction generated considerable heat, which boiled the water associated with the chemicals. When water changes phases from a liquid to a vapor it expands in volume by more than 1,600 times in milliseconds. This tremendous instantaneous volume increase launched the chemicals out of the 5,400-gallon tank, injuring Mr. Perry and his coworker.

No.: SMA-01-003-B
Date: 11/29/2012

**Technology Bulletin** HALLIBURTON

**Preparing Acid Blends Containing Fe-1A**

A temperature rise will occur when Fe-1A is added to water or a solution containing water. If the following rules are followed, potential problems caused by a catastrophic temperature rise can be avoided:

- To prevent a dangerous rise in temperature, make sure that the volume of water (or water-containing solution) is large enough to absorb the heat generated by the reaction of the Fe-1A with the water.
- Follow the instructions contained on HalWorld for the preparation of any treatment fluids in which Fe-1A is used as the source of acetic acid. These treatment fluids include MSA™ multiservice acid, Fe acid, and the MOD acids. Some temperature rise may occur during the preparation of these fluids, but it should be limited to about 40°F (22°C).
- If a nonstandard treatment fluid is being prepared or if Fe-1A is being used for some other purpose, always add the Fe-1A to the water (or water-containing solution). Never add water (or a water-containing solution) to the Fe-1A. The Fe-1A should not be added to a solution in which the final Fe-1A proportion will be greater than 30%. A solution of two parts water and one part Fe-1A can be expected to rise approximately 41°F (23°C) when the reaction of the acetic anhydride with the water occurs. Higher percentages of Fe-1A will result in greater temperature increases.
- **Do not add Fe-1A directly to concentrated HCl Acid.** Adding Fe-1A directly to 20°Be or 22°Be HCl acid (or other concentrated HCl acid mixtures) can result in a rapid rise in temperature and production of excessive amounts of HCl acid vapor. An eruption of the acid blend from the container can occur. Always avoid direct mixing of these concentrated acids.
- **Do not preblend Fe-1A with other additives.**

**6.0 Signature of This Reports Author:**

(PTS) Prescient Technical Services LLC. Hereby certifies that the expressed opinions and conclusions have been formulated with a reasonable degree of professional certainty. They are based upon all of the information known by PTS as of the time this report was issued, as well as the author’s knowledge, skill, experience, training, and/or education. The author of this report reserves the right to edit, amend, alter, or modify this report in any manner based on any additional information or evidence that is provided that might change the opinions or conclusions contained in this report.

John R. Puskar

John R. Puskar, P.E., President Prescient Technical Services, LLC.
Date: 6/28/2024

**ANNEX – The following materials were reviewed in the preparation of this document.**

Landon Perry 4096774
Haliburton Production HESI001 [HESI_1-1249] - Natives & PDFs
DATA
NATIVES
NATIVES001
PDF

Haliburton Production - HESI001 [HESI_1-1249] - Natives & PDFs

HESI_00000001.pdf
HESI_00000057.pdf
HESI_00000071.pdf
HESI_00000053.pdf
HESI_00000081.pdf
HESI_00000092.pdf
HESI_00000088.pdf
HESI_00000093.pdf
HESI_00000094.pdf
HESI_00000095.pdf
HESI_00000062.pdf
HESI_00000105.pdf
HESI_00000115.pdf
HESI_00000135.pdf
HESI_00000096.pdf
HESI_00000375.pdf
HESI_00000120.pdf
HESI_00000385.pdf
HESI_00000386.pdf
HESI_00000387.pdf
HESI_00000394.pdf
HESI_00000395.pdf
HESI_00000002.pdf
HESI_00000399.pdf
HESI_00000388.pdf
HESI_00000401.pdf

HESI_00000402.pdf
HESI_00000405.pdf
HESI_00000406.pdf
HESI_00000408.pdf
HESI_00000429.pdf
HESI_00000454.pdf
HESI_00000430.pdf
HESI_00000286.pdf
HESI_00000480.pdf
HESI_00000481.pdf
HESI_00000420.pdf
HESI_00000482.pdf
HESI_00000483.pdf
HESI_00000484.pdf

HESI_00000485.pdf
HESI_00000486.pdf
HESI_00000487.pdf
HESI_00000488.pdf
HESI_00000489.pdf
HESI_00000491.pdf
HESI_00000499.pdf
HESI_00000501.pdf
HESI_00000493.pdf
HESI_00000514.pdf
HESI_00000505.pdf
HESI_00000516.pdf
HESI_00000518.pdf
HESI_00000545.pdf

HESI_00000547.pdf
HESI_00000546.pdf
HESI_00001064.pdf
HESI_00000519.pdf
HESI_00001074.pdf
HESI_00000525.pdf
HESI_00001078.pdf
HESI_00001077.pdf
HESI_00001081.pdf
HESI_00001065.pdf
HESI_00001118.pdf
HESI_00001104.pdf
HESI_00001121.pdf
HESI_00001082.pdf

HESI_00001146.pdf
HESI_00001123.pdf
HESI_00001147.pdf
HESI_00001159.pdf
HESI_00001154.pdf
HESI_00001160.pdf
HESI_00001162.pdf
HESI_00001166.pdf
HESI_00001168.pdf
HESI_00001169.pdf
HESI_00001170.pdf
HESI_00001173.pdf
HESI_00001171.pdf
HESI_00001186.pdf

- HESI_00001184.pdf
- HESI_00001187.pdf
- HESI_00001174.pdf
- HESI_00001193.pdf
- HESI_00001188.pdf
- HESI_00001212.pdf
- HESI_00001205.pdf
- HESI_00001208.pdf
- HESI_00001213.pdf
- HESI_00001214.pdf
- HESI_00001195.pdf
- HESI_00001235.pdf
- HESI_00001221.pdf
- HESI_00001249.pdf

