# Exhibit 2

3D Marine USA Inc

Exhibit

B

exhibitsticker.com

July 29, 2024 Our Ref.: AZA/D240669/ESO/24L

AZA Law Firm
1221 McKinney, Suite 2500
Houston, Texas 77010

Attn: Mr. Rey Flores

RE: C.A. No. 4:23-cv-04441; *Landon Perry vs. Halliburton Energy Services, Inc.*; In the U.S. District Court for the Southern District of Texas Houston Division.

Dear Sir,

At your request, 3D Marine Consultants have reviewed the following documentation concerning the above captioned case:

1) Bates Documents produced by Halliburton HESI 1-1249;

2) Declaration of Andrew Hasemann, Halliburton Region Manager, with exhibits.

3) Plaintiff's expert witness report, Captain Jeffrey Perlstein, dated 25 June 2024

4) Plaintiff's Original Petition, dated 20 October 2023.

After review of the above documentation, we report as follows:

Contd/…

I, Erik Oberlin hold an Unlimited Master's license and Unrestricted Offshore Installation Manager (OIM) license and have been employed in the marine industry since 1997. I received a BSc in Marine Transportation from Texas A&M University in 1997, as well as accepting a commission in the United States Naval Officer Reserves.

I have also sailed on Drill ships, DP Semi-Submersibles, Moored Semi-Submersibles, and VLCC crude tankers, in positions up to and including Master/OIM. During my time at sea, I gained considerable experience in managing the daily operations of a deep-water drilling vessel. This experience includes knowledge and skills managing workboat and helicopter operations, as well as drill floor, deck crane, and subsea work activities.

Additionally, I have experience in ship management, working as a corporate marine superintendent responsible for pre-hire vessel inspections of Offshore Supply vessels, Heavy-lift crane barges, Dredge vessels, chemical/oil tankers, Crew Boats, Harbor tugs, Multi-Purpose vessels, Well-Stimulation vessels, as well as fixed and Mobile Offshore Drilling units.

With experience as a USCG licensed Unlimited Master Mariner and Unrestricted Offshore Installation Manager, I have command experience inclusive of being a Senior Safety Leader and Supervisor in a variety of offshore marine and deck operations.

I also have considerable experience managing HR processes. While working for Seadrill and Rowan Companies as Offshore Installation manager, I worked closely with shore-based HR departments to manage the hiring, terminations, and annual performance reviews of marine and offshore employees, both foreign and domestic.

In addition, I have also been involved in several shipyard projects and vessel dry dockings, inclusive of shipyard and repair facilities located in Texas, Louisiana, Mississippi, California, Virginia, Hawaii, South Korea, and Singapore.

In my role as a marine superintendent, I have performed numerous pre-hire vessel inspections and SMS compliance audits, attending various ship types including work boats, crew boats, tugs, project, and construction vessels, tankers, MODUs, and Jack-up drilling rigs.

## A. Brief Description of Incident

In April 2023, Mr. Landon Perry was employed by Halliburton Energy Services as a ***Service Operator I-Sand Control***[1].

Mr. Perry had been employed by Halliburton Energy Services since 2019 as a Sand Control operator and had been based out of Halliburton's port facility in Fourchon, Louisiana.

On 22 April 2023, Mr. Perry was mixing some well stimulation chemicals in a 5,400-gallon tank for use in fracking operations at an offshore drilling site on the Outer Continental Shelf. The tank was located dockside at Halliburton's facility in Fourchon. The chemical mixing resulted in a reaction that resulted in Mr. Perry being injured with chemical burns on his body.

Following the incident, Mr. Perry has been receiving benefits as a Longshoreman[2].

Mr. Perry subsequently retained an attorney and filed suit against Halliburton Energy Services, for the alleged incident and alleged injuries.

## B. Vessel Particulars

| | |
|---|---|
| Name: | M/V STIM STAR III |
| Flag: | USA |
| IMO No.: | 9274991 |
| Year Built: | 2002 |
| Gross Tonnage: | 3191 t |
| Net Tonnage: | 957 t |
| Length: | 79.25 m |
| Breadth: | 17.0 m |
| Depth: | 6.4 m |




The M/V STIM STAR III is a Well Stimulation vessel used for injecting stimulation substances into oil or gas wells at sea.

A Well Stimulation vessel also known as an offshore support vessel (OSV) or oil/gas field service vessel, is a ship that injects stimulation substances into oil and gas wells to increase production. These vessels carry equipment and materials for procedures like hydraulic fracturing and acid stimulation, which

---

[1] Declaration of Andrew Hasemann Exhibit A-1
[2] Bates HESI 488, 591

involve injecting fluids into the well at high pressure to create fractures or dissolve materials. This allows more oil or gas to flow out of the reservoir and into the wellbore for extraction.

## C. Factual Background

Mr. Perry alleged he was injured while mixing chemicals on the Halliburton dock during rig-up preparations for an offshore fracking job for one of Halliburton's clients, Hess Corporation.

At the time of the alleged incident, Mr. Perry was employed as a ***Service Operator I-Sand Control*** by Halliburton Energy Services. Mr. Perry was experienced in his specialized role and had gradually been promoted up the Sand Control Operator job ladder from Operator trainee in 2019, to Assistant Sand Control Operator from 2020 to 2023, with subsequent promotion to Sand Control Operator in March 2023[3].

From the undersigned's career experiences in offshore drilling operations, a Sand Control Operator was sometimes referred to as a Fracking technician or Oil Service technician. Hydraulic fracturing, also known as "fracking", is a technique used to extract oil from deep underground rock formations. Fracking involves injecting a mixture of water, sand, and chemicals into a wellbore under high pressure to create fractures in the rock. These fractures allow the oil to migrate up the well and be captured.

To better understand the differences between the role of Fracking technicians, such as Mr. Perry, and the role of the dedicated Marine vessel crew on a Well Stimulation vessel, it is useful to briefly examine the history and background of Well Stimulation vessels and the maritime companies that own these vessels. Further, it is important to understand the relationship between Well Stimulation vessel owners/operators, such as Edison Chouest Offshore LLC, and the oil service companies, such as Halliburton Energy Services, who time-charter vessels (such as the M/V STIM STAR III).

### Edison Chouest Offshore LLC

Edison Chouest Offshore LLC (ECO) is a privately-owned company based in Galliano, Louisiana, USA, specializing in marine transportation and support services primarily for the offshore oil and gas industry.

ECO was founded in 1960 by Edison "Eddie" Chouest as Edison Chouest Boat Rental. In the early years, ECO provided vessels for charter and support services to oil and gas companies operating in the Gulf of Mexico. Over the decades, ECO expanded its fleet significantly, adding various types of vessels such as offshore supply vessels (OSVs), anchor handling tug supply (AHTS) vessels, platform supply vessels (PSVs), fast supply vessels (FSVs), and more specialized vessels like well stimulation vessels, icebreakers and subsea construction vessels.

Presently, ECO owns a substantial fleet of over 200 vessels operating globally. The company is involved in both vessel ownership and operations, specializing in providing marine transportation and support

[3] Bates HESI 483

services primarily for the offshore oil and gas industry. Beyond ownership, ECO also operates its fleet. This involves crewing, managing logistics, maintenance, and ensuring compliance with safety and environmental regulations. The company's operations are geared towards providing comprehensive and reliable services to its clients in the oil and gas industry. The crews which ECO provides with their time-chartered vessels are responsible for the safe navigation of the vessel, engine and deck maintenance, and operation and maintenance of required lifesaving appliances and emergency response equipment on board the vessel. Typically, the crew provided by ECO includes Masters, Mates, Chief Engineers, Assistant Engineers, Bosuns, Deckhands, Oilers, and Wipers.

***Nautical Ventures LLC***

Nautical Ventures LLC is a well-known marine retailer and distributor based in Florida, USA. It specializes in providing a wide range of marine products, including boats, yacht tenders, and related accessories.

Nautical Ventures and ECO are connected through a business relationship where Nautical Ventures serves as a distributor for certain products and services related to Edison Chouest Offshore operations.

From available owner data, we note that the Group Owner of M/V STIM STAR III is Edison Chouest Offshore LLC, and the Registered Owner is Nautical Ventures LLC.

A Group Owner typically refers to the company or entity that owns a group of vessels through various subsidiary companies or special purpose entities. In shipping, large companies often own and operate fleets of vessels under different subsidiaries or entities for various strategic, operational, or financial reasons.

The Registered Owner of a vessel is the legal entity or person whose name is officially recorded in the ship's registration documents with the relevant maritime authority (such as a flag state registry). This entity or person holds legal title to the vessel and is responsible for compliance with maritime regulations, safety standards, and financial obligations related to the ship.

ECO was identified as the owner in various amendments in the Time-Charter agreement, but as of the latest Time-Charter Amendment[4] No.12 dated 30 December 2022, Nautical Ventures has been identified as the owner.

[4] Declaration of Andrew Hasemann Exhibit A-7

***<u>Time Charter of Vessels</u>***

Offshore oil service companies typically do not own Well Stimulation vessels. Instead, these companies charter the vessels from vessel owners.

A time charter in shipping refers to a contractual agreement where the owner of a vessel leases out the use of the vessel to a charterer for a specified period of time. The charterer, in turn, pays hire (rent) to the owner for the duration of the charter agreement.

Review of evidentiary documents[5] reveals that the M/V STIM STAR III has been under time-charter to Halliburton Energy Services since 2002. The original time-charter agreement has been amended twelve times but has retained the same basic characteristics since the origin of the charter.

Maritime vessels chartered by oil service companies usually include dedicated marine crews, but the specific arrangements can vary depending on the type of charter and the vessel itself. Here are a few scenarios:

1. <u>Oil Service Company Vessels with Oil Service Company Crews</u>: Some oil service companies own and operate their own vessels (such as oil tankers, offshore supply vessels, or drilling rigs) and maintain dedicated marine crews for these vessels. These crews are typically employed directly by the oil service company or by a subsidiary.

2. <u>Owner Vessels with Owner Crews:</u> In this scenario, an oil service company charters a vessel from a third-party shipowner, and the third-party shipowner provides the crew.

3. <u>Owner Vessels with Third-Party Crews:</u> In this scenario, an oil service company charters a vessel from a third-party shipowner, and the third-party shipowner contracts with a crewing service company to provide the crew.

A review of the time-charter[6] (**Section 10**), reveals that at the time of the incident, the marine crew arrangement was in alignment with scenario No. 2 (*as described above*). Therefore, the Marine crew for the M/V STIM STAR III was provided by ECO or Nautical Ventures.

---

[5] Declaration of Andrew Hasemann Exhibit A-7
[6] Declaration of Andrew Hasemann Exhibit A-6, A-7

**10. MANNING OF VESSEL.**

When the Vessel is crewed for operations, OWNER will provide manning as required by U.S. Coast Guard in its Certificate of Inspection.

In the event that any consular official having authority to do so, or an officer or agent of any other government having authority to do so shall require the employment of any additional crew, and so notify CHARTERER and OWNER of that requirement, then OWNER shall employ such additional crew and CHARTERER shall pay to OWNER, in addition to hire at the applicable daily rate, the actual cost to OWNER of such additional crew, including payroll burden and travel, plus 10%.

OWNER shall man the Vessel and pay all costs in connection therewith (except those costs specifically agreed to be borne by CHARTERER in above paragraph), including wages and any fringe benefits, social security payments and taxes, unemployment contributions and taxes and all other taxes applicable to the employment of OWNER's crew.

***The Role of Specialized Oil Service Technicians***

It has been the undersigned's experience, from many years working offshore on Mobile Offshore Drilling Units (MODU) as both Master and Offshore Installation Manager and having participated in numerous fracking operations offshore on the Outer Continental Shelf, that Well Stimulation vessels operate with two different types of personnel during those operations.

The first category of personnel is the traditional marine crew that are typically found on vessels of all types out at sea, which includes both commercial shipping vessels and offshore oil and gas industry vessels. These individuals are required and necessary for the safe navigation of the vessel at sea regardless of the industrial mission of the vessel.

The second category of personnel are the specialized service technicians who typically provide specific, discrete, contract-based services to exploration and production companies. These technicians, who are typically employees of the oil service company (or Charterer), have a limited scope of involvement with the Well Stimulation vessel due to their specialized roles and job descriptions.

These personnel often possess specialized skills and expertise that are crucial for particular phases of offshore operations, such as spudding, drilling, well completions, well-stimulation, workovers, plug and abandonment, and decommissioning. Examples of job titles associated with this type of specialized work include engineers, technicians, divers, welders, and operators.

A specialized oil service technician, such as Mr. Perry, typically performs specific specialized tasks under an independent contractor agreement between his employer and an exploration and production company.

Projects can typically last a few days or sometimes for several days. However, when the vessel returns from sea, the vessel may or may not have another project lined up immediately. This is mostly due to the constantly changing schedules of offshore drilling projects.

It is the undersigned's experience, from many years of working on offshore drilling rigs, that oil and gas wells are rarely completed on time or in the sequence planned. Certain phases of a drilling program can change or be eliminated on short notice. This uncertainty in timing and schedule includes the phase of drilling when fracking is required for the well. Consequently, this implies that most Well Stimulation vessels often tend to operate in Standby mode and are not typically hired or engaged in any type of regular service.

The unpredictability of work and sailing schedules for Well Stimulation vessels is one of the reasons why vessel operators such as ECO and Nautical Ventures only provide core Marine crew for the vessel and do not employ specialized oil service technicians. It would not be economically viable or desirable for an entity such as ECO or Nautical Ventures to employ specialized oil and gas technicians on their vessel payrolls. A charterer such as Halliburton Energy Services provides these specialized technicians on demand as dictated by the needs of any particular fracking project.

Consequently, a Sand Control Operations technician, such as Mr. Perry, can easily be assigned to different projects or Well Stimulation vessels based on client demands and schedules.

## **Opinions and Discussion**

**Opinion No. 1:** Mr. Perry's job duties were typical of a fracking service technician and were not maritime in nature.

Mr. Perry was an employee of Halliburton Energy Services and, as of April 22, 2023, was performing the job duties of ***Service Operator I-Sand Control*** while dockside at the Port Fourchon facility or when on board the vessel during fracking operations being performed at offshore drilling sites. As Mr. Perry was not an employee of ECO or Nautical Ventures, he would not have been considered a part of the core marine crew.

As noted previously in this report, Mr. Perry's employment and work history with Halliburton consisted of a gradual progression in duties and responsibilities related to the specialized role of Sand Control Operator. Sand Control operations are an essential component of well production enhancement programs delivered by Oil Service companies such as Halliburton. The job functions of a Sand Control operator while operating under a Well Services Agreement contribute exclusively to the interests of the Charterer (Halliburton), and not to the benefit of a vessel owner.

A review of Mr. Perry's official Job Description[7] at Halliburton confirms the fact that his role in no way supported or contributed to the safe navigation and maintenance of the M/V STIM STAR III, or any

[7] Declaration of Andrew Hasemann Exhibit A-1

other vessel. His job function as Sand Control Operator while on board the vessel exclusively pertained to the operation of Charterer-provided equipment (i.e. Halliburton fracking equipment). Consequently, his job duties only served the interests of Halliburton.

<u>Duties and responsibilities described in Mr. Perry's Job Description include:</u>

- Performs or assists in all phases of the rigging up and down of Sand Control Service Line equipment on work locations for the purpose of providing Sand Control pumping services at the well site.
- Prepares materials and equipment (rig-up) on job site (blending materials, packing to ship to location).
- Rigs-up on location and prepares equipment for installation and service.
- Performs and operates equipment to run sand control services on the job site.
- Performs rigging down on a location of service line equipment and the cleanup, repair, and preparation of equipment for the next job.
- Performs PSL equipment function check at facility.
- Drives a truck or other assigned equipment as required.

Furthermore, a review of **Section 16** of the Time-Charter agreement reveals that the Charterer (Halliburton) paid for and was responsible for the operation and maintenance of its fracking equipment on board the vessel.

<u>Time-Charter Section 16 - Charter's Equipment</u>

All equipment used in CHARTERER's operations and by its personnel, agents, clients or subcontractors shall be maintained by and for the account of CHARTERER. CHARTERER shall pay, or reimburse OWNER for the cost of all dockage, wharfage, port charges, pilot's fees,

Accordingly, Mr. Perry's role while on board the vessel was contractually agreed to as being solely for the operation of Halliburton's fracking equipment, which only served the interests of Halliburton.

Although Mr. Perry was to travel on the M/V STIM STAR III for the contracted work offshore with Hess in April 2023, he apparently did not have a regular work history with the vessel prior to that time. Review of Mr. Perry's personnel records[8] reveals that he was on Leave of Absence for 13 months from January 2022 to February 2023 for military duty overseas. It is typically understood in the maritime industry that an individual with a similar work history can't be considered as being part of a permanent vessel crew. Vessels such as the STIM STAR III require regular attendance by crewmembers to function properly.

As noted previously, Mr. Perry and other Halliburton employees were to provide hydraulic fracturing services to Hess under a contract between Halliburton and Hess. As would be typical in the industry, these fracking services provided by Halliburton to Hess would be considered a discrete and unique project. The reason for this is because the development of fracking work scopes requires significant individualized analysis and engineering. Each oil or gas well on land or on the seabed has different

[8] Bates HESI 1170

parameters which necessitate specifically designed and engineered fracking programs for that well. This results in varying mixes and quantities of fracking chemicals planned for each well. Every fracking project is unique and executed differently from well to well. Fracking chemicals are pumped down-hole in measured and precise sequences. Consequently, the composition of specialized oil service operators and technicians sent out to perform fracking jobs will vary and change over time, depending on the needs of the project or the experience and capabilities of the specialized technicians.

Review of Mr. Perry's job description above highlights the fact that Mr. Perry provided discrete, contract-based services on a job-by-job basis. Additionally, the service he provided within the work scope for Hess was defined in the context of the ***Amended and Restated Well Services Agreement Between Hess Corporation And Halliburton Energy Services, Inc***.[9] Review of Article 6.1 of the service agreement shows that Halliburton was defined as an independent contractor. Consequently, Mr. Perry was providing services as an independent contractor for the job which Halliburton was performing for Hess.

> ***ARTICLE 6: RELATIONSHIP, PERSONNEL, AND VESTED SUB-AGREEMENTS***
> *6.1 Independent Contractor. Contractor is providing the Work as an independent contractor. Although Company has the right to oversee and inspect the performance of the Work in order to assess whether Contractor's performance is satisfactory, Contractor has complete direction and control over its own personnel and over the manner and method of performance of the Work. No instruction or direction of any kind given by the Company relieves Contractor of any obligation or liability as an independent contractor.*

It is the undersigned's experience that independent contractors typically are not considered permanent employees. It is understood within the Oil and Gas industry that independent contractors perform or deliver services on a contractual basis and as such are not engaged in regular or permanent assignments.

From this discussion, it is then apparent that there were two categories of personnel on board the M/V STIM STAR III. Each type served the management hierarchy and interests of their respective employers.

First, there was the essential Marine crew employed by ECO or Nautical Ventures. This Marine crew managed the safe navigation and maintenance of the vessel on a daily and continuous basis. They did not have any duties or responsibilities with respect to the operation or maintenance of Sand Control Line equipment. All Marine crew members ultimately reported to the Master of the vessel as part of their chain of command.

Second, there was the fracking operations crew employed by Halliburton. They rigged-up Sand Control pumping equipment on the dock or on the vessel prior to deployment offshore, and they performed the fracking fluids/sands pumping operations when the vessel was offshore and alongside a drilling rig. Technicians such as Mr. Perry pumped fracking fluids/sands directly into the oil/gas well. When the job was completed, they would return to the dock and rig-down the Sand Control line pumping equipment. They performed their services as independent contractors representing Halliburton.

[9] Declaration of Andrew Hasemann Exhibit A-3

We note that in this particular matter, Mr. Perry did not deploy to the Hess drilling rig offshore on 22 April 2023 due to his alleged injury that occurred on the dock prior to the STIM STAR III deployment to the Outer Continental Shelf.

Close inspection of the ***Cumulative Post-Job Summary*** **and** ***Event Log*** (*Andrew Hasemann Exhibits A-4 and A-5*), however, clearly demonstrates that Halliburton's fracking technicians played a significant role in the contracted fracking operations completed at the offshore Hess drilling site. They pumped fluids downhole as part of the exploration and production of minerals for several days, often involving numerous starts and stops as dictated by parameters of the operation. Event Log activities included rigging up equipment, connecting hoses, communicating with rig drilling personnel for coordinating increasing or decreasing pumping rates, switching tanks, adjusting chemical mix percentages, bleeding off pressure, and rigging down equipment.

To the extent that Mr. Perry had a connection to the vessel, that connection was for performing a specific discrete contract-based job specifically focused on the exploration, development, and production of minerals. He was not involved in the control of the vessel and was not permanently assigned to the vessel. His time on the STIM STAR III was simply a result of Halliburton's contract with a third party (Hess) and not the result of Perry's permanent assignment to the vessel.

Finally, it is noteworthy that hydraulic fracturing, or "fracking" is utilized both on land and at sea. The task of pumping fracking fluids/sands into oil/gas wells is performed on land and sea. As such, Mr. Perry's job specialization as a Sand Control Operator was not exclusive to the offshore Outer Continental Shelf or maritime applications. He could have just as easily completed his job duties on land. Several prominent oil and gas companies, such as ExxonMobil, Chevron, and Hess, have utilized fracking techniques across their land-based assets for several decades to achieve higher production rates, and Halliburton has been one of the foremost providers of fracking services for land operations.[10]

**<u>Opinion No. 2</u>**: Halliburton's time-charter of the MV STIM STAR III was typical in the offshore oil and gas industry, in that the vessel owner provided the Marine crew which had sole responsibility for the safe navigation and maintenance of the vessel.

The M/V STIM STAR III belongs to a substantial fleet of over 200 offshore support vessels owned and operated by Edison Chouest Offshore. Most of Edison Chouest's offshore support vessels are typically time-chartered to oil service companies.

As is often the case, oil service companies such as Halliburton are not in the business of hiring or managing Marine crews for vessels. It is not their core business. A company such as Halliburton provides specialized technical services in support of exploration, production and development activities across the oil and gas industry. These technical services are defined and allocated in highly structured Well Service Agreements.[11] The agreed upon services are delivered to clients on a contractual basis. Halliburton performs these services as an independent contractor. Halliburton is not in the business of owning or

[10] Hydraulic Fracturing (Fracking) | Council on Foreign Relations
[11] Declaration of Andrew Hasemann Exhibit A-3

managing vessels for profit. Halliburton time-charters vessels in order to facilitate the delivery of specialized technical energy-related services to its clients.

Review of **Section 22** of the time-charter agreement further demonstrates that there was a well-defined division of authority and management hierarchy for the members of the crew supplied by the owner (ECO or Nautical Ventures). As evidenced by the language in this section, it is clear that by definition, the Marine crew of the vessel were not to be considered employees of the Charterer (Halliburton). Consequently, Mr. Perry who was an employee of Halliburton could not possibly have been considered as a member of the Marine crew supplied by the Owner.

> ***22. RELATIONSHIP OF OWNER & EMPLOYEES TO CHARTERER.***
> *Neither OWNER nor its employees nor the master nor the members of the crew of the Vessel is or shall be held or construed to be servants, agents or employees of CHARTERER to any extent or for any purpose whatsoever.*

Andrew Hasemann, Halliburton's Region Manager[12] at the time of the alleged incident, also corroborates this finding. Paragraph 10 of his declaration reiterates the division of authority between vessel's Marine crew provided by the owner, and Halliburton employees while they were on board the vessel for fracking operations offshore.

> *10. Edison Chouest, as the owner and operator of the vessel, provided the captain and crew of the STIM STAR III and was responsible for all vessel navigation, operations, maintenance and repairs. Neither Perry nor the other Halliburton employees operating the Halliburton fracking equipment on the STIM STAR III were to engage in any of these functions on or for the vessel. Likewise, Edison Chouest had no management authority over Halliburton personnel, including Perry. Accordingly, Plaintiff took orders from Halliburton personnel and was not a part of the Edison Chouest crew.*

Review of the time-charter agreement between Edison Chouest and Halliburton reveals that a standard provision[13] was made for the owner Edison Chouest to provide the Marine crew of the vessel. Marine crews must possess the certification, knowledge, skills, and abilities to safely navigate, operate, and maintain vessels as per STCW Watchkeeping Standards promulgated by The International Maritime Organization (IMO)[14]. Close examination of Mr. Perry's training and credentials[15] reveals that he did not possess any training or certification related to navigating or maintaining a vessel such as the M/V STIM STAR III.

---

[12] Declaration of Andrew Hasemann Exhibit A
[13] Declaration of Andrew Hasemann Exhibit A-7 (Section 10)
[14] International Convention on Standards of Training, Certification and Watchkeeping for Seafarers, 1978 (imo.org)
[15] Bates HESI 401, 1212

Fracking technicians, such as Mr. Perry, who are temporarily on board a vessel like the STIM STAR III, deliver and execute specialized contractual services to offshore clients. At no time are fracking technicians, such as Mr. Perry, expected or permitted to contribute to the safe navigation or maintenance of the vessel. The structure and language of the time-charter agreement has clearly defined this arrangement and is typical of industry standards and best practices.

We reserve the right to amend or supplement these opinions should further information be made available.

Erik Oberlin
3D MARINE USA, INC.

*The opinions expressed in this report are based upon a review of the documentation provided. This report, including the opinions and analyses contained within, is the product of an application of the preparer's experience and knowledge in the context of the material provided in this matter and cannot be applied to other situations or incidents, no matter how similar they may be. Furthermore, this report does not attempt to resolve conflicts, nor is it intended to discredit witnesses or experts, and is produced bearing in mind that it is normal for conflicts to exist between the accounts of witnesses.*

Attachments:
- i) Resume (CV) Erik Oberlin
- ii) List of Papers authored by Erik Oberlin
- iii) Schedule of Fees